**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re: | **Case No.: 25-70001-JAD** |
| **WILSON CREEK ENERGY, LLC, *et al.,*[1]** | **Chapter 11** |
| Debtors. | *Jointly Administered* |
| **WILSON CREEK ENERGY, LLC, *et al.,*** | **Doc. No.:** |
| Movant, | **Related to Document No.** |
| v. | **Hearing Date:** |
| **KIA II, LLC; KEYBANK NATIONAL ASSOCIATION; LSQ FUNDING GROUP, L.C.; R&D SVONAVEC VENTURES, LLC; BILL MILLER EQUIPMENT SALES; CLEVELANDBROTHERS EQUIPMENT; AND PRIME ALLIANCE BANK, INC., as Assignee of WINGSPIRE EQUIPMENT FINANCE,** | **Hearing Time:** |
| | **Response Deadline:** |
| Respondents. | |

**DEBTORS' MOTION FOR ENTRY OF ORDERS (A) APPROVING SALE OF ALL OR
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) APPROVING BIDDING
PROCEDURES FOR SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS'
ASSETS, (C) AUTHORIZING THE DEBTORS TO DESIGNATE STALKING HORSE
BIDDER AND APPROVING PROPOSED STALKING HORSE BID PROTECTIONS,
(D) SCHEDULING AUCTION FOR AND HEARING TO APPROVE THE SALE OF THE
DEBTORS' ASSETS, (E) APPROVING FORM AND MANNER OF NOTICE OF SALE,
AUCTION, AND SALE ORDER HEARING, (F) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES, (G) AUTHORIZING ASSUMPTION AND
ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
<u>AND (H) GRANTING RELATED RELIEF</u>**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Wilson Creek Energy, LLC (6202); Wilson Creek Holding, Inc. (7733); Maryland Energy Resource, LLC (5299); Mincorp Acquisition Corp. (4858); Mincorp Inc. (5688); PBS Coals, Inc. (2413); Roxcoal, Inc. (3768); Quecreek Mining, Inc. (1745), Croner, Inc. (0529); Elk Lick Energy, Inc. (8551); and Corsa Coal Corp. (0027). The Debtors' address is 1576 Stoystown Road, Friedens, Pennsylvania 15541.

1

The debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), by and through their undersigned proposed counsel, file their *Motion for Entry of Orders (A) Approving Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (C) Authorizing the Debtors to Designate Stalking Horse Bidder and Approving Proposed Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* (the "<u>Motion</u>"),[2] pursuant to sections 105(a), 363, 364, 365, 503, and 507 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), requesting approval of the following:

a.  following entry of, and compliance with, the Bidding Procedures Order (as defined herein), entry of an order (the "<u>Sale Order</u>") authorizing and approving, the following, as applicable: (A) one or more sales of all or substantially all of the assets of the Debtors (as more particularly defined in the governing sale agreements, the "<u>Sale Assets</u>") free and clear of all liens, interests, Claims, and Encumbrances (other than any specifically assumed liabilities and permitted liens) to the fullest extent permitted by section 363(f) of the Bankruptcy Code (each, a "<u>Sale Transaction</u>" and collectively, the "<u>Sale Transactions</u>"); (B) the assumption and assignment of the Assumed Agreements (defined below) in connection with the Sale Transactions to the fullest extent permitted under section 365 of the Bankruptcy Code; and (C) granting related relief;

b.  establishing the below dates and deadlines for the sale process, subject to the Court's approval and availability:

---

[2] Capitalized Terms that are not otherwise defined in this Motion shall have the meaning attributed to them in the Bidding Procedures Order (as defined herein) or in the First Day Declaration (as defined herein), as applicable.

| Proposed Date | Milestone |
|---|---|
| **On or before January 23, 2025** | Bidding Procedures Hearing (subject to Court availability) |
| **On or before January 24, 2025** | Entry of Bidding Procedures Order (subject to Court availability) |
| **January 27, 2025** | Deadline to serve Notices |
| **February 17, 2025, at 4:00 p.m. (ET)** | Sale Objection Deadline and Contract Objection Deadline[3] |
| **February 21, 2025, at 4:00 p.m. (ET)** | Bid Deadline |
| **February 23, 2025, at 12:00 p.m. (ET)** | Deadline for Debtors to Designate Stalking Horse Bidder(s), Qualifying Bid(s), and Opening Bid(s) |
| **February 24, 2025, at 10:00 a.m. (ET)** | Auction |
| **As soon as practicable after completion of the Auction** | File and Serve Post-Auction Notice |
| **February 25, 2025, at 5:00 p.m. (ET)** | Deadline for Supplemental Objections[4] |
| **February 26, 2025, at _____ _.m. (ET)** | Sale Order Hearing |
| **On or before February 27, 2025** | Entry of the Sale Order |
| **On or before February 28, 2025** | Sale Closing |

      c.      entry of an order substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order") authorizing and approving, among other things, the bidding, auction, and sale procedures for the Sale Assets (including the Debtors' right to designate a Stalking Horse Bidder (as defined herein) and the proposed Bid Protections (as defined herein) afforded to the Stalking Horse Bidder if so designated by the Debtors) substantially in the form attached to the Bidding Procedures Order as **Exhibit 1** (the "Bidding Procedures");

---

[3] The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Sale Assets, with the exception of objections related to adequate assurance of future performance by a Successful Bidder (including a potential Stalking Horse Bidder if designated by the Debtors in accordance with the Bidding Procedures) and the conduct of the Auction.

[4] Supplemental Objections are objections related to adequate assurance of future performance of the Successful Bidder and the conduct of the Auction.

d.  scheduling an auction for the sale(s) of the Sale Assets (the "Auction") in accordance with the Bidding Procedures;

e.  scheduling a hearing to consider approval of Sale Transactions (the "Sale Order Hearing") and entry of one or more proposed Sale Orders;

f.  authorizing and approving the form of the Proposed APA (as defined herein) for the sale of all or substantially all of the Sale Assets, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**

g.  authorizing and approving the form and manner of notice of the Sale Transactions, the Auction, and the Sale Order Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 3** (the "Auction and Sale Notice");

h.  authorizing and approving, as applicable, the form and manner of notice to each Debtor counterparty (each a "Counterparty" and collectively, the "Counterparties") to a relevant executory contract or unexpired lease relating to the Sale Assets (collectively, the "Executory Contracts") regarding the potential assumption and assignment of such Executory Contracts (upon assumption, the "Assumed Agreements") and the Debtors' calculation of the amount necessary to cure any monetary defaults under such Assumed Agreements (the "Cure Costs"), substantially in the form attached to the Bidding Procedures Order as **Exhibit 4** (the "Contract Assumption and Assignment Notice");

i.  authorizing and approving the form and manner of notice following the Auction, which shall include (A) the applicable Successful Bid(s) and Backup Bid(s) (as such terms are defined below), and (B) the identity of the Successful Bidder(s) and Backup Bidder(s) (as such terms are defined below), substantially in the form attached to the Bidding Procedures Order as **Exhibit 5** (the "Post-Auction Notice"); and,

j.  granting related relief.

In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.  The United States Bankruptcy Court for the Western District of Pennsylvania (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The Debtors consent to entry of a final order under Article III of the United States Constitution.

2.      Venue of these Chapter 11 Cases in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested in this Motion are section 105(a), 363(b), 364, 365, 503, and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004, 6006, 9007, 9014.

## BACKGROUND

4.      On January 6, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court. The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No party has requested the appointment of a trustee or examiner, and no official committee of unsecured creditors (a "Committee") has been appointed in these Chapter 11 Cases as of the filing of this Motion.

5.      A detailed description of the Debtors, their businesses, and the facts and circumstances surrounding the Debtors' filing of these Chapter 11 Cases are set forth in greater detail in the *Amended Declaration of Kevin Harrigan, President and Chief Executive Officer of Wilson Creek Energy, LLC and its Affiliated Debtors in Support of Chapter 11 Petitions and First Day Motions* [Doc. No. 51-1] (the "First Day Declaration").

## FACTUAL BACKGROUND

6.      The Debtors' headquarters is located in Friedens, Somerset County, Pennsylvania, and it has approximately 365 employees. All of the Debtors' physical assets, mining operations and employees are located in Somerset County, Pennsylvania and Garret County, Maryland. The common shares of the Debtors' parent company, Corsa Coal Corp., are listed on the Canadian TSX

Venture Exchange under the symbol "CSO" and also trade on the OTCQX Best Market under the symbol "CRSXF" but trading has been halted.

7.      Through its US-based operating subsidiaries, the Debtors supply premium quality, low volatile metallurgical coal, an essential ingredient in the production of steel. The Debtors' core business involves the supply of premium quality metallurgical coal to domestic and international steel and coke producers. The Debtors sell metallurgical coal by either: (i) selling coal that the Debtors produce; or (ii) selling coal that the Debtors purchase from third parties and subsequently provide value added services (storing, washing, blending, loading) to make the coal saleable. The Debtors produce and sell approximately one million tons of coal each year.

8.      The Debtors own and operate six underground and surface mines, all of which are located in Somerset County, Pennsylvania, with the exception of the underground Casselman mine, which is located in Garrett County, Maryland. The Debtors' total coal reserves for just their active mines are approximately 23 million clean and recoverable tons. For all of their properties, the Debtors' coal reserves are approximately 38 million clean and recoverable tons. The Debtors also own three coal preparation plants: the Shade Creek Preparation Plant, the Cambria Plant and the Rockwood Plant, all of which are located in Somerset County, Pennsylvania.

9.      The Debtors likewise have an extensive portfolio of machinery and equipment that they use in connection with their mining operations. The Debtors estimate that the combined value of the Debtor's personal property assets and real property and mineral rights holdings materially exceeds the amount of the pre-petition secured debt.

10.      The Debtors are also parties to a variety of contracts and leases, including, without limitation, coal sales contracts, equipment leases and coal leases. Many of these agreements have significant value to the Debtors and their estates.

## PREPETITION MARKETING AND SALE PROCESS

11.     The Debtors retained an investment banker in mid-2024 to explore potential merger and sale options. Through their prepetition investment banker, the Debtors contacted numerous parties about potential transactions, including U.S. and international investors and operators in the mining space. While no material traction resulted from this process, the Debtors prepetition marketing efforts provided the Debtors with some insight concerning potential strategic partners, which, in addition to the relationships and contacts of the Debtors and their professionals, provide the Debtors with a large pool of potential purchasers of the Debtors' assets (some of whom have already contacted the Debtors and/or their professionals since the commencement of these Chapter 11 Cases).

12.     After securing the relief necessary to orderly transition into these Chapter 11 Cases, the Debtors have determined in their sound business judgment that marketing the Sale Assets to interested parties with the complimentary goals of maximizing the going concern value of their operations while simultaneously preserving the employment of their over 300 employees is the best option for their estates and stakeholders thereof. As described herein and in the First Day Declaration, the Debtors have significant assets, contracts, coal leases and coal reserves.

13.     The Debtors and their professionals will market the Sale Assets to a wide range of potential purchasers in furtherance of their sale efforts. The Debtors have not currently retained an investment banker in these Chapter 11 Cases. If and to the extent the Debtors determine, in their sound business judgment, that their estates and stakeholders thereof would benefit from the Debtors' employment of an investment banker, the Debtors reserve the right to file an appropriate application for approval of a broker and/or investment banker by the Court.

## **PROPOSED FORM OF ASSET PURCHASE AGREEMENT**

14.     Based on their extensive experience in the coal industry, including in transactions relating to the purchase and sale of coal mines and mining operations, the Debtors and their professionals have prepared a form asset purchase agreement (the "Proposed APA") for the purchase and sale of the Sale Assets. The Proposed APA is attached to the proposed Bidding Procedures Order as **Exhibit 2**.

15.     In connection with the request for approval of their proposed Bidding Procedures, the Debtors also seek approval of the Proposed APA, which the Debtors will provide to potential strategic partners that express an interest in acquiring some or all of the Sale Assets in accordance with the proposed Bidding Procedures.

16.     Approval of the Proposed APA for dissemination to potential strategic partners will allow the Debtors to launch their sale efforts on an even playing filed, such that all potential strategic partners that express an interest in acquiring the Sale Assets will have to provide the Debtors with the Proposed APA, as modified and marked in redline to reflect the terms and conditions acceptable to each such potential strategic partner. This will assist the Debtors in their review of bids received, as the marked versions of the Proposed APA will include both the original terms and conditions on which the Debtors will consider offers for the purchase of the Sale Assets as well as comparison versions of each prospective purchaser. Further, requiring all potential strategic partners to provide the Debtors with their modifications to the Proposed APA in connection with the submission of a bid will reduce the administrative costs that the Debtors would inevitably incur if the Debtors had to review and analyze numerous forms of proposed definitive agreements, which may vary substantially in form and substance, submitted by each potential strategic partner.

17.     In sum, the Debtors believe that requiring any potential strategic partner to submit a modified and marked form of the Proposed APA in connection with submission of a Bid for the Sale Assets will minimize the administrative costs incurred by the Debtors and allow the Debtors, and any Consultation Parties,[5] to expeditiously determine whether a Bid is a Qualified Bid.

**DESIGNATION OF STALKING HORSE BID AND
APPROVAL OF PROPOSED BID PROTECTIONS**

18.     By this Motion, the Debtors also request the authority (but not direction) to designate, in their sound business judgment and in consultation with the Consultation Parties, one or more Qualified Bidders that submit Qualified Bids as stalking horse bidders (each, a "Stalking Horse Bidder" and collectively, "Stalking Horse Bidders," and each bid, a "Stalking Horse Bid" and collectively "Stalking Horse Bids") and authority to, among other things, provide the Stalking Horse Bidders, if so designated, with the following (collectively, the "Bid Protections"): (i) a breakup fee in an amount not to exceed three percent (3%) of each Stalking Horse Bid (the "Breakup Fee"); and (ii) actual legal and diligence expense reimbursement in an amount not to exceed two percent (2%) of each Stalking Horse Bid (the "Expense Reimbursement"), provided that the aggregate value of the Bid Protections will not exceed five percent (5%) of each Stalking Horse Bid. **For avoidance of doubt, while the Debtors would like to sell all of the Sale Assets to a single purchaser, the Debtors are willing to entertain Bids for some or all of the Sale Assets, such that the Debtors will seek approval of multiple Sale Transactions if the Debtors determine, in their sound business judgment and after consultation with any applicable Consultation Parties, that consummating multiple Sale Transactions (whether or not the**

---

[5] As of the date of this Motion, KIA II, LLC, KeyBank, National Association ("KeyBank") and the Committee (should one be appointed) shall be Consultation Parties. If any Consultation Party becomes a bidder, they will no longer be a Consultation Party.

**Debtors designate a Stalking Horse Bidder for each Sale Transaction) will maximize the value of their estates.** These Bid Protections are reasonable in light of, among other things, the Debtors' goal of maximizing interest in the Sale Assets and creating an environment that fosters competitive bidding and robust auction and sale process.

19.     Given the potential for the designation of one or more Stalking Horse Bidders if so authorized by the Court, in the event the Debtors do designate one or more Stalking Horse Bidders, the Debtors propose to file a notice (each, a "Designation Notice") which: (i) identifies each Stalking Horse Bidder if designated by the Debtors and the Minimum Initial Topping Bid based on the Stalking Horse Bid(s) received, or (ii) if the Debtors do not designate one or more Stalking Horse Bidders, identifies the Opening Bid and the Minimum Initial Topping Bid for each Sale Transaction. The Designation Notice will also identify the incremental bid amount for Sale Transaction, which may thereafter be modified in the Debtors' sole discretion in consultation with the Consultation Parties (the "Minimum Bid Amount").

### NEED FOR AN EXPEDITIOUS SALE PROCESS

20.     As noted above and as set forth in the First Day Declaration, the financial challenges that prompted the commencement of these Chapter 11 Cases continue to persist. Further, as set forth in the *Revised Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Approving Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [Doc. No. 86] (the "Interim DIP Financing Order"), the Interim DIP Financing Order binds the Debtors to comply with certain milestones, including: (i) conducting an auction for the Sale Assets by February 24, 2025; (ii) obtaining entry of the Sale Order by February 26, 2025, and (iii) closing

on the sale of the Sale Assets by February 28, 2025. Accordingly, an expedited sale process offers the only path to keeping the Debtors operational, remaining in compliance with the Interim DIP Financing Order, and maximizing value for all creditors and parties in interest.

21.    The auction process and time periods set forth in the Bidding Procedures are reasonable under these circumstances and will provide parties with sufficient time and information necessary to formulate a bid to purchase some or all of the Sale Assets. Given that the Debtors not only sought out potential strategic transactions prior to the Petition Date, but also have significant experience within the coal space including with both financial and strategic parties who may have interest in the Debtors' assets, the Debtors submit that the proposed timeline allows ample opportunity to engage with and promote active bidding from interested parties. The procedures proposed in this Motion ensure a fair and transparent sale process that maximizes the value to be obtained for the Sale Assets and reduces the losses associated with continued operations in the bankruptcy context.

### THE SALE MUST BE FREE AND CLEAR OF
### ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS

22.    The Debtors anticipate that, absent a Sale Order expressly providing that the Sale Assets shall be transferred free and clear of all liens, interests, Claims and Encumbrances (other than assumed liabilities and permitted liens) and free from any successor liability claims, the Debtors will be unable to consummate a sale of the Sale Assets. The Debtors acknowledge any prospective purchaser shall comply with applicable local, state and federal law, including without limitation, laws governing transfer of permits. The Debtors will also coordinate with the Pennsylvania Department of Environmental Protection (the "PA DEP") throughout the sale process and in connection with seeking the approval of any Sale Order authorizing one or more Sale Transactions contemplated herein.

23.    Further, the Debtors submit that one or more subsections of Section 363(f) of the

Bankruptcy Code, which authorizes the sale of assets free and clear of liens, claims, interests, and

encumbrances, will be satisfied, as: (i) the Debtors are required under the Interim DIP Order to

obtain both the DIP Lender and KeyBank's consent to the sale of the Sale Assets, (ii) the sale

proceeds of the Sale Assets will likely exceed the value of all liens against the Sale Assets, (iii)

the Debtors may have a *bona fide* dispute with certain interests asserted in the Sale Assets; or (iv)

any entity that opposes the sale of the Sale Assets could be compelled, in a legal or equitable

proceeding, to accept a money satisfaction of such interest.

## **BIDDING PROCEDURES**

**A.    Overview**

24.    The Bidding Procedures are designed to promote a competitive and expedient sale

process. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids

from potential buyers that constitute the highest and/or best offer(s) for some or all of the Sale

Assets in an efficient manner and on a reasonable timeline.

25.    The Debtors believe the proposed Bidding Procedures summarized below are fair

and appropriate. Because the Bidding Procedures are attached as **Exhibit 1** to the Bidding

Procedures Order, they are not restated in their entirety herein. Among other things, the Bidding

Procedures provide the following:[6]

> a.    The Debtors have the right to designate one or more Qualified Bidders as
> Stalking Horse Bidders and afford such Stalking Horse Bidder(s) the Bid
> Protections described herein and in the Bidding Procedures;
>
> b.    The parameters for determining the Minimum Initial Topping Bid(s),
> depending on whether the Debtors designate one or more Stalking Horse
> Bidders and Minimum Bid Increments, shall be established and potentially

---

[6] To the extent there is any inconsistency between this summary and the Bidding Procedures, the
Bidding Procedures will govern.

modified by the Debtors;

c.     Bids for some or all of the Sale Assets submitted in compliance with the Bidding Procedures must be received by **February 21, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline");

d.     The Consultation Parties shall be the DIP Lender, KeyBank, and the Committee (should one be appointed); provided, however, any Consultation Party that submits a Bid shall be removed as a Consultation Party without further order of the Court;

e.     To be eligible to participate in the Auction, each bid and bidder submitting such a bid ("Potential Bidder") must conform to the following requirements (collectively, the "Participation Requirements"):

   i.   Include an acknowledgement that the Potential Bidder has received, has had an opportunity to review, and agrees to be bound by, the Bidding Procedures Order;

   ii.   Convey an offer to consummate the Sale Transaction on the terms and conditions set forth as modifications to the Proposed APA (each, a "Modified Proposed APA"), which shall identify, *inter alia*, which Sale Assets the Potential Bidder intends to acquire, and shall be provided to the Debtors in a clean executed version and redline version against the Proposed APA;

   iii.   Include a statement that there are no conditions precedent to the Potential Bidder's ability to enter into the definitive Modified Proposed APA, including that (a) there are no financing contingencies to the bid, (b) there are no due diligence contingencies to the bid, and (c) all necessary internal board, member, and/or equity holder approvals have been obtained prior to submitting the bid;

   iv.   State that such offer is binding and irrevocable until the approval of the Successful Bid by the Court, unless designated as the Back-Up Bid (as defined below);

   v.   Accompanied by an executed letter stating that the Potential Bidder's offer is irrevocable until consummation of a Sale Transaction involving the Sale Assets and that such bidder agrees to serve as a Backup Bidder (as defined herein) in accordance with these Bid Procedures;

   vi.   Disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation;

vii.  Include the names and contact information of representatives of the Potential Bidder who will be available to answer questions regarding the offer, including any advisors and related parties;

viii.  Not be conditioned on the receipt of any third-party approvals or consents (excluding required Court approval and required governmental, licensing, permitting, or other regulatory approvals or consents, if any), including, without limitation, board of director approval. With respect to any governmental, licensing, or regulatory approvals or consents, each bid must include a description of all such approvals or consents that are required to consummate the proposed Sale Transaction, together with evidence satisfactory to the Debtors, of the ability of the Potential Bidder to obtain such approvals or consents in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents;

ix.  Include sufficient financial or other information (the "Adequate Assurance Information") to establish adequate assurance of future performance with respect to any lease or contract to be assigned to the Potential Bidder in connection with the proposed Sale Transaction. The bid shall also identify a contact person (with relevant contact information) of the Potential Bidder that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information;

x.  Include a deposit of cash or other immediately available funds in the amount of at least ten percent (10%) of the Proposed Bid (the "Earnest Money Deposit") which will be held by Debtors' counsel in a segregated bank account (which can be an escrow or IOLTA account);

xi.  Provide satisfactory written evidence of available funds or a firm commitment for financing sufficient to consummate the Sale Transaction for which the Potential Bidder submitted the Potential Bid;

xii.  Proposed Bids for mines must include adequate information on the Potential Bidder's ability to continue to operate such mine(s) upon closing, including compliance with all local, state, and federal laws, rules, and regulations;

xiii.  provide that the Potential Bidder will (i) (a) take transfer of or obtain permits for the mining operations to be acquired, (b) assume all associated and applicable environmental obligations with respect to the mines subject to the Bid to the extent required under applicable nonbankruptcy law, and (c) obtain assignment of or replace the

reclamation surety bonds and other financial assurance associated with such permits, and (ii) provide evidence of (a) the Potential Bidder's ability to satisfy the conditions set forth in clause (i) of this paragraph (including verification that the Potential Bidder is not, and will not be as of the time of the transfer, "permit blocked" under the federal Surface Mining Control and Reclamation Act by application of the federal Applicant Violator System), and (b) the Potential Bidder's financial resources necessary to obtain assignment of or replace the reclamation surety bonds and other financial assurance associated with such permits, which evidence may include a letter from a surety company confirming that the Potential Bidder is a "qualified buyer" (as such term is used in the surety industry);

xiv.   Represent and warrant that the Potential Bidder has had a full and fair opportunity to conduct due diligence regarding the Debtors' business and the Sale Assets prior to submitting its bid and a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Sale Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' business or the Sale Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Modified Proposed APA, if ultimately accepted and executed by the Debtors;

xv.   Acknowledge that the Potential Bidder is not entitled to any of the Bid Protections unless designated as a Stalking Horse Bidder by the Debtors;

f.   Potential Bidders will have a due diligence period that expires at the Bid Deadline;

g.   The Debtors will provide each Potential Bidder who has executed a confidentiality agreement with reasonable access to Debtors' confidential electronic data room concerning the Sale Assets (the "Data Room") and any other additional information that the Debtors believe to be reasonable and appropriate under the circumstances; provided, however, that the Debtors, in consultation with the Consultation Parties, may withhold or limit access by any Potential Bidder to the Data Room or other diligence materials if the Potential Bidder does not become, or the Debtors determine, in consultation with the Consultation Parties, that the Potential Bidder is not likely to become, a Qualified Bidder;

h.      Potential Bidders who have satisfied the Participation Requirements in the Debtors' judgment, will be deemed "<u>Qualified Bidders</u>" and each a "<u>Qualified Bidder</u>" and Bids that satisfy all bid requirements, as determined by the Debtors in consultation with the Consultation Parties, will be deemed "<u>Qualified Bids</u>." The Debtors will advise each Potential Bidder whether they are deemed to be a Qualified Bidder and whether their bid is a Qualified Bid before the Auction.

i.      If the Debtors designate one or more Qualified Bidders as Stalking Horse Bidders, at the Auction, each Stalking Horse Bidder shall be entitled to credit bid the amount of the Breakup Fee and the maximum amount of the Expense Reimbursement (*i.e.*, five percent (5%) of the Stalking Horse Bid). Each Stalking Horse Bidder, if designated, shall be required to serve as Backup Bidder if it is not the Successful Bidder but is selected as the Backup Bidder.

j.      All Qualified Bidders shall be deemed to have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to due diligence, the submission of its bid, the Bid Procedures, the Auction, and the Sale Transaction, provided that each Stalking Horse Bidder is entitled to the Bid Protections described herein.

k.      If more than one Qualified Bids for one or more Sale Transactions involving the Sale Assets is received, an Auction will be held on or before February 24, 2025 (unless such different date is established by the Bankruptcy Court in the Bidding Procedures Order);

l.      The Auction will be conducted openly, and all Qualified Bidders, the Consultation Parties, sureties that have issued the Debtors' bonds, and the U.S. Trustee will be permitted to attend.

m.      At the Auction, the Debtors shall determine, in their reasonable judgment and in consultation with the DIP Lender (assuming the DIP Lender is not a bidder) and KeyBank, which of the Qualified Bids is the highest and/or best bid for the Sale Assets (each, a "<u>Successful Bid</u>" and collectively, the "<u>Successful Bids</u>," and the bidder(s) submitting such Successful Bid(s), each, a "<u>Successful Bidder</u>" and collectively, the "<u>Successful Bidders</u>"), and the second highest and/or best bid(s) for the Sale Assets (each, a "<u>Backup Bid</u>" and collectively, the "<u>Backup Bids</u>," and the bidder(s) submitting such Backup Bid(s), each, a "<u>Backup Bidder</u>" and collectively, the "<u>Backup Bidders</u>");

n.      Successful Bid(s) and Backup Bid(s) will be subject to approval by the Court at the Sale Order Hearing. At the Sale Order Hearing, the Debtors will seek the entry of one or more Sale Orders approving the Sale Transaction(s) to the Successful Bidder(s) on the terms and conditions of

the Successful Bid(s), as well as approval of the Backup Bid(s);

o.     Following the Sale Order Hearing and entry of one or more Sale Orders, if a Successful Bidder fails to consummate an approved Sale Transaction, the Backup Bidder for that Sale Transaction will be deemed to be the new Successful Bidder, and the Debtors will be authorized to consummate the Sale Transaction with the Backup Bidder without further order of the Court, and the Backup Bidder and Backup Bid shall thereupon be deemed the Successful Bidder and Successful Bid.

p.     If there are no other Qualified Bidders as of the Bid Deadline, then the Debtors, in consultation with the Consultation Parties, shall exercise their sound business judgment in furtherance of their fiduciary duties owed to their estates and creditors thereof, to determine what action(s) the Debtors should take to preserve and maximize the value of their estates, including whether to (i) extend the Bid Deadline; (ii) confer and attempt to confirm any non-Qualified Bids received as of the Bid Deadline; or (iii) withdraw this Motion; and,

q.     The Debtors reserve the right to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent that the Debtors determine, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary duties under applicable law.

**B.     The Assumption and Assignment Procedures**

26.     The Debtors also request that the Court approve the form of the Contract Assumption and Assignment Notice attached to the Bidding Procedures Order as **Exhibit 4** and the assumption and assignment procedures described below (the "Assumption and Assignment Procedures"). The Debtors submit that service of the Contract Assumption and Assignment Notice on the applicable Counterparties is proper and sufficient to provide notice to the Counterparties of the Assumption and Assignment Procedures.

27.     To facilitate one or more Sale Transactions, the Debtors seek authority to assume and assign the Assumed Agreements to the Successful Bidder(s) in accordance with the following Assumption and Assignment Procedures:

i.     By no later than January 27, 2025, the Debtors shall serve an initial notice on all counterparties to each Executory Contract on the list of Executory

Contracts available for assuming and assigning (the <u>Available Contracts List</u>") specifically stating that the Debtors are or may be seeking the assumption and assignment of such Executory Contracts, the Debtors' calculation of the associated Cure Costs, and the deadline for objecting to the Cure Costs or any other aspect of the proposed assumption and assignment of their Contracts to a potential Successful Bidder (the "<u>Initial Assumption and Assignment Notice</u>").

ii.   Pursuant to the Bidding Procedures Order, the counterparties to the Executory Contracts on the Available Contracts List shall have an opportunity to file any objections to the assumption and/or assignment of any Executory Contracts on the Available Contracts List. Upon any such objection, such Executory Contract shall become a "<u>Disputed Contract</u>" and, unless the Disputed Contract is rejected (each, a "<u>Rejected Contract</u>"), the Debtors shall either settle the objection of such counterparty or shall litigate such objection under such procedures as the Court shall approve as part of the Bidding Procedures Order. Upon a final order or settlement determining any Cure Costs regarding any Disputed Contract after the Closing or at any time prior to such final order or settlement, the Successful Bidder shall have the option to (x) pay the Cure Cost with respect to such Disputed Contract and assume the Disputed Contract as an Assumed Agreement or (y) designate the Disputed Contract as a Rejected Contract and not be responsible for the Cure Cost.

iii.   At the Sale Order Hearing, the Debtors will seek Court approval of the assumption and assignment to the applicable Successful Bidder of the Assumed Agreements that have been selected by such Successful Bidder to be assumed and assigned and request authority to assume and assign to the Successful Bidder any additional Assumed Agreements selected by the Successful Bidder prior to Closing of the Sale Transaction upon payment by the Successful Bidder of the necessary Cure Cost. If additional Assumed Agreements are selected by the Successful Bidder after the Sale Order Hearing, but before Closing of the Sale Transaction, the Debtors will file with the Court and serve on the applicable counterparties, a notice identifying the Assumed Agreements and the Cure Costs, if any, that the Debtors believe are required to be paid. If the parties are unable to consensually agree to the required Cure Cost, the Debtors will seek a hearing with the Court.

iv.   If no Contract Objection is timely filed with respect to an Assumed Agreement in accordance with the foregoing procedures: (i) the Counterparty to such Assumed Agreement shall be deemed to have consented to the assumption by the Debtors and assignment to the applicable Successful Bidder of the Assumed Agreement, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate

assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Assumed Agreement and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Cost set forth in the Contract Assumption and Assignment Notice (and any Amended Assumption and Assignment Notice); and (iii) the Counterparty shall be forever barred from asserting any other claims related to such Assumed Agreement against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the Sale Order.

v.     To the extent that the parties are unable to consensually resolve any dispute with respect to the Cure Cost required to be paid to the applicable Counterparty under sections 365(b)(a)(1)(A) and (B) of the Bankruptcy Code (any such dispute, a "Cure Dispute"), the Debtors may (i) assume the applicable Executory Contract prior to the resolution of the Cure Dispute; provided that the applicable Successful Bidder(s) shall (A) pay to the applicable Counterparty the undisputed portion of the Cure Cost within five (5) business days of the Closing of the Sale Transaction and (B) reserve cash in an amount sufficient to pay the disputed portion of the Cure Cost reasonably asserted by the applicable Counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the Counterparty and the Debtors), or (ii) adjourn their request to assume the Assumed Agreement pending resolution of the Cure Dispute (an "Adjourned Cure Dispute"); provided further that, to the extent the Adjourned Cure Dispute is resolved or determined unfavorably to the Debtors' and/or Successful Bidder's interests, the Debtors (with the consent of the Successful Bidder(s)) may withdraw the proposed assumption of the applicable Assumed Agreement after such determination by filing a notice of withdrawal, which, in the case of a lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code.

vi.    Nothing herein or in the Bidding Procedures will obligate any Successful Bidder to satisfy the Cure Cost related to any Executory Contract unless such Successful Bidder expressly designates such Executory Contract for assumption and agrees to pay the Cure Cost as a condition to assumption and assignment.

vii.   At Closing, the Successful Bidder(s) shall pay all Cure Costs in connection with the assumption and assignment of the Assumed Agreements relating to the Sale Assets acquired by such Successful Bidder.

viii.  Any Executory Contracts that are not designated for potential assumption and assignment to a Successful Bidder or Backup Bidder may be assumed, assumed and assigned, or rejected at a later date in compliance with Section 365 of the Bankruptcy Code.

### C.     The Notice Procedures

28.     The Debtors request that the Court approve the form of the Auction and Sale Notice, the Contract Assumption and Assignment Notice, and the Post-Auction Notice (collectively, the "Notices"), each attached to the proposed Bidding Procedures Order as **Exhibits 3, 4** and **5**, respectively. The Debtors submit that service of the Notices as set forth below (the "Notice Procedures") is proper and sufficient to provide notice of this Motion and the deadlines that will be set in the Bidding Procedures Order.

29.     Bidding Procedures Hearing Notice. This Motion and notice of the Bidding Procedures Hearing, as set by the Court, will initially be served in accordance with the *Revised Order Establishing Certain Notice, Case Management, and Administrative Procedures as well as Granting Related Relief* [Doc. No. 39] (the "Case Management Order") on the Master Service List (as defined in the Case Management Order) and any parties requesting notice pursuant to Rule 2002 of the Bankruptcy Rules.

30.     Auction and Sale Notice. After entry of the Bidding Procedures Order, the Debtors will comply with Bankruptcy Rule 2002(a), which provides that all creditors of a bankruptcy estate are entitled to receive at least 21 days' notice by mail of a proposed sale or property of the estate other than in the ordinary course of business, unless the bankruptcy court for cause shown shortens the time or directs another method of giving notice. To satisfy this requirement, the Debtors propose to serve notice of the filing of this Motion and the Bidding Procedures Hearing (the "Auction and Sale Notice") by first-class mail, postage prepaid, or electronic mail to counsel who has filed an appearance in the Debtors' cases on behalf of any party, and on the following parties (collectively, the "Sale Notice Parties"): (a) all of the Debtors' creditors; (b) all entities that have, to the best knowledge of the Debtors' management and advisors, expressed written interest in

purchasing any of the Sale Assets within the past one (1) year; (c) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Sale Assets; (d) the Master Service List; (e) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (f) all federal, state, and local regulatory or taxing authorities, including any applicable taxing bodies or recording offices which have a reasonably known interest in the relief granted herein; (g) the Internal Revenue Service; (j) any other governmental authority known or reasonably believed by the Debtors to have or assert a claim against any of the Debtors in these Chapter 11 Cases; (k) the Office of the Attorney General and Office of the Secretary of State for the Commonwealth of Pennsylvania and State of Maryland; (l) the counterparties to the Executory Contracts; and (m) the Consultation Parties.

31.     Contract Assumption and Assignment Notice. By no later than January 27, 2025 or such other date as may be set in the Bidding Procedures Order, the Debtors shall file the Contract Assumption and Assignment Notice with the Court, and post such notice on the website of the Debtors' claims and noticing agent, Omni Agent Solutions ("Omni"): at https://cases.omniagentsolutions.com/wilsoncreek (the "Case Website"), and serve such notice by first class mail, postage prepaid, on the following parties (collectively, the "Contract Notice Parties"):

      a.     each Counterparty to an Executory Contract;

      b.     counsel to other potential bidders (if known to the Debtors);

      c.     the Master Service List; and,

      d.     all parties that have requested notice pursuant to Bankruptcy Rule 2002.

If applicable, and as soon as practicable, the Debtors shall file any Amended Assumption and Assignment Notice with the Court, post such notice on the Case Website, and serve such notice,

by overnight delivery, on the Contract Notice Parties.

32.     _Post-Auction Notice_. As soon as practicable following the Auction, the Debtors

shall file the Post-Auction Notice with the Court, post such notice on the Case Website, and serve

such notice by overnight delivery on the Sale Notice Parties.

33.     The Debtors believe the Notice Procedures constitute adequate and reasonable

notice of the key dates and deadlines for the sale process, including, among other things, the

Contract Objection Deadline, the Sale Objection Deadline, the applicable Bid Deadlines, and the

date, time, and location of the Auction and Sale Order Hearing. Accordingly, the Debtors request

that the Court find that the Notice Procedures are adequate and appropriate under the circumstances

and comply with the requirements of Bankruptcy Rule 2002, 6004 and 6006.

**BASIS FOR RELIEF**

I.    **APPROVAL OF THE SALE TRANSACTIONS IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES.**

      *A.*    ***The Sale Transaction Should Be Approved as an Exercise of the Debtors' Sound Business Judgment.***

34.     Ample authority exists for approval of the Sale Transaction(s) contemplated by this

Motion. Section 363(b) of the Bankruptcy Code provides that a debtor may sell property of the

estate outside the ordinary course of business after notice and a hearing. Although section 363(b)

does not specify a standard for determining when it is appropriate for a court to authorize the use,

sale, or lease of property of the estate, courts have required that such use, sale, or lease be based

upon the debtor's sound business judgment. *See, e.g., Myers v. Martin (In re Martin)*, 91 F.3d 389,

395 (3d Cir. 1996) (internal citation omitted); *Comm. of Equity Sec. Holders v. Lionel Corp. (In

re Lionel Corp.)*, 722 F.2d 1063, 1070–71 (2d Cir. 1983); *In re Abbotts Dairies of Penn., Inc.*, 788

F.2d 143, 147–48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *In re*

*Lionel Corp.*); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175–76 (D. Del. 1991) (holding

that the Third Circuit adopted the "sound business judgment" test in *Abbotts Dairies*); *Dai-Ichi*

*Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*,

242 B.R. 147, 153 (D. Del. 1999) (same).

35.     The demonstration of a valid business justification by the debtor leads to a strong

presumption "that in making [the] business decision the directors of a corporation acted on an

informed basis, in good faith and in the honest belief that the action taken was in the best interests

of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re*

*Integrated Res. Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d

858, 872 (Del. 1985)).

36.     The Debtors submit that their decision to consummate the sale of the Sale Assets

to one or more Successful Bidders represents a reasonable exercise of the Debtors' business

judgment and, accordingly, the Sale Transaction should be approved under sections 105(a) and

363(b) of the Bankruptcy Code. The Debtors will continue to conduct an extensive and fulsome

process to market the Sale Assets. The open and fair auction and sale process contemplated by the

Bidding Procedures will ensure that the Debtors' estates receive the highest or otherwise best value

available for the Sale Assets and will provide a greater recovery than would be provided by any

other available alternative. Furthermore, compliance with the Bidding Procedures will ensure the

fairness and reasonableness of the consideration to be paid by a potential Successful Bidder and

establish that the Debtors and such bidder have proceeded in good faith.

37.     The Debtors have a sound business justification for selling the Sale Assets pursuant

to a competitive-bidding process consistent with the Bidding Procedures. Based on an analysis of

the Debtors' ongoing and future business prospects, the Debtors concluded that a sale of the Sale

Assets pursuant to a competitive-bidding process would likely be the best way to maximize recoveries for creditors in these Chapter 11 Cases. The Debtors believe that the proposed sale process will produce a fair and reasonable purchase price for the Sale Assets, especially in light of the opportunity to secure multiple Bids for various portions of the Sale Assets. Given: (i) the prepetition strategic transaction process, (ii) the structure of the proposed Sale Transactions and the ability to accept multiple Bids, and (iii) the Debtors request for the authority to designate one or more Stalking Horse Bidders, the Debtors are confident that the post-petition sale process will culminate in the Debtors obtaining the highest or otherwise best offer for such assets, thereby maximizing the value of the Debtors' operations.

38.     As such, the Debtors' determination to sell the Sale Assets pursuant to a competitive bidding process as provided for in the Bid Procedures is a valid and sound exercise of the Debtors' business judgment. The Debtors believe that they have proposed a fair process for obtaining the highest and/or best offer and sale of the Sale Assets for the benefit of the Debtors' estates and their creditors. The fairness and reasonableness of the consideration to be received by the Debtors will be demonstrated by a "market check" through the process outlined in the Bid Procedures.

**B.**     ***The Sale Transaction Should be Approved "Free and Clear" Under Section 363(f) of the Bankruptcy Code.***

39.     Section 363(f) of the Bankruptcy Code permits a debtor to sell assets free and clear of all liens, claims, interests, and encumbrances (with any such liens, claims, interests, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets) if any one of the following conditions is satisfied:

> i. applicable non-bankruptcy law permits sale of such property free and clear of such interest;

ii. such entity consents;

iii. such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

iv. such interest is in bona fide dispute; or

v. such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). As section 363(f) is stated in the disjunctive, when proceeding pursuant to section 363(f), it is only necessary to meet one of the five conditions of section 363(f). *In Messina*, 687 F.3d 74, 77 n.4 (3d Cir. 2012); *In re Nature Leisure Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007); *see also Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code § 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code § 363(f) is met).

40. The Court may also authorize the sale of a debtors' assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) of the Bankruptcy Code does not apply. *See In re Ditech Holding Corp.*, 606 B.R. 544, 591 (Bankr. S.D.N.Y. 2019) ("[P]lan sales can be free and clear of claims without invoking section 363(f)."); *In re Trans World Airlines, Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("[B]ankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of section 363(f)."); *see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.*), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11."); *see also In re White Motor Credit Corp.*,

75 B.R. 944 (Bankr. N.D. Ohio 1987) (holding that section 363(f) precluded tort claims against asset purchaser); *In re Appalachia Fuels, LLC*, 503 F.3d 538 (6th Cir. 2007) (approving a sale free and clear of "claims" arising as coal commission sales). The Debtors submit, and to the extent necessary will demonstrate at the Sale Order Hearing, that the sale of the Sale Assets free and clear of all liens, Claims, interests, and Encumbrances will satisfy one or more of the requirements under section 363(f) of the Bankruptcy Code.[7] Accordingly, the Debtors request that the Court authorize the sale of the Sale Assets free and clear of any liens, claims, interests and Encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests and Encumbrances attaching to the proceeds thereof in the same order of relative priority, with the same validity, force and effect as prior to such transfer.

### C.    *The Sale Order Must Provide that the Successful Bidders Do Not Have Successor Liability for the Debtors' Debts Unless Assumed by the Successful Bidders.*

41.    The Debtors further request that, unless expressly assumed in connection with one or more Sale Transactions, the Sale Order specifically provide that any Successful Bidder shall have no successor liability of any kind arising from the Debtors' operations prior to consummating the aforesaid Sale Transaction except for assumed liabilities, permitted liens, and local, state, and federal governmental and regulatory obligations required in connection with the operation of the Sale Assets.

---

[7] Moreover, the Debtors will send the Auction and Sale Notice to creditors and lienholders of record. If such creditors and lienholders do not object to the proposed Sale Transaction, then their consent should be presumed. Accordingly, the Debtors request that, unless a party asserting a prepetition lien, Claim or Encumbrance on any of the Sale Assets timely objects to this Motion, such party shall be deemed to have consented to any Sale Transaction approved at the Sale Order Hearing. *See, e.g.*, *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent"); *Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein).

42.    The analysis in *In re Trans World Airlines, Inc.*, 322 F.3d 283 (3d Cir. 2003) shows that the concepts of what constitutes an "interest in property" and a debtor's ability to sell free and clear of liabilities are closely related. If a potential liability arises from the debtor's operation of an integral part of its business, then section 363 of the Bankruptcy Code authorizes a sale of the assets comprising that business free and clear of the liability. *In re Trans World Airlines, Inc.*, 322 F.3d at 290. *See also In re WBQ Partnership*, 189 B.R. 98, 105 (Bankr. E.D. Va. 1995) (enjoining state from pursuing recovery of depreciation recapture from purchaser) ("DMAS's right of recapture falls with the category of 'any interest' that is subject to §363(f)."). In these Chapter 11 Cases, the Court may approve a sale of the Sale Assets free and clear of any claims, including claims for successor liability, arising exclusively from the Debtors' operations of the Sale Assets being sold.

43.    In *Trans World*, the Court reasoned that the claims asserted qualified as interests subject to section 363(f) of the Bankruptcy Code because "it was the assets of the debtor which gave rise to the claims. Had TWA not invested in airline assets, which required the employment of the EEOC claimants, those successor liability claims would not have arisen." *Id.* (citing *In re Leckie*, 99 F.3d 573, 585 (4th Cir. 1996) (Sale of debtor's assets pursuant to section 363 of the Bankruptcy Code was free and clear of any liability imposed upon successors under the federal Coal Act.))[8]

---

[8] In *Leckie*, the Court reasoned that "[b]ecause there is therefore a relationship between (1) the Fund's and Plan's rights to demand premium payments from [the debtors] and (2) the use to which [the debtors] put their assets, we find that the Fund and Plan have interests in those assets within the meaning of section 363(f) [of the Bankruptcy Code]." *See In re Leckie*, 99 F.3d at 582. The court explained that "[t]hose rights are grounded, at least in part, in the fact that [the debtors'] assets have been employed for coal-mining purposes: if [the debtors] had never elected to put their assets to use in the coal-mining industry, and had taken up business in an altogether different area, the [claimants] would have no right to seek premium payments from them." *Id.* at 582.

44.     Like the EEOC claims in the *Trans World* case, any claims arising from the Debtors' operations of the Sale Assets – which are all or substantially all of the Debtors' assets – are the Sale Assets that the Debtors desire to sell pursuant to this Motion. Clearly, any claims against the Debtors would not exist but for the fact that the Debtors operate their mines and prep plans. Because any liability owed to claimants in these Chapter 11 Cases is "inextricably linked" to the Sale Assets, this Court may approve a sale free and clear of those claims and any other claims based on successor liability.[9]

45.     The Debtors are actively seeking to maximize the Sale Assets' value. Prepetition, the Debtors engaged an investment banker in furtherance of a potential strategic transaction and identified the potential universe of potential strategic partners. Given the knowledge garnered from the prepetition strategic efforts and the Debtors' experience and knowledge within the coal industry, the Debtors intend to market and sell the Sale Assets and are prepared to entertain any competing bids that will maximize the returns for their bankruptcy estates. Under these circumstances, this Court and all others routinely include in orders approving sales of assets pursuant to section 363 of the Bankruptcy Code a finding that a purchaser is not a successor to the debtor and is not liable for payment of amounts the debtors owe. *See, e.g., In re Leckie*, 99 F.3d at 576 ("even if [buyers] would be a successor in interest, the Bankruptcy Court may extinguish Coal Act successor liability pursuant to 11 U.S.C. § 363(f)(5)"); *In re Rockdale Marcellus Holdings,*

---

[9]   The Debtors' request for approval of the Sale Transactions free and clear of all liens, claims, interests, and encumbrances under Section 363(f) of the Bankruptcy Code does not include assumed liabilities and permitted liens. Nothing herein is meant to limit or curtail the rights of the Debtors or any applicable governmental or regulatory agency with respect to otherwise applicable state or federal law. To the extent a Successful Bidder acquires any of the Sale Assets that require, as a matter of applicable law, satisfaction of regulatory requirements for commencing and continuing operations, the Debtors are not seeking to divest the Sale Assets of these ongoing obligations.

*LLC*, Case No. 21-bk-22080 (Bankr. W.D. Pa. 2021) (Docket No. 617, ¶AA. "No Successor Liability"); *In re. Claim Jumper Acquisition Company, LLC*, Case No. 22-bk-21941 (Bankr. W.D. Pa.) (Docket No. 330, ¶¶ U, 11 and 13); *In re R.E. Gas, LLC*, Case No. 18-22032-JAD (Bankr. W.D. Pa. Aug. 31, 2018) (Docket No. 841, ¶¶ 15-19).

46.      Accordingly, the Debtors request that any Sale Order entered by this Court include a finding and conclusion that the sale of the Sale Assets will be free and clear of any and all liens, claims, interests, and encumbrances, and further enjoining all creditors holding claims against the Debtors from attempting to collect any liability of the Debtors from any other Successful Bidder.

**D.      *Liens and Other Interests Will Attach to the Proceeds in Accordance With Their Existing Priority.***

47.      As provided by the Bankruptcy Code, all valid liens or other interests against the Sale Assets being sold will attach against the sale proceeds in the order of their existing priority.[10] The Debtors request authority to pay the net sale proceeds at the closing of any Sale Transaction, subject to carve-outs for any Bidding Protections afforded the Stalking Horse Bidders (if designated), to the holders of valid liens against the Sale Assets being sold for application to their debt in the order of their priority without further order from the Bankruptcy Court (subject to any other orders previously entered by the Bankruptcy Court). Any proceeds in excess of the amounts required to satisfy valid liens (including the DIP Liens and the liens in favor of KeyBank, subject to the professional fee carveout) against the Sale Assets will be held by the Debtors pending further order of this Court. Furthermore, the Debtors reserve for further determination by this Court the issue of the proper allocation of any excess proceeds among the Debtors.

---

[10] A lien will only be considered not "valid" if so determined by a non-appealable order of a court of competent jurisdiction as of the time of the closing of any particular Sale Transaction.

E.    *The Sale Transaction Has Been Proposed in Good Faith and Without Collusion, and Each Successful Bidder Will Be a "Good Faith Purchaser."*

48.    Pursuant to section 363(m) of the Bankruptcy Code,[11] a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims. *O'Dwyer v. O'Dwyer (In re O'Dwyer)*, 611 Fed. App'x. 195, 200 (5th Cir. 2015); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D.N.J. May 11, 2007); see also *In re Abbotts Dairies*, 788 F.2d at 147 (to constitute lack of good faith, a party's conduct in connection with the sale must usually amount to fraud, collusion between the buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders); *In re Made In Detroit, Inc.*, 414 F.3d 576, 581 (6th Cir. 2005) (following the *Abbotts Dairies* standard).

49.    Courts in this Circuit have upheld section 363 purchase agreements "negotiated, proposed, and entered into . . . in good faith, without collusion . . . [resulting from] arm's-length bargaining with . . . parties represented by independent counsel." *In re THQ Inc.*, No. 12-13398 (MFW), 2013 Bankr. LEXIS 781 (Bankr. D. Del. Jan. 24, 2013); *In re Rockdale Marcellus, LLC*, Case No. 21-22080 (Bankr. W.D. Pa. Dec. 29, 2021); *In re Gottschalks Inc.*, Case Nos. 09-10157 2009 Bankr. LEXIS 4880 (Bankr. D. Del. June 10, 2009); *In re Against All Odds USA, Inc.*, Case Nos. 09-10117 (DHS), 2009 Bankr. LEXIS 5234, at *1 (Bankr. D.N.J. May 28, 2009); *In re Allegheny Health, Educ. & Research Found.*, Case Nos. 98-25773, 98- 25774, 98-25775, 98-25776, 98-25777, 1998 Bankr. LEXIS 1684, at *31 (Bankr. W.D. Pa. Oct. 30, 1998).

---

[11] Section 363(m) of the Bankruptcy Code provides: The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

50.     In other words, a party would have to show fraud or collusion between the successful bidder and the debtor-in-possession or trustee or other bidders to demonstrate a lack of good faith. An appropriate characterization of good faith in a bankruptcy sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir.1981) (*quoting In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)). Due to the absence of a bright-line test for good faith, the determination is based on the facts of each case, with a focus on the "integrity of [a bidder's] conduct in the course of the sale proceedings." *Made In Detroit, Inc.*, 414 F.3d at 581 (6th Cir. 2005) (quoting *In re Rock Indus*., 572 F.2d at 1998).

51.     Given that the Debtors are entering this sale process without one or more committed Stalking Horse Bidders, the Debtors submit that, to the extent they designate one or more Stalking Horse Bidders in accordance with the Bidding Procedures, those Stalking Horse Bidders are "good faith purchasers" within the meaning of section 363(m) of the Bankruptcy Code. The Debtors and their professionals intend to negotiate the potential sale(s) of the Sale Assets without collusion, in good faith, and through extensive arms'-length negotiations.

52.     Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Sale Assets. As noted above, any agreement with any Successful Bidder executed by the Debtors will be negotiated at arm's-length and in good faith. Accordingly, the Debtors seek a finding that any Successful Bidder (including potential Stalking Horse Bidders) are good faith purchasers and entitled to the full protections afforded by section 363(m) of the Bankruptcy Code.

53.     The Debtors submit, and the evidence and testimony presented at the Sale Order Hearing will demonstrate, that the terms and conditions of each Sale Transaction for which the Debtors seek approval was negotiated by the Debtors and the Successful Bidder, as applicable, at arm's-length and in good faith, with the assistance of the Debtors' professional advisors, and that the parties did not engage in any conduct that would cause or permit the Sale Transaction(s) to be avoided under section 363(n) of the Bankruptcy Code.

54.     Based on the foregoing, the Debtors submit that they will be able to demonstrate that the proposed sale(s) of the Sale Assets is/are a sound exercise of the Debtors' business judgment and should be approved as good faith Sale Transactions.

### F.      *The Court Should Waive the Stay of Bankruptcy Rules 6004 and 6006.*

55.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

56.     The Debtors believe that any sale should be consummated as soon as practicable to preserve and maximize value. Accordingly, the Debtors request that any Sale Order approving the sale of the Sale Assets and the assumption and assignment of the Assumed Agreements be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived. This is critically important because the milestones that bind the Debtors pursuant to the Interim DIP Financing Order require the Debtors to close just two (2) days after the Sale Order Hearing.

## II.      THE BID PROCEDURES, INCLUDING THE BID PROTECTIONS, SHOULD BE APPROVED.

57.      The Bid Procedures are appropriate and in the best interests of the Debtors, their estates, and the creditors. The key objective in any sale of property of a debtor's estate is to maximize the value received by the estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (same).

58.      Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 537 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate); *Integrated Res.*, 147 B.R. at 659 (stating that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets").

59.      The Debtors have designed the Bid Procedures to promote a competitive and fair bidding process and, thus, maximize value for the Debtors' estates and creditors. The Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders, thereby increasing the likelihood that the Debtors will receive the highest or best possible consideration for the Sale Assets. Furthermore, the Bid Procedures provide an appropriate framework for the Debtors to review, analyze, and compare any bids received to determine which bids are in the best interests of the Debtors' estates and their creditors.

60.      The Debtors submit that the Bid Procedures are fair and transparent and will derive

the highest or best bids for the Sale Assets. Therefore, the Debtors request the Court approve the Bid Procedures.

### A.    *The Proposed Bid Protections Should be Approved.*

61.    Stalking horse bidders virtually always require breakup fees and, in many cases, other forms of bidding protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Official Comm. of Unsecured Creditors v. Interforum Holding, LLC*, No. 11-CV-219, 2011 U.S. Dist. LEXIS 73421, at *4 n.2 (E.D. Wis. July 7, 2011). Thus, the use of bidding protections has become an established practice in chapter 11 cases.

62.    In this Circuit, whether breakup fees and expenses are allowable is subject to the same standard as other general administrative expenses under section 503 of the Bankruptcy Code. *In re O'Brien,* 191 F.3d at 532; *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) ("The Third Circuit has expressly recognized as an administrative claim a stalking-horse bidder's claim for a break-up fee and expense reimbursement if granting such claim provides a benefit to the estate."). These expenses are allowable if they are actually necessary to preserve the value of the bankruptcy estates or if they benefit the debtor's estate. *Id*.

63.    While the Debtors have not yet selected a Stalking Horse Bidder, the Debtors submit that the ability to offer the Bid Protections proposed herein constitute an integral component of their ability to negotiate the highest and best offers for the Sale Assets. More importantly, the Debtors believe that their ability to offer Bid Protections will increase not only the interest of Potential Bidders in the Sale Assets, but also the likelihood of having multiple Potential Bids submitted by the Bid Deadline.

64.    To the extent the Debtors' designate one or more Stalking Horse Bidders, the

Debtors' proposed Bid Protections for each Stalking Horse Bidder consist of: (i) a Breakup Fee

not to exceed three percent (3%) of the Stalking Horse Bid as designated; and (ii) an Expense

Reimbursement not to exceed two precent (2%) of the Stalking Horse Bid as designated, such that,

under any circumstances, no Bid Protections afforded to any Stalking Horse Bidder shall exceed

five percent (5%) of the subject Stalking Horse Bid.

65.     The Debtors believe the dollar amount of the Bid Protections is appropriate and

reasonable and consistent with other bid protections approved by courts in this Circuit. *See In re*

*Abarta Oil & Gas Co, LLC*, Case No. 21-22406, Doc. No. 110 (Bankr. W.D. Pa. Nov. 11, 2021)

(court approved Breakup Fee of 3.0% in a Sale Transaction with $8,000,000 purchase price); *In*

*re Chi-Chi's, Inc.*, Case No. 03-13063, Doc. 143 (Bankr. D. Del. November 4, 2003) (fee of 5.1%

permitted).

66.     The request for the authority to offer Bid Protections is a sound exercise of the

Debtors' business judgment and is in the best interests of the Debtors, their estates, and all

stakeholders. Accordingly, the Court should approve the Bid Protections.

**B.      This Court Should Approve the Assumption and Assignment Procedures, as well as the Proposed Assumption and Assignment of Contracts.**

67.     The Debtors respectfully submit that the proposed Assumption and Assignment

Procedures set forth above are appropriate and reasonably tailored to provide all necessary notices

to the Counterparties, including the deadlines for objecting to the assignment and assumption of

their Executory Contracts. Without limitation, the Assumption and Assignment Procedures

provide for the payment of any Cure Costs (and resolution of disputes related thereto) owed under

the Assumed Agreements upon the assumption and assignment of such contracts. Accordingly, the

Debtors submit that implementation of the proposed Assumption and Assignment Procedures is

appropriate in these Chapter 11 Cases, and that this Court should authorize the Assumption and

Assignment Procedures and further authorize the Debtors to assume and assign the Assumed

Agreements as may be set forth in any purchase agreement with a Successful Bidder(s) in

accordance with such procedures.

68.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in

possession, "subject to the court's approval, may assume or reject any executory contract or

unexpired lease of the debtor." 11 U.S.C. § 365(a). "The purpose behind allowing the assumption

or rejection of executory contracts is to permit the trustee or debtor-in-possession to use valuable

property of the estate and to 'renounce title to and abandon burdensome property.'" *Orion Pictures*

*Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993)

(quoting 2 COLLIER ON BANKRUPTCY ¶ 365.01[1] (15th ed. 1993)).

69.     The standard applied to determine whether the assumption of a contract or an

unexpired lease should be authorized is the "business judgment" standard. *See Sharon Steel Corp.*

*v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *In re AbitibiBowater Inc.*, 418

B.R. 815, 831 (Bankr. D. Del. 2009) (finding that a debtor's decision to assume or reject an

executory contract will stand so long as "a reasonable business person would make a similar

decision under similar circumstances."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511

(Bankr. D. Del. 2003) (stating a debtor's decision to reject an executory contract is governed by

the business judgment standard and can only be overturned if the decision was the product of bad

faith, whim, or caprice). As described above, "[t]he business judgment rule 'is a presumption that

in making a business decision the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interest of the company.'"

*Integrated Res., Inc.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A.2d at 872). Indeed,

"the sole issue is whether the rejection benefits the estate." *In re HQ Global*, 290 B.R. at 511.

70.     The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See id.*; *see also Comm. of Asbestos Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."). Generally, courts defer to a debtor in possession's business judgment to assume or reject an executory contract or lease. *See Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (stating that the business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the executory contract will benefit the estate."); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984); *Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 42–43 (2d Cir. 1979); *In re Riodizio, Inc.*, 204 B.R. 417, 424–25 (Bankr. S.D.N.Y. 1997); *In re G Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

71.     Here, the Debtors have exercised their sound business judgment in determining that assumption and assignment of the Assumed Agreements is in the best interests of the Debtors and their estates, and, accordingly, the Court should approve the proposed assumption under section 365(a) of the Bankruptcy Code. *See, e.g., In re Philadelphia Newspapers, LLC*, 424 B.R. 178, 182–83 (Bankr. E.D. Pa. 2010) (stating that if a debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an executory contract or unexpired lease); *Westbury Real Estate Ventures, Inc. v. Bradlees, Inc. (In re Bradlees Stores, Inc.)*, 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y. 1996); *Summit Land Co. v. Allen (In re Summit Land Co.)*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding that, absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of

course").

72.    As set forth above, the Debtors believe that one or more Sale Transactions will provide significant benefits to the Debtors' estates. To that end, the assumption and assignment of the Assumed Agreements is necessary for the Debtors to maximize the benefits from the sale of all or substantially all of the Sale Assets. In addition, under section 365(k) of the Bankruptcy Code, the assignment by a debtor to an entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Thus, following an assignment to the Successful Bidder of any Assumed Agreement, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

73.    Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Agreements must be cured or that adequate assurance be provided that such defaults will be promptly cured. 11 U.S.C. § 365(b)(1). The Debtors propose to file with the Court, and serve on each Counterparty to an Assumed Agreement, the Contract Assumption and Assignment Notice (and, if applicable, an Amended Assumption and Assignment Notice) that indicates the proposed Cure Cost for each such contract or lease. As such, each Counterparty will have the opportunity to object to the proposed Cure Cost, if applicable. Moreover, the payment or reserve of the applicable Cure Cost will be a condition to the Debtors' assumption and assignment of any Assumed Agreement.

74.    Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The words "adequate assurance of future performance" must be given a "practical,

pragmatic construction" in light of the facts and circumstances of the proposed assumption. *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

75.     Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

76.     Here, any Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Agreement. In order for its bid to be deemed a Qualified Bid, each Qualified Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "Adequate Assurance Information"), including: (a) the bidder's financial wherewithal and willingness to perform under any contracts that are assumed and assigned to such potential bidder; and (b) a contact person for the proposed assignee that the Counterparty may directly contact in connection with the adequate assurance of future performance. Furthermore, given that the Debtors will submit evidence that all requirements for

the assumption and assignment of such contracts have been satisfied at the Sale Order Hearing,

the Court and other interested parties will have the opportunity to evaluate the ability of each

Successful Bidder to provide adequate assurance of future performance.

77.    Therefore, the Debtors respectfully request the Court (a) approve the Assignment

and Assumption Procedures, (b) approve the proposed assumption and assignment of the Assumed

Agreements, and (c) find that all anti-assignment provisions of such contracts are unenforceable

under section 365(f) of the Bankruptcy Code.[12]

## **NO PRIOR REQUEST**

78.    No previous request for the relief sought herein has been made to this Court or any

other court.

*[The remainder of this page is left intentionally blank.]*

---

[12] Section 365(f)(1) provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease . . ." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

WHEREFORE, the Debtors respectfully request that the Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, and, after the Sale Order Hearing, a Sale Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated: January 16, 2025

**RAINES FELDMAN LITTRELL, LLP**

By: */s/ Michael J. Roeschenthaler*
Michael J. Roeschenthaler (PA ID No. 87647)
Kenneth J. Lund (PA ID No. 63468)
Mark A. Lindsay (PA ID No. 89487)
Daniel R. Schimizzi (PA ID No. 311869)
11 Stanwix Street, Suite 1100
Pittsburgh, PA 15222
Telephone: 412-899-6462
Email: mroeschenthaler@raineslaw.com
klund@raineslaw.com
mlindsay@raineslaw.com
dschimizzi@raineslaw.com

*Proposed Counsel to the Debtors and
Debtors in Possession*