**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

FILED
1/28/25 4:42 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

| | |
|---|---|
| In Re: | Case No.: 25-70001-JAD |
| **WILSON CREEK ENERGY, LLC, *et al.*,**[1] | Chapter 11 |
| Debtors. | *Jointly Administered* |
| **WILSON CREEK ENERGY, LLC, *et al.*,** | Doc. No.: 189 |
| Movant, | Related to Document No. 116 |
| v. | Hearing Date: March 12, 2025 |
| **KIA II, LLC; KEYBANK NATIONAL ASSOCIATION; LSQ FUNDING GROUP, L.C.; R&D SVONAVEC VENTURES, LLC; BILL MILLER EQUIPMENT SALES; CLEVELANDBROTHERS EQUIPMENT; AND PRIME ALLIANCE BANK, INC., as Assignee of WINGSPIRE EQUIPMENT FINANCE,** | Hearing Time: 9:00 AM (EST) |
| | Response Deadlines: |
| | General Sale Objections: 4:00 PM (EST) on February 24, 2025 |
| Respondents. | Supplemental Objections:  4:00 PM (EST) on March 11, 2025 |

**ORDER (A) APPROVING BIDDING PROCEDURES FOR SALE OF ALL OR
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE
DEBTORS TO DESIGNATE STALKING HORSE BIDDER AND APPROVING
PROPOSED STALKING HORSE BID PROTECTIONS, (C) SCHEDULING AUCTION
FOR AND HEARING TO APPROVE THE SALE OF THE DEBTORS' ASSETS, (D)
APPROVING FORM AND MANNER OF NOTICE OF SALE, AUCTION, AND SALE
ORDER HEARING, (E) APPROVING ASSUMPTION AND ASSIGNMENT
PROCEDURES, (F) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF
EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
AND (G) GRANTING RELATED RELIEF**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Wilson Creek Energy, LLC (6202); Wilson Creek Holding, Inc. (7733); Maryland Energy Resource, LLC (5299); Mincorp Acquisition Corp. (4858); Mincorp Inc. (5688); PBS Coals, Inc. (2413); Roxcoal, Inc. (3768); Quecreek Mining, Inc. (1745), Croner, Inc. (0529); Elk Lick Energy, Inc. (8551); and Corsa Coal Corp. (0027). The Debtors' address is 1576 Stoystown Road, Friedens, Pennsylvania 15541.

Upon consideration of the *Debtors' Motion for Entry of Orders (A) Approving Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (C) Authorizing the Debtors to Designate Stalking Horse Bidder and Approving Proposed Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [Doc. No. 116] (the "Motion"),[2] and the Court, having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding under 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409, and the Court having considered the Motion, the arguments of counsel and the evidence presented at the hearing on the Motion (the "Bidding Procedures Hearing") and the entire record; and the Court having found that the Debtors provided due and sufficient notice of the Motion and Bidding Procedures Hearing and the relief sought in the Motion under the particular circumstances, and it appearing no other or further notice need be provided; and the Court having reviewed the Motion, the filings in support of the Motion, and all objections to the relief sought in the Motion; and the Court having found that the relief requested in the Motion is in the best interest of the Debtors, their estates, their creditors, and other parties in interest; and after due deliberation and good and

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

sufficient cause appearing for the relief sought in the Motion, it is hereby **FOUND AND DETERMINED** that:

A.      The findings of fact and conclusions of law set forth in this Bidding Procedures Order constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this case pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusion of law, they are hereby adopted as such. Any findings of fact or conclusions of law stated by the Court on the record at the Bidding Procedures Hearing are hereby incorporated, to the extent they are not inconsistent with this Order.

B.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.      The statutory and legal bases for the relief requested in the Motion are sections 105, 363(b), 363, 364, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 4001, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

D.      A reasonable opportunity to object or be heard regarding the relief requested in the Motion (including, without limitation, with respect to the Bidding Procedures) has been afforded to all interested persons and entities, including, but not limited to, the Sale Notice Parties.

E.      Notice of the Motion and the Bidding Procedures Hearing was adequate and sufficient under the circumstances of these Chapter 11 Cases, and such notice complied with sections 102(1), 105(a), 363, and 365 of the Bankruptcy Code, and Rules 2002, 6004, 6006, and 9014 of the Bankruptcy Rules.

F.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties-in-interest.

G.      The Debtors have demonstrated a compelling and sound business justification for the Court to enter this Order approving a sale process for the sale of the Sale Assets on the terms and conditions initially set forth in the Proposed APA attached hereto as **Exhibit 2**, including the Debtors' request for the authority to designate one or more Stalking Horse Bidders and afford each Stalking Horse Bidder the Bid Protections, which consist of (a) a Breakup Fee in an amount not to exceed three percent (3%) of such Stalking Horse Bid, and (b) an Expense Reimbursement not to exceed two percent (2%) of such Stalking Horse Bid, for an aggregate Bid Protections package not to exceed five percent (5%).

H.      The Bid Protections are fair and reasonable and provide a benefit to the Debtors' estates and stakeholders.

I.      The Debtors have demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation, to (a) approve the Bidding Procedures; (b) authorize the Debtors to designate one or more Stalking Horse Bidders and approve the Bid Protections; (c) establish the Assumption and Assignment Procedures; (d) approve the form and manner of the Notices and the Notice Procedures; (e) schedule a date for the (i) Auction and (ii) Sale Order Hearing; and (f) grant related relief as set forth herein. Such compelling and sound business justification, which was set forth in the Motion and on the record at the Bidding Procedures Hearing, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

J.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation filed with the Court are overruled except as otherwise set forth herein.

K.      The Bidding Procedures, substantially in the form attached as **<u>Exhibit 1</u>** hereto, are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates.

L.      The Proposed APA, substantially in the form attached hereto as **<u>Exhibit 2</u>** is reasonable and appropriate for purposes of serving as an initial form of definitive agreement for negotiation by and between the Debtors and any Potential Bidder.

M.      The Auction and Sale Order Hearing Notice, substantially in the form attached as **<u>Exhibit 3</u>** hereto, is appropriate and reasonably calculated to provide notice of the sale of the Sale Assets free and clear of all liens, claims, encumbrances, or interests, including, without limitation: (i) the date, time, and place of the Auction, if any; (ii) a summary of the Bidding Procedures; (iii) the deadline for filing objections to the sale of the Sale Assets; (iv) the date, time, and place of the Sale Order Hearing to consider the sale of the Sale Assets; (v) that the sale of the Sale Assets is free and clear of all liens, interests, claims, and encumbrances to the fullest extent allowable under section 363(f) of the Bankruptcy Code, with all liens, interests, claims, and encumbrances attaching with the same validity and priority to the proceeds of the Sale Transaction(s); and (vi) the proposed assumption and assignment of the Assumed Agreements to any Successful Bidder arising from the Auction (if any), and no other or further notice of the Sale Transaction shall be required.

N.      The Contract Assumption and Assignment Notice, substantially in the form attached as **<u>Exhibit 4</u>** hereto, is reasonably calculated to provide all interested parties with timely

and proper notice of the potential assumption and assignment of Executory Contracts in connection

with the Sale Transaction and the related Cure Costs, and no other or further notice is required.

O.      The Post-Auction Notice, substantially in the form attached as **Exhibit 5**

hereto, is appropriate and reasonably calculated to provide all interested parties with timely and

proper notice of the Successful Bidder(s) and Backup Bidder(s), and no other or further notice is

required.

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that:

1.      The relief requested in the Motion is **GRANTED AND APPROVED** as set forth

in this Order.

2.      All objections or the relief requested in the Motion that have not been withdrawn,

waived, or settled as announced to the Court at the Bidding Procedures Hearing or by stipulation

filed with the Court, and all reservations of rights included therein, are hereby overruled on the

merits or have been otherwise satisfied or adequately provided for pursuant to this Order.

**(i)      Timeline of the Sale**

3.      The Debtors are authorized to proceed with the sale of the Sale Assets in accordance

with the Bidding Procedures and are authorized to take any and all actions reasonably necessary

or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| Proposed Date | Milestone |
|---|---|
| **On or before January 28, 2025** | Bidding Procedures Hearing |
| **On or before January 30, 2025** | Entry of Bidding Procedures Order |
| **February 3, 2025** | Deadline to Serve Auction and Sale Notice and Contract Assumption and Assignment Notice |
| **February 14, 2025, at 5:00 PM (ET)** | Deadline to Designate Stalking Horse Bid(s) |

| | |
|---|---|
| **February 24, 2025, at 4:00 p.m. (ET)** | Sale Objection Deadline and Contract Objection Deadline[3] |
| **March 7, 2025, at 4:00 p.m. (ET)** | Bid Deadline |
| **March 9, 2025, at 12:00 p.m. (ET)** | Deadline for Debtors to Designate Qualifying Bid(s) and Opening Bid(s) |
| **March 10, 2025, at 10:00 a.m. (ET)** | Auction |
| **As soon as practicable after completion of the Auction** | File and Serve Post-Auction Notice |
| **March 11, 2025, at 4:00 p.m. (ET)** | Deadline for Supplemental Objections[4] |
| **March 12, 2025, at 9:00 a.m. (ET)** | Sale Order Hearing |
| **On or before March 13, 2025** | Entry of the Sale Order |
| **On or before March 18, 2025** | Sale Closing |

4.      The failure to timely file an objection in accordance with this Order shall forever bar the assertion of any objection to the Motion, Bidding Procedures, and/or consummation of the Sale Transaction, including the assumption and assignment of Assumed Agreements to a Successful Bidder, and shall be deemed to constitute any such party's consent to entry of an order approving the Sale Transaction and consummation of the Sale Transaction and all other transactions related thereto.

---

[3] The Sale Objection Deadline and Contract Objection Deadline apply to all objections to the sale of the Sale Assets, with the exception of objections related to adequate assurance of future performance by a Successful Bidder (including a potential Stalking Horse Bidder if designated by the Debtors in accordance with the Bidding Procedures) and the conduct of the Auction.

[4] Supplemental Objections are objections related to adequate assurance of future performance of the Successful Bidder and the conduct of the Auction.

5.      The Debtors are authorized to modify the above timeline and Bidding Procedures in accordance with the Bidding Procedures upon consultation with the DIP Lender, KeyBank, and the Committee (collectively, the "Consultation Parties").[5]

### (ii)      The Bidding Procedures

6.      The Bidding Procedures are **APPROVED** in their entirety. The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith. The failure to specifically include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such actions.

7.      The process and requirements associated with submitting a bid and the designation of a bid as a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest. As further described in the Bidding Procedures, the Bid Deadline shall be **4:00 p.m. (prevailing Eastern Time) on March 7, 2025,** and such Bid Deadline may not be extended without the consent of the DIP Lender in consultation with the Consultation Parties. Any disputes or objections to the selection of any Qualified Bid, the Successful Bid, or the Backup Bid (each as defined in the Bidding Procedures) shall be resolved by the Court at the Sale Order Hearing as set forth herein.

8.      The Debtors are authorized to conduct and preside over the Auction in accordance with the Bidding Procedures. The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at **10:00 a.m. (prevailing Eastern Time) on March 10, 2025**, at the offices of: (a) Raines Feldman Littrell, LLP, 11 Stanwix St., Suite 1100, Pittsburgh,

---

[5] In the event any Consultation Party submits a Bid to acquire some or all of the Sale Assets, upon submission of a Bid, the Consultation Party shall no longer be a Consultation Party.

Pennsylvania 15222, (b) via in person or a virtual platform, such as Zoom, or (c) such other location, in each case as the Debtors designate (or at any other time and location as the Debtors may hereafter designate on proper notice). The Auction will be conducted openly, and all Qualified Bidders, the Consultation Parties, sureties that have issued the Debtors' bonds, and the U.S. Trustee will be permitted to attend.

(iii)    **Authority to Designate Stalking Horse Bidder(s) and Approval of Bid Protections**

9.    The Bid Protections are approved. Each Potential Bidder submitting a Potential Bid that the Debtors designate, in an exercise of their sound business judgment and in consultation with the Consultation Parties, as a Stalking Horse Bidder and a Stalking Horse Bid, respectively, shall be entitled to (i) a Breakup Fee of no more than three percent (3%) of the Stalking Horse Bid, and (ii) the Expense Reimbursement not to exceed two percent (2%) of the Stalking Horse Bid, for an aggregate Bid Protections package not to exceed five percent (5%) of the Stalking Horse Bid. The Bid Protections, if due and payable pursuant to this Order, shall be payable at the Closing of a Sale Transaction in which the Successful Bidder is not the Stalking Horse Bidder. To the extent entitled to the Expense Reimbursement, each Stalking Horse Bidder shall provide the Debtors, the U.S. Trustee, and the Consultation Parties with a notice (the "Expense Reimbursement Notice") of its intent to seek payment of any Expense Reimbursement, which notice shall include the amount sought and reasonable supporting documentation. Unless the Debtors, U.S. Trustee, or the Consultation Parties file an objection as to the reasonableness of the Expense Reimbursement with the Court within five (5) business days of the date of service of the Expense Reimbursement Notice (the "Expense Reimbursement Objection Deadline"), the Debtors shall pay the Expense Reimbursement to the Stalking Horse Bidder within three (3) business days of the Expense Reimbursement Objection Deadline. If any of the Debtors, the U.S. Trustee, or the Consultation

Parties files an objection as to the reasonableness of the Expense Reimbursement within the Expense Reimbursement Objection Deadline, the parties shall schedule a hearing before the Court to resolve the objection. In the event of a timely objection, after Closing of the Sale Transaction to the Successful Bidder that is not the Stalking Horse Bidder, the Debtors shall hold the total amount of Expense Reimbursement sought in a segregated account for the specific purpose of paying the Expense Reimbursement.

10.     Each Stalking Horse Bidder shall be required to serve as the Backup Bidder if the Stalking Horse Bidder is not the Successful Bidder, but is selected as the Backup Bidder.

**(iv)     Notice Procedures**

11.     The Auction and Sale Notice, substantially in the form attached as **Exhibit 3**, is **APPROVED**.

12.     As soon as practicable after entry of this Order, the Debtors shall serve the Auction and Sale Notice by first-class mail, postage prepaid on the following parties; provided, however, that, to the extent email addresses are available for counsel for any of the following parties that have appeared in these Chapter 11 Cases, such counsel may be served by email in lieu of mailing such notice to the party represented by such counsel (collectively, the "Sale Notice Parties"): (a) all of the Debtors' creditors; (b) all entities that have, to the best knowledge of the Debtors' management and advisors, expressed written interest in purchasing any of the Sale Assets within the past one (1) year; (c) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Sale Assets; (d) the Master Service List; (e) all parties that have requested notice pursuant to Bankruptcy Rule 2002; (f) all federal, state, and local regulatory or taxing authorities, including any applicable taxing bodies or recording offices which have a reasonably known interest in the relief granted herein; (g) the Internal Revenue Service; (j) any

other governmental authority known or reasonably believed by the Debtors to have or assert a claim against any of the Debtors in these Chapter 11 Cases; (k) the Office of the Attorney General and Office of the Secretary of State for the Commonwealth of Pennsylvania and State of Maryland; (l) the counterparties to the Executory Contracts; and (m) the Consultation Parties.

13.     The Debtors shall also (i) upload the Sale Order Hearing Notice to the Court's Electronic Access to Sales Information (EASI) system and (ii) advertise notice of the Sale Order Hearing by publication in newspapers of general circulation and legal journals for the counties in which the Debtors conduct operations, all as required by Local Rule 6004-1.

14.     Service of the Auction and Sale Order Hearing Notice as described above shall be good and sufficient notice of the Sale Transaction and the Assumption and Assignment Procedures with respect to known interested parties.

15.     The Debtors are directed to post the Auction and Sale Order Hearing Notice on their case information website at https://cases.omniagentsolutions.com/wilsoncreek.

16.     The form of the Post-Auction Notice substantially in the form attached hereto as **Exhibit 5** is **APPROVED**. The Debtors shall file on the docket and serve the Post-Auction Notice on the Counterparties to the Assumed Agreements, the Sale Notice Parties, and all parties entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 2002-1 via ECF, by email, fax, or overnight delivery, all in accordance with the Case Management Order and as soon as practicable after completion of the Auction.

### (v)     Assumption and Assignment Procedures

17.     The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein, are hereby **APPROVED**.

18.    The Contract Assumption and Assignment Notice, substantially in the form attached hereto as **Exhibit 4** is hereby **APPROVED**.

19.    The Debtors shall file with the Court, post on their case information website at https://cases.omniagentsolutions.com/wilsoncreek, and serve on each counterparty to an Executory Contract, the Contract Assumption and Assignment Notice by **February 3, 2025**. If no Cure Cost is listed for a particular Assumed Agreement, or if the amount is listed as "unknown" or "undetermined", the Debtors' asserted Cure Cost for such Executory Contract shall be deemed to be $0.00. The Debtors shall serve, via email to counsel for any party that has appeared in these Chapter 11 Cases, if available, or by first-class mail, the (a) Contract Assumption and Assignment Notice that contains the list of Executory Contracts, (b) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Executory Contracts that may be Assumed Agreements and rights thereunder, (c) the Cure Cost, if any, and (d) the procedures for objecting thereto, on all Counterparties to the Executory Contracts, the Master Service List, and all parties on the Rule 2002 Notice List. Service of such Contract Assumption and Assignment Notice as set forth herein shall be deemed good and sufficient notice of, among other things, the potential assumption and assignment of the Executory Contracts, the applicable Cure Costs related thereto, and the procedures for objecting thereto, and no other or further notice is necessary.

20.    Any objection with respect to the Debtors' proposed assumption and assignment of any Executory Contract included in the Contract Assumption and Assignment Notice, including, without limitation, any objection to the Cure Cost (a "Contract Objection"), shall be filed by **4:00 p.m. (prevailing Eastern Time) on February 24, 2025** (the "Contract Objection Deadline"), for any Counterparties to a Executory Contracts provided that, with respect to any Contract Objection

for any Executory Contract included on a supplemental or amended Contract Assumption and Assignment Notice filed by the Debtors, such Contract Objections shall be filed on or prior to fourteen (14) days following service of such Amended Contract Assumption and Assignment Notice. Any Contract Objection must (a) be in writing; (b) comply with the applicable provisions of the Bankruptcy Rules and Bankruptcy Local Rules; (c) be filed with the Court by the Contract Objection Deadline, unless otherwise provided herein; and (d) state with specificity the grounds for such objection, including, without limitation, the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the counterparty believes is required to be paid under Sections 365(b)(1)(A) and (B) of the Bankruptcy Code for the applicable Assumed Agreement, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise thereto.

21.     If, after the Contract Assumption and Assignment Notice and Contract Objection Deadline, additional executory contracts or unexpired leases of the Debtors are determined to be potential Assumed Agreements in connection with one or more Sale Transactions, or the Debtors seek to modify the previously stated Cure Cost associated with any Executory Contract, as soon as practicable thereafter, the Debtors shall file with the Court and serve, by overnight delivery, on the applicable Counterparties, an Amended Contract Assumption and Assignment Notice, and such Counterparties shall file any objection to the Cure Cost not later than fourteen (14) days following service of such Amended Contract Assumption and Assignment Notice.

22.     The inclusion of an Executory Contract on the Contract Assumption and Assignment Notice, or any Amended Contract Assumption and Assignment Notice, will not (a) obligate the Debtors to assume any Executory Contract listed thereon nor obligate any Successful Bidder to take assignment of such Executory Contract or (b) constitute any admission or agreement

of the Debtors that such Executory Contract is an executory contract. Any Executory Contracts that are not designated for potential assumption and assignment to a Successful Bidder or Backup Bidder may be assumed, assumed and assigned, or rejected at a later date in compliance with Section 365 of the Bankruptcy Code.

23.    Any objection to the adequate assurance of future performance of any Successful Bidder must be filed no later than **March 11, 2025, at 4:00 p.m. (EST)**, and all such objections must specify what the objecting party believes is required to provide such adequate assurance.

24.    If no Contract Objection is timely received with respect to an Assumed Agreement: (a) the counterparty to such Assumed Agreement shall be deemed to have consented to the assumption by the Debtors and assignment to a Successful Bidder of the Assumed Agreement, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the applicable Successful Bidder); (b) any and all defaults under the Assumed Agreement and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Cure Cost set forth in the Contract Assumption and Assignment Notice, or any Amended Contract Assumption and Assignment Notice; and (c) the counterparty shall be forever barred from asserting any other claims related to such Assumed Agreement against the Debtors and their estates or any Successful Bidder, or the property of any of the foregoing, that existed prior to the entry of the Sale Order.

25.    To the extent that the parties are unable to consensually resolve any Contract Objection prior to the commencement of the Sale Order Hearing, the Debtors may, after consultation with, and approval from, one or more Successfully Bidders (which may be Stalking Horse Bidders), (i) assume the applicable Assumed Agreement prior to the resolution of the Cure

Dispute; provided that the Successful Bidder shall (a) pay to the applicable counterparty the undisputed portion of the Cure Cost within five (5) business days after the Closing of the Sale Transaction and (b) reserve cash in an amount sufficient to pay the disputed portion of the Cure Cost reasonably asserted by the applicable counterparty (or such lesser amount as may be fixed or estimated by the Court or otherwise agreed to by the counterparty and the Debtors), or (ii) adjourn their request to assume the contract or lease pending resolution of the Cure Dispute; provided, further, that, to the extent the Adjourned Cure Dispute (as defined in the Motion) is resolved or determined unfavorably to the Debtors, the Debtors (with the consent of the Successful Bidder(s)) may withdraw the proposed assumption of the applicable contract or lease after such determination by filing a notice of withdrawal, which, in the case of a lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under section 365(d)(4) of the Bankruptcy Code. The Debtors shall file notice of their intention to reserve for a Cure Cost or to adjourn their request for assumption. An Adjourned Cure Dispute may be resolved after the Closing Date of the Sale Transaction in the Debtors' discretion with the consent of the Successful Bidder(s).

### (vi)   Sale Order Hearing

26.    A Sale Order Hearing to (a) approve a sale of all or substantially all of the Sale Assets one or more Successful Bidders, (b) approve the Debtors' designation of one or more Backup Bids and Backup Bidders, if applicable, in accordance with the Bidding Procedures, and (c) authorize the assumption and assignment of the Assumed Agreements, shall be held at **9:00 a.m. (prevailing Eastern Time) on March 12, 2025**, and may be adjourned or rescheduled on notice by the Debtors. At the Sale Order Hearing, the Debtors will seek Court approval of the Successful Bid(s) and Backup Bid(s), if applicable. Unless the Court orders otherwise, any Sale Order Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction, and there

will be no further bidding at such hearing. In the event that a Successful Bidder cannot or refuses to consummate the Sale Transaction because of the breach or failure on the part of such Successful Bidder, the Debtors, may, in accordance with the Bidding Procedures and the applicable Modified Proposed APA: (i) designate the applicable Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder and consummate the Sale Transaction with the Backup Bidder without further order of the Court; (ii) retain any deposit tendered by the Successful Bidder that cannot or refuses to close because of a breach or failure on the part of the Successful Bidder as liquidated damages; and (iii) in the event the Successful Bidder that cannot or refuses to close because of a breach or failure on the part of the Successful Bidder is a Stalking Horse Bidder, terminate the Bid Protections that the Successful Bidder (as a Stalking Horse Bidder) is entitled to receive under this Order.

27.    Any and all general objections to the proposed Sale Transactions must be filed on or before **4:00 p.m. (prevailing Eastern Time) on February 24, 2025**. Any objections relating to the conduct of the Auction and the proposed adequate assurance of any Successful Bidder for each Sale Transaction, must be filed no later than **4:00 p.m. (prevailing Eastern Time) on March 11, 2025**. For avoidance of doubt, any objections to the conduct of the Auction or a Successful Bidder's proposed form of adequate assurance of future performance of any Assumed Agreement will be resolved at the Sale Order Hearing.

28.    Except as otherwise provided in any Sale Order, all valid liens or other interests against the Sale Assets being sold will attach against the sale proceeds in the same order of their existing priority and with the same validity, force, and effect as existed prior to the sale.[6] The net

---

[6] A lien will only be considered not "valid" if so determined by a non-appealable order of a court of competent jurisdiction as of the time of the closing of any particular Sale Transaction.

sale proceeds of the sale, subject to carve-outs for any Bidding Protections afforded any Stalking Horse Bidder, shall be paid to the DIP Lender, KeyBank, and other prepetition secured lenders at closing for application to their respective contractually owed debt in the order of their priority without further order from the Court. Any proceeds in excess of the amounts required to pay the DIP Lender, KeyBank, and any other prepetition secured lenders in full will be held by the Debtors pending further order of the Court.

### (vii)   **Miscellaneous**

29.     Except as otherwise provided herein, any objection made pursuant to any of the provisions set forth in the Motion must: (a) be in writing, (b) comply with the applicable provisions of the Bankruptcy Rules and Bankruptcy Local Rules, (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor, and (d) be filed with this Court via ECF and served in accordance with the Case Management Order.

30.     Any substantial contribution claims by any Potential Bidder are deemed waived, to the extent based on such Potential Bidder's submission of a bid in accordance with the Bidding Procedures.

31.     The Debtors are authorized and empowered to take such action as may be necessary to implement and effect the terms and requirements established under this Order.

32.     The Debtors are authorized to make any non-material revisions to the exhibits and notices attached hereto without further Court approval.

33.     This Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

34.     Nothing in this Order or the Proposed APA releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would

be subject to as the post-sale owner or operator of property after the date of entry of this Order. Nothing in this Order or the Proposed APA authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable laws.

35.    Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

36.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding Procedures and the implementation of this Order.

Prepared by:
*/s/ Daniel R. Schimizzi*
Daniel R. Schimizzi, Counsel to the Debtors

BY THE COURT:

Date: _____January 28_____, 2025

_____
The Honorable Jeffery A. Deller
United States Bankruptcy Judge

## **EXHIBIT 1**

Bidding Procedures

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re: | **Case No.: 25-70001-JAD** |
| **WILSON CREEK ENERGY, LLC, *et al.*,**[1] | **Chapter 11** |
| **Debtors.** | *Jointly Administered* |

**BIDDING PROCEDURES FOR THE SALE OF ALL OR
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS**

### Due Diligence Participation Requirements

Any person desiring to conduct due diligence that may lead to a bid for all or substantially all of the Sale Assets will be required to deliver to the Debtors an executed confidentiality agreement in form and substance satisfactory to the Debtors.[2] The Debtors and their professionals will afford any parties that execute a confidentiality agreement (a "Potential Bidder") such due diligence access or additional information as the Debtors, in their business judgment, determine to be reasonable and appropriate. Notwithstanding the foregoing, the Debtors, in consultation with the DIP Lender, KeyBank National Association ("KeyBank"), and the Official Committee of Unsecured Creditors (the "Committee") (collectively, the DIP Lender, KeyBank, and the Committee, the "Consultation Parties"), shall have the right to require satisfactory evidence of any Potential Bidder's available funds for or firm commitment for sufficient financing to consummate an acquisition, prior to granting said Potential Bidder access to conduct due diligence, and the Debtors, in consultation with the Consultation Parties, may withhold or limit access by any Potential Bidder to the due diligence if the Potential Bidder does not become or, the Debtors

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Wilson Creek Energy, LLC (6202); Wilson Creek Holding, Inc. (7733); Maryland Energy Resource, LLC (5299); Mincorp Acquisition Corp. (4858); Mincorp Inc. (5688); PBS Coals, Inc. (2413); Roxcoal, Inc. (3768); Quecreek Mining, Inc. (1745), Croner, Inc. (0529); Elk Lick Energy, Inc. (8551); and Corsa Coal Corp. (0027). The Debtors' address is 1576 Stoystown Road, Friedens, Pennsylvania 15541.

[2] Unless otherwise defined, all capitalized terms used herein shall have the meanings provided in the *Debtors' Motion for Entry of Orders (A) Approving Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (C) Authorizing the Debtors to Designate Stalking Horse Bidder and Approving Proposed Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [Doc. No. 116] (the "Motion").

determine, in consultation with the Consultation Parties, that the Potential Bidder is not likely to become, a Qualified Bidder. Additional due diligence will not be provided after the Bid Deadline (as defined below).

Each Potential Bidder agrees to use, and to instruct its advisors and representatives to use, any of the Debtors' confidential information only in connection with the formulation of a bid(s) during the bidding process or in accordance with the terms of any applicable confidentiality agreement.

### Bid Deadline

The deadline for Potential Bidders to submit bids for consideration by the Debtors is **March 7, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline"). Such bids must be received on or before the Bid Deadline by the following parties (collectively, the "Notice Parties"):

> Debtors: 1576 Stoystown Road, Friedens, Pennsylvania 15541, Attn: Kevin Harrigan, President and Chief Executive Officer of the Debtors (kharrigan@corsacoal.com); and,

> Debtors' counsel: Raines Feldman Littrell, LLP, 11 Stanwix St., Suite 1100, Pittsburgh, PA 15222, Attn: Michael J. Roeschenthaler (mroeschenthaler@raineslaw.com); and Daniel R. Schimizzi (dschimizzi@raineslaw.com).

The Debtors will promptly deliver a copy of each bid received by the Bid Deadline to each of the Consultation Parties. The Bid Deadline cannot be extended unless the Debtors, upon consultation with the Consultation Parties, consent to such extension.

### Participation Requirements

To be eligible to participate in the Auction (as such term is defined below), each bid and each Potential Bidder submitting such a bid must conform to the following requirements (collectively, the "Participation Requirements"):

1.  Acknowledge that the Potential Bidder has received, has had an opportunity to review, and agrees to be bound by, the Bidding Procedures Order;

2.  Propose an offer by which the Potential Bidder will consummate the proposed Sale Transaction by providing the Debtors with a clean executed and revised redline form of the Proposed APA (as revised by the Potential Bidder and submitted to the Debtors, the "Modified Proposed APA"), with such Modified Proposed APA including, among other things: (i) the identification of the Sale Assets to be included in the contemplated Sale Transaction; (ii) the terms and conditions upon which the Potential Bidder intends to acquire the Sale Assets; (iii) the consideration (both cash consideration and assumed liabilities) for the sale of the Sale Assets contemplated by the Modified Proposed APA; and (iv) whether the Potential Bidder desires to be designated as a Stalking Horse Bidder;

3.      Include a statement that there are no conditions precedent to the Potential Bidder's entry into a definitive Modified Proposed APA, including that (a) there are no financing contingencies to the bid, (b) there are no due diligence contingencies to the bid, and (c) all necessary internal, board, member and/or equity holder approvals have been obtained prior to submitting the bid;

4.      State that such offer is binding and irrevocable until the approval of the Successful Bid by the Court unless designated as the Back-Up Bid (as defined below);

5.      Disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, and the complete terms of any such participation;

6.      Include the names and contact information of representatives of the Potential Bidder who will be available to answer questions regarding the offer, including any advisors and related parties;

7.      Include a deposit of cash or other immediately available funds in the amount of at least ten percent (10%) of the Proposed Bid (the "Earnest Money Deposit") which will be held by Debtors' counsel in a segregated bank account (which can be an escrow or IOLTA account);

8.      Not be conditioned on the receipt of any third-party approvals or consents (excluding required Court approval and required governmental, licensing, or regulatory approval or consent, if any), including without limitation board of director approval. With respect to any governmental, licensing, permitting, or other regulatory approvals or consents, each bid must include a description of all such approvals or consents that are required to consummate the proposed transaction, together with evidence satisfactory to the Debtors of the ability of the bidder to obtain such approvals or consents in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such approvals or consents;

9.      Accompanied by an executed letter stating that the Potential Bidder's offer, is irrevocable until consummation of a Sale Transaction involving the Sale Assets identified and that such bidder agrees to serve as a Backup Bidder (as defined herein) in accordance with these Bidding Procedures;

10.     Include sufficient financial or other information (the "Adequate Assurance Information") to establish adequate assurance of future performance with respect to any lease or contract to be assigned to the Potential Bidder in connection with the proposed Sale Transaction. The bid shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information;

11.     Provide satisfactory written evidence of available funds or a firm commitment for financing sufficient to consummate the Sale Transaction for which the Potential Bidder submitted the Potential Bid;

12.     Provide that the Potential Bidder will (i) (a) take transfer of or obtain permits for the mining operations to be acquired, (b) assume all associated and applicable environmental obligations with respect to the mines subject to the Bid to the extent required under applicable nonbankruptcy law, and (c) obtain assignment of or replace the reclamation surety bonds associated and other financial assurance associated with such permits, and (ii) provide evidence of (a) the Potential Bidder's ability to satisfy the conditions set forth in clause (i) of this paragraph (including verification that the Potential Bidder is not, and will not be as of the time of the transfer, "permit blocked" under the federal Surface Mining Control and Reclamation Act by application of the federal Applicant Violator System), and (b) the Potential Bidder's financial resources necessary to obtain assignment of or replace the reclamation surety bonds and other financial assurance associated with such permits, which evidence may include a letter from a surety company confirming that the Potential Bidder is a "qualified buyer" (as such term is used in the surety industry);

13.     Represent and warrant that the Potential Bidder has had a full and fair opportunity to conduct any and all due diligence regarding the Debtors' business and the Sale Assets prior to submitting its bid and a statement that the Potential Bidder has relied solely upon its own independent review, investigation, and/or inspection of any relevant documents and the Sale Assets in making its bid and did not rely on any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express or implied, by operation of law or otherwise, regarding the Debtors' business or the Sale Assets or the completeness of any information provided in connection therewith, except as expressly stated in the representations and warranties contained in the Potential Bidder's Modified Proposed APA, if ultimately accepted and executed by the Debtors; and,

14.     Acknowledge that the Potential Bidder is not entitled to any of the Bid Protections unless designated as a Stalking Horse Bidder by the Debtors.

The Debtors, after consultation with the Consultation Parties, shall determine whether bids submitted by the Bid Deadline by Potential Bidders meet the Participation Requirements.

The Debtors reserve the right to request additional information from a Potential Bidder in connection with any Potential Bid, including any information that the Debtors believe, after consultation with the Consultation Parties, would render a non-confirming Potential Bid a Qualified Bid.

## Qualified Bidders and Bids

Potential Bidders who have satisfied the Participation Requirements in the Debtors' judgment and in consultation with the Consultation Parties will be deemed "Qualified Bidders."

Bids that satisfy all bid requirements, as determined by the Debtors will be deemed "Qualified Bids." The Debtors will advise each Potential Bidder whether it is deemed to be a Qualified Bidder and whether its bid is a Qualified Bid before the Auction.

As provided in the Bidding Procedures Order, if and to the extent the Debtors designate one or more Potential Bidders as Stalking Horse Bidders, the Stalking Horse Bids shall be deemed Qualified Bids, and the Stalking Horse Bidders shall be Qualified Bidders in all respects. Each Stalking Horse Bidder shall be entitled to credit bid the amount of the Breakup Fee and Expense Reimbursement towards any subsequent bid at the Auction, if any. Each Stalking Horse Bidder shall be required to serve as a Backup Bidder if they are not the Successful Bidder but the Debtors select them as the Backup Bidder.

All Qualified Bidders shall be deemed to have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to due diligence, the submission of its bid, the Bidding Procedures, the Auction, and the Sale (defined below), provided that any Stalking Horse Bidders are entitled to the Bid Protections.

### Auction Participation

Unless otherwise agreed to by the Debtors, only the Debtors, Qualified Bidders, the Consultation Parties, members of the Committee, sureties issuing the Debtors' bonds, the U.S. Trustee, and each of the foregoing parties' legal and financial professionals, are eligible to attend and participate in the Auction. Subject to the other provisions of these Bidding Procedures, if the Debtors do not receive any Qualified Bids, the Debtors, in consultation with the Consultation Parties, shall exercise their sound business judgment in furtherance of their fiduciary duties owed to their estates and creditors thereof, to determine what action(s) the Debtors should take to preserve and maximize the value of their estates, including whether to (i) extend the Bid Deadline; (ii) confer and attempt to confirm any non-Qualified Bids received as of the Bid Deadline; or (iii) withdraw this Motion.

Prior to the start of the Auction, the Debtors may hold discussions with any Qualified Bidders for less than all of the Sale Assets to discuss proposals to combine their Qualified Bids for purposes of bidding on the Sale Assets at the Auction.

### Auction

If more than one Qualified Bid is received, the Debtors will conduct an auction (the "Auction") for the sale of substantially all the Sale Assets. Each Qualified Bidder participating at the Auction will be required to confirm on the record that it has not engaged in any collusion with respect to the bidding or a potential Sale Transaction. Prior to the start of the Auction, the Debtors will select a Qualified Bid to be the opening bid at the Auction (each such Qualified Bid, the "Opening Bid" and each such Qualified Bidder, the "Opening Bidder"), and inform each of the Qualified Bidders participating in the Auction of the same. The "Minimum Initial Topping Bid" shall mean: (i) in the event the Debtors designate a Staking Horse Bidder for any given Sale Transaction, the sum of (x) the Stalking Horse Bid plus (y) the maximum amount of the Bid Protections plus (z) the Minimum Bid Amount of $200,000; or (ii) in the event the Debtors do not

designate a Stalking Horse Bidder for any given Sale Transaction, the sum of (y) the Opening Bid plus (z) the Minimum Bid Amount of $200,000.

The Auction, if necessary, shall take place at 10:00 a.m. (prevailing Eastern Time) on March 10, 2025 (the "Auction Date") at the offices of: (a) Raines Feldman Littrell, LLP, 11 Stanwix St., Suite 1100, Pittsburgh, Pennsylvania 15222, (b) via in person or a virtual platform, such as Zoom or GoToMeeting, or (c) such other location, in each case as the Debtors designate. No later than forty-eight (48) hours prior to the Auction Date, the Debtors shall provide notice of the Auction location and, if via a virtual platform, the credentials required to access such platform, to all Qualified Bidders, the U.S. Trustee, and the Consultation Parties. At the Auction, only the Qualified Bidders (including any Stalking Horse Bidders, taking into account their right to credit bid the Bid Protections) will be permitted to increase their bids by the Minimum Bid Amount, and to make any incremental bids thereafter. The Debtors, in consultation with the Consultation Parties, may conduct the Auction in the manner they reasonably determine, in their business judgment will achieve the maximum value for the Sale Assets.

### Closing the Auction

The Auction shall continue until there is one offer or a combination of offers that the Debtors determine, in consultation with the Consultation Parties and subject to Bankruptcy Court approval, is the highest and best offer(s) from among the Qualified Bidders (including any Stalking Horse Bidders) submitted at the Auction (the "Successful Bid(s)"). The Qualified Bidder(s) submitting such Successful Bid(s) shall become the "Successful Bidder(s)" and shall have such rights and responsibilities of a purchaser, as set forth in the Modified Proposed APAs, as applicable. Immediately prior to the conclusion of the Auction, the Debtors shall notify all Qualified Bidders at the Auction of the name or names of the Successful Bidder(s) and the amount and other material terms of the Successful Bid(s).

The Debtors, in consultation with the Consultation Parties, shall also select an offer or a combination of offers to serve as a back-up bid (the "Back-Up Bid(s)" and, such Qualified Bidder submitting the Back-Up Bid, the "Back-Up Bidder(s)"), which Back-Up Bid(s) shall remain open and irrevocable until the Closing of the sale (the "Sale") with the Successful Bidder(s). In the event that a Successful Bidder fails to close the transaction contemplated by the Successful Bidder, for any reason, the Debtors may elect to regard the Back-Up Bid as the highest and best bid for the Sale Assets, and the Debtors will be authorized to consummate the transaction contemplated by the Back-Up Bid without further order of the Court.

The Successful Bidder(s) and the Back-Up Bidder(s) shall be deemed to have waived the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code related in any way to due diligence, the submission of its bid, the Bidding Procedures, the Auction, and the Sale, provided that the Stalking Horse Bidders are entitled to the Bid Protections.

Any Qualified Bidder identified as a Stalking Horse Bidder shall serve as the Back-Up Bidder in the event the Debtors select other Qualified Bidder(s) as the Successful Bidder(s).

### Assumption of Executory Contracts and Unexpired Leases

The Modified Proposed APAs must designate which executory contracts and unexpired leases are to be assumed and assigned as part of the sale of the Sale Assets (the "Assumed Agreements"). Except as otherwise provided in the Successful Bidder's Modified Proposed APA or in the Sale Order, the Successful Bidder(s) shall be responsible for all Cure Costs relating to the Assumed Agreements under Section 365 of the Bankruptcy Code.

### No Collusion; Good-Faith Bona Fide Offer

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (a) it has not engaged in any collusion with respect to the Sale or Bidding Procedures (including that it has no agreement with any other Bidder or Qualified Bidder to control the price) and (b) its Qualified Bid is a good faith bona fide offer and it intends to consummate the Sale Transaction if selected as the Successful Bidder or the Back-Up Bidder.

### Return of Deposits

No later than the earlier of (a) three (3) business days following the entry of a Sale Order, or (b) ten (10) business days following the end of the Auction, unless otherwise provided in an escrow agreement or a Qualified Bid, the Debtors shall return by check or wire the full amount of each Earnest Money Deposit submitted by a party that is not a party who is a Successful Bidder(s) or a Back-up Bidder(s). A defaulting Successful Bidder's Earnest Money Deposit shall be forfeited to the Debtors, subject to the terms set forth in the Bidding Procedures Order and the Successful Bidder's Modified Proposed APA.

### Communications among Qualified Bidders

Notwithstanding anything to the contrary in these Bidding Procedures, all communications between and among Qualified Bidders shall involve the Debtors and their advisors. No Qualified Bidder shall communicate with any other Qualified Bidder absent prior written consent from the Debtors.

### Free and Clear of Any and All Claims, Liens, and Interests

Subject to entry of the Sale Order, and except as otherwise provided in any Modified Proposed APA, all of the Debtors' right, title, and interest in and to the Sale Assets subject thereto shall be sold free and clear of all liens, claims, and interests (collectively, the "Encumbrances") to the maximum extent permitted by Section 363 of the Bankruptcy Code (other than permitted liens, assumed liabilities as provided in a Successful Bidder's Modified Proposed APA), with such Encumbrances attaching to the proceeds of the sale of the Sale Assets with the same validity and priority as such Encumbrances applied against the Sale Assets. Any prospective purchaser shall comply with applicable local, state and federal law, including without limitation, laws governing transfer of permits. Nothing herein is meant to or shall limit or curtail the rights of the Debtors or any applicable governmental or regulatory agency with respect to otherwise applicable local, state or federal law.

**Reservation of Rights by the Debtors**

Nothing in these Bidding Procedures shall require the Debtors to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent that the Debtors determine, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or their fiduciary duties under applicable law.

## **EXHIBIT 2**

Proposed Asset Purchase Agreement

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**_____, AS PURCHASER,**

**AND**

**WILSON CREEK ENERGY, LLC**

**AND**

**CERTAIN AFFILIATES OF WILSON CREEK ENERGY, LLC,**

**AS SELLER**

**DATED: _____, 2025**

# Table of Contents

RECITALS ............................................................................................................................. 1

    **ARTICLE I** ........................................................................................................................ 2

    **DEFINITIONS** ................................................................................................................. 2

        1.1    **Definitions.** The following defined terms shall have the following meanings: ....................... 2

    **ARTICLE II** ...................................................................................................................... 10

    **PURCHASED ASSETS; ASSUMED LIABILITIES** ....................................................... 10

        2.1.    **Assets to be Transferred:** ....................................................................................... 10

        2.2.    **Retained Assets** ....................................................................................................... 11

        2.3.    **Assumed Liabilities** ............................................................................................... 13

        2.4.    **Retained Liabilities** ............................................................................................... 13

        2.5.    **Assignment and Assumption of Contracts.** ........................................................... 14

        2.6.    **Reserved** ................................................................................................................. 15

    **ARTICLE III** ..................................................................................................................... 15

    **PURCHASE AND SALE** ................................................................................................. 15

        3.1.    **Purchase and Sale of Purchased Assets.** ............................................................... 15

        3.2.    **Allocation.** .............................................................................................................. 15

    **ARTICLE IV** ..................................................................................................................... 16

    **CLOSING AND DELIVERABLES** ................................................................................. 16

    **ARTICLE V** ...................................................................................................................... 18

    **REPRESENTATIONS AND WARRANTIES OF THE SELLER** ................................... 18

        5.1.    **Organization of the Seller** ..................................................................................... 18

        5.2.    **Title to Purchased Assets** ...................................................................................... 18

        5.3.    **Litigation** ............................................................................................................... 18

        5.4.    **Brokers** .................................................................................................................. 18

        5.5.    **No Other Representations and Warranties** ........................................................... 19

    **ARTICLE VI** ..................................................................................................................... 19

    **REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ........................... 19

        6.1.    **Organization and Authority of Purchaser** ........................................................... 19

        6.2.    **No Conflict or Violation** ........................................................................................ 19

        6.3.    **Litigation** ............................................................................................................... 20

        6.4.    **Brokers** .................................................................................................................. 20

        6.5.    **Sufficiency of Funds; Solvency** ............................................................................ 20

        6.6.    **Permitting** .............................................................................................................. 20

i

6.7.   "AS IS" Transaction ........................................................................ 20

7.1.   Withholding ................................................................................... 21

7.2.   Tax Cooperation; Allocation of Taxes. ......................................... 21

**ARTICLE VIII** ........................................................................................ 22

**CERTAIN COVENANTS AND AGREEMENTS** ................................. 22

8.1.   Certain Provisions Relating to Consents. ...................................... 22

8.2.   Permitting. ..................................................................................... 22

8.3.   Further Assurances. ....................................................................... 24

8.4.   Correspondence ............................................................................. 24

8.5.   Employees ...................................................................................... 25

8.6.   Bulk-Sales Laws ............................................................................ 25

8.7.   Post-Closing Books and Records .................................................. 25

8.8.   No Successor Liability ................................................................... 26

**ARTICLE IX** ........................................................................................... 26

**TERMINATION AND EFFECT** ........................................................... 26

9.1   Termination ................................................................................... 26

9.2   Effect of Termination; Liquidated Damages ................................ 26

**ARTICLE X** ............................................................................................ 27

**MISCELLANEOUS PROVISIONS** ....................................................... 27

10.1   Survival .......................................................................................... 27

10.2   Confidentiality .............................................................................. 27

10.3   Notices ........................................................................................... 27

10.4   Waivers and Amendments ............................................................. 28

10.5   Fees and Expenses ......................................................................... 28

10.6   Successors and Assigns .................................................................. 28

10.7   Consent to Jurisdiction .................................................................. 29

10.8   Governing Law ............................................................................... 29

10.9   Specific Performance ..................................................................... 29

10.10   Waiver of Jury Trial ...................................................................... 29

10.11   Severability .................................................................................... 30

10.12   Entire Agreement .......................................................................... 30

10.13   Construction .................................................................................. 30

10.14   Incorporation of Exhibits and Schedules ..................................... 30

10.15   Headings ........................................................................................ 30

10.16   Counterparts .................................................................................. 31

**10.17**    **Announcements** ................................................................................................................. 31

**10.18**    **Third Parties** ................................................................................................................. 31

## <u>SCHEDULES</u>

Schedule 1.1(a) Lease Bonds and Reclamation Performance Bonds

Schedule 1.1(b) Leased Real Property

Schedule 1.1(c) Owned Real Property

Schedule 1.1(d) Software

Schedule 2.1(d) Tangible Personal Property

Schedule 2.1(e) Seller Permits

Schedule 2.2(h) Retained Assets

Schedule 2.3(b) Assumed Cure Costs

Schedule 2.3(e) Assumed Liabilities (Administrative Costs)

Schedule 2.5(a) Available Agreements

Schedule 2.5(b) Assumed Agreements

Schedule 5.2 Title to Purchased Assets

Schedule 5.3 Litigation Actions

Schedule 5.4 Seller's Brokers

Schedule 6.4 Purchaser's Brokers

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of _____, 2025, by and among _____, a _____ company ("Purchaser"), and Wilson Creek Energy, LLC, a Delaware limited liability company ("Wilson Creek"), and its affiliates (the "Additional Sellers" (as defined below), and collectively with Wilson Creek, the "Seller").[1]

## RECITALS

A.      Seller is engaged in the business of, inter alia, mining and selling coal through certain mining complexes;

B.      On January 6, 2025, Seller commenced a bankruptcy cases (the "Bankruptcy Cases") by filing voluntary petitions under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Pennsylvania (the "Bankruptcy Court"), where the Bankruptcy Cases are jointly administered at Case No. 25-70001;

C.      Whereas Seller moved to establish bidding procedures and for the sale of its assets pursuant to Section 363 of the Bankruptcy Code by the Sale Motion filed with the Court on January _____, 2025 at Docket No. _, and the Court entered the Bidding Procedures Order on [date] at Docket No. ___.

D.      On _____, 2025, Purchaser provided to Seller a cash deposit in the amount of $_____ U.S. Dollars (the "Purchase Deposit"), which has been deposited into a trust account established by Seller for such purpose;

E.      Subject to the terms and conditions set forth in this Agreement[2] and applicable sections of the Bankruptcy Code, Seller desires to sell to Purchaser all of the Purchased Assets and to assign to Purchaser all of the Assumed Liabilities, and Purchaser desires to purchase, or cause one or more of the Purchaser Designees to purchase, from Seller all of the Purchased Assets and assume, or cause one or more of the Purchaser Designees to assume, all of the Assumed Liabilities, and the parties intend to effectuate the transactions contemplated hereby, upon the terms and conditions hereinafter set forth; and

F.      Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to sections 105, 363, and 365 of the Bankruptcy Code, and Rules 4001, 6004, and 6006 Federal Rules of Bankruptcy Procedure.

NOW, THEREFORE, in consideration of the premises, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency

---

[1] References to "Seller" herein shall, as the context requires, be deemed to be references to all entities comprising Seller collectively or to a given entity comprising Seller individually.

[2] Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article I, below.

of which hereby are acknowledged, the parties hereto, intending to be legally bound, agree as follows:

**ARTICLE I**

**DEFINITIONS**

1.1     <u>**Definitions.**</u> The following defined terms shall have the following meanings:

"<u>Accounts Receivable</u>" has the meaning set forth in Section 2.2(b).

"<u>Additional Sellers</u>" means Wilson Creek Holdings, Inc., a Delaware corporation; Corsa Coal Corp., a Canadian corporation; Maryland Energy Resources, LLC, a Delaware limited liability company; Mincorp Inc., a Delaware corporation; Mincorp Acquisition Corp., a Delaware corporation; PBS Coals, Inc., a Delaware corporation; RoxCoal Inc., a Pennsylvania corporation; Quecreek Mining, Inc., a Pennsylvania corporation; Croner, Inc., a Pennsylvania corporation; and Elk Lick Energy, Inc. a Pennsylvania corporation.

"<u>Affiliate</u>" of, or a Person "<u>affiliated with</u>," a specified Person, is a Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Person specified. For purposes of this definition, "<u>control</u>" means the power through equity ownership, contract or otherwise, to direct or cause the direction of the affairs of a Person.

"<u>Agreement</u>" means this Agreement including any Exhibits and all Schedules hereto.

"<u>Agreed Allocation Statement</u>" has the meaning set forth in Section 3.2(a).

"<u>Allocation Statement</u>" has the meaning set forth in Section 3.2(a).

"<u>Alternative Transaction</u>" means the consummation of any transaction (regardless of the form thereof) involving a sale of all or any substantial portion of the Purchased Assets by Seller to a purchaser or purchasers other than Purchaser.

"<u>Ancillary Agreements</u>" means the Bill of Sale, the Liabilities Assignment and Assumption Agreement, the Deed(s), the Lease Assignments, the Contract Assignments, the Permit Assignment and Assumption Agreements and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by any of the parties in connection with the consummation of the transactions contemplated by this Agreement, in each case only as applicable to the relevant party or parties to such Ancillary Agreement, as indicated by the context in which such term is used.

"<u>Applicant Violator System</u>" has the meaning set forth in Section 8.2(b).

"<u>Assumed Agreements</u>" has the meaning set forth in Section 2.5(a).

"<u>Assumed Cure Costs</u>" has the meaning set forth in Section 2.3(b).

"<u>Assumed Liabilities</u>" has the meaning set forth in Section 2.2(i).

"<u>Available Agreements</u>" has the meaning set forth in Section 2.5(a).

2

"<u>Avoidance Action</u>" means any avoidance, preference, recovery, claim, right or cause of action of Seller arising under Chapter 5 of the Bankruptcy Code or under any analogous state or federal laws relating to the Purchased Assets, the Mines or the Business.

"<u>Backup Bidder</u>" has the meaning set forth in the Bidding Procedures.

"<u>Bankruptcy Cases</u>" has the meaning set forth in the preamble hereto.

"<u>Bankruptcy Code</u>" has the meaning set forth in the preamble hereto.

"<u>Bankruptcy Court</u>" has the meaning set forth in the preamble hereto.

"<u>Bidding Procedures</u>" means the processes and procedures required by the Bidding Procedures Order, with such amendments, modifications or supplements as approved by Purchaser and Seller.

"<u>Bidding Procedures Order</u>" means an Order (A) Approving Bidding Procedures, (B) Scheduling an Auction, Sale Hearing and Other Dates and Deadlines, (C) Approving Stalking Horse Purchaser, (D) Approving the Assumption and Assignment of Contracts and Leases and Related Cure Procedures and (E) Granting Related Relief, approval of which is to be pursued by Seller in the Bankruptcy Cases.

"<u>Bill of Sale</u>" has the meaning set forth in Section 4.3(a).

"<u>Black Lung Act</u>" means the Federal Coal Mine Safety and Health Act of 1969, the Black Lung Benefits Act of 1972, the MSHA, the Black Lung Benefits Reform Act of 1977, or and the Black Lung Benefits Amendments of 1981.

"<u>Bond Amount</u>" has the meaning set forth in Section 8.2(e).

"<u>Business</u>" means the business of (a) the exploration, permitting, extraction, mining, processing, sale, storage and transportation of coal and non-coal minerals and interests (including by way of example, Rare Earth minerals, oil and gas and coalbed methane gas) from the Mines and the Real Property by Seller and the Reclamation of lands used for such activities by the Seller, and (b) Seller's ownership of the Owned Real Property, maintenance of the Leases and performance of the obligations of the Seller thereunder, maintenance of the assets related thereto and Reclamation of the Mines, including Seller's interest (if any) in the natural gas/coalbed methane gas wells and/or facilities on the Real Property and any precious metals.

"<u>Business Day</u>" means a day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close within the Commonwealth of Pennsylvania.

"<u>Cash Collateral</u>" has the meaning set forth in Section 2.2(g).

"<u>Cash Consideration</u>" shall mean $[●] US Dollars, inclusive of the Purchase Deposit.

"<u>Causes of Action</u>" shall mean any claims, interests, obligations, rights, liabilities, actions, causes of actions, choses in action, suits, debts, demands, damages, expenses and/or losses of whatever kind or nature, in each case held as an asset by Seller or its estate relating to the Purchased Assets, the Mines or the Business.

"<u>Closing</u>" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Coal Act" means the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701, et seq.

"COBRA" means Section 4980B of the Code and Sections 601 to 608, inclusive, of ERISA.

"Code" means the Internal Revenue Code of 1986, as amended, and the Treasury Regulations promulgated thereunder.

"Confidential Information" has the meaning set forth in Section 10.2.

"Confidentiality Agreement" means that certain Confidentiality and Non-Disclosure Agreement, dated as of [●], 2025, by and among Seller and Purchaser.

"Consent" means any consent, novation, approval, authorization, qualification, notice, waiver or registration required to be obtained from, filed with or delivered to any Person in connection with the consummation of the transactions contemplated hereby.

"Contamination" means the presence or existence in surface water, groundwater, soil or subsurface strata of any Hazardous Substance as a result of an emission, discharge or release of any Hazardous Substance to, on, onto or into the Environment or requiring investigation, remediation or other response action under Environmental Law.

"Contract Assignments" has the meaning set forth in Section 4.2(d).

"Contracts" means all of the agreements or other contracts to which Seller is a party related primarily to the Real Property, Mines or the Business, but excluding the Leases.

"Cure Costs" means all monetary liabilities, including pre-petition monetary liabilities, of Seller that must be paid or otherwise satisfied to cure all of Seller's monetary defaults under the Assumed Agreements pursuant to Section 365 of the Bankruptcy Code at the time of Closing as such amounts are determined by the Bankruptcy Court or approved pursuant to the assignment and assumption procedures provided for in the Bidding Procedures Order or herein.

"Cure Notice" means, with respect to each Assumed Agreement, the notice submitted by Seller to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth, among other things, the Cure Costs amount with respect thereto as calculated by Seller.

"Data" has the meaning set forth in Section 2.1(h).

"Deeds" means the special warranty deeds, dated as of the Closing Date, conveying the Owned Real Property from each applicable Seller to the Purchaser or a Purchaser Designee.

"DIP Lender" means KIA II, LLC.

"Employee Plans" means (i) all "employee benefit plans," as defined in Section 3(3) of ERISA, (ii) all other compensation, employment, consulting, severance pay, salary continuation, bonus, incentive, equity or equity-based compensation, change in control, transaction bonus, retirement, vacation, pension, profit sharing, deferred compensation, insurance, medical, dental, vision, supplemental unemployment benefits or post-employment or retirement benefits plans,

Contracts, programs, funds, or arrangements of any kind, and (iii) all other employee benefit plans, Contracts, programs, funds, or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic) and any trust, escrow, or similar agreement related thereto, whether or not funded, sponsored, maintained or contributed to by Seller for the benefit of any of their respective current or former employees.

"Employees" are those employees of Seller identified on the list it provided by Seller to Purchaser, which list is current as of the date hereof and, to the Knowledge of Seller, includes the respective names, job titles, hire dates, annual or hourly rate of base compensation and annual bonuses payable to each such employee.

"Encumbrances" means all and any Liabilities, Liens, levies, claims, charges, assessments, mortgages, security interests, pledges, conditional sales agreements, title retention contracts, leases, subleases, rights of first refusal, options to purchase, restrictions and other encumbrances, and agreements or commitments to create or suffer any of the foregoing;

"Environment" or "Environmental" means relating to navigable waters, waters of the contiguous zone, ocean waters, surface waters, groundwater, drinking water supply, land surface, soil, subsurface strata, indoor surfaces or outdoor or indoor air.

"Environmental Law" means, collectively, any and all Legal Requirements of any nature (including common law) relating in any way to any Hazardous Substance, Contamination, protection of the Environment, protection of natural resources, or human health and safety, including, without limitation, those relating to environmental claims, reclamation or restoration, to emissions, discharges, releases or threatened emissions, discharges or releases to, on, onto or into the Environment of, or exposures or threatened exposures to, any Hazardous Substance.

"Environmental Liability" shall mean any Liabilities arising under any Environmental Law, including any response, remedial or investigation costs, and any other expenses (including reasonable attorney and consultant fees, laboratory costs and litigation costs) required under, arising from, or necessary to attain or maintain compliance with, Environmental Laws or relating to or arising from Contamination or Hazardous Substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" with respect to an entity means any other entity that, together with such first entity, would be treated as a single employer under Section 414 of the Code.

"Excluded Agreements" has the meaning set forth in Section 2.5(a).

"Excluded Permits" means and any U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives licenses or permits.

"Exhibits" means, collectively, any Exhibits referred to in this Agreement.

"Final Order" means a judgment or Order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to by Purchaser) and as to which (A) the time to appeal, petition for certiorari, or move for a new trial, stay, reargument or rehearing shall have expired and as to which no appeal, petition

for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (B) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such Order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such Proceeding or Order shall have become final in accordance with Bankruptcy Rule 8002; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedures, or any analogous rule under the Bankruptcy Rules, may be filed relating to such Order and shall not cause such Order not to be a Final Order.

"GAAP" means accounting principles generally accepted in the United States of America as in effect on the Closing Date.

"Governmental Agency" means any government or political subdivision or regulatory authority, whether federal, state, local, provincial, municipal, special purpose, administrative or other governmental or quasi-governmental authority or regulatory body, or any agency, commission, bureau, taxing authority, department, authority, court, arbitration tribunal or instrumentality of any such government or political subdivision or regulatory authority, as well as any other instrumentality or entity designated to act for or on behalf of any of the foregoing.

"Hazardous Substances" shall mean any element, substance, compound, pollutant, contaminant mixture or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material, whether solid, liquid or gaseous, that: (a) is subject to regulation of any kind by any Governmental Agency with regard to protection of the Environment, natural resources or human health and safety; or (b) the presence or existence of which shall at any time give rise, under any theory of law or equity, to Environmental Liability.

"Imaged Document" has the meaning set forth in Section 10.16.

"Inventory" means the raw materials; work-in-process; coal in raw, clean, or partially processed states; and other inventories of Seller related primarily to the Real Property or Mines.

"Lease Assignments" has the meaning set forth in Section 4.3(c).

"Lease Bonds" means all bonds related to the Leases that are Assumed Agreements, including the bonds listed on Schedule 1.1(a).

"Leased Real Property" means the real property leased, subleased, licensed or otherwise occupied by the Seller, in each case, primarily in connection with the Business, including the real property that is described on Schedule 1.1(b).

"Leases" means the agreements or other contracts pursuant to which the Seller leases, subleases, licenses or otherwise occupies or possesses the Leased Real Property (for the avoidance of doubt, not including any agreements under which Seller has granted an interest in the Leased Real Property to any other Person).

"Legal Requirement" means any federal, state or local statute, law, code, rule, regulation, constitutions, ordinance, common law, treaty, injunction, judgment, decree, ruling, reporting or licensing requirement or other similar requirement enacted, adopted, promulgated or applied by any Governmental Agency, including but not limited to the Bankruptcy Code. For avoidance of doubt, Legal Requirements include all requirements to conduct business in the United States as

established by the US Department of the Treasury, Office of Foreign Assets Control ("OFAC") relating to, among other things, sanctioned entities and/or persons.

"Liability" or "Liabilities" means any and all liabilities, obligations, debts, duties or adverse claims of Seller of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, absolute, liquidated or unliquidated, direct or indirect, contingent or otherwise in respect of any and all matters or events, including those arising under Legal Requirements, or imposed by any court or arbitrator of any kind, and those arising in connection with coal or other products sold, Contracts, Leases, commitments or undertakings, and whether existing or occurring on, prior to or after the Closing.

"Liabilities Assignment and Assumption Agreement" has the meaning set forth in Section 4.3(b).

"Lien" means any mortgage, deed of trust, pledge, hypothecation, title retention agreement, voting trust agreement, equitable interest, lien, security interest, bailment (in the nature of a pledge or for purposes of security), grant of a power to confess judgment, conditional sales and title retention agreement (including any lease or license in the nature thereof), adverse claim, easement, encroachment, right of way, charge, equitable interest, restriction or other similar encumbrance on real or personal property.

"Mines" means, collectively, all mines in which the Seller has any interest, including, without limitation, the three underground and three surface mines and related facilities commonly known as the Acosta mine, Casselman mine, Horning mine, Schrock Run Extension mine, Rhoads mine and Byers mine, all of which are located in Somerset County, Pennsylvania, except the Casselman mine which is located in Garrett County, Maryland.

"Mining" has the meaning set forth in the definition of Mining Law.

"Mining Law" means all present Legal Requirements relating to the exploration, permitting, extraction, processing, storage and transportation of coal and non-coal minerals and to the reclamation or restoration of lands used for such activities (collectively referred to as "Mining"), including with respect to the prevention or mitigation of, or otherwise relating to the effects of, Mining activities, including with respect to the prevention or mitigation of, or otherwise relating to the effects of, Mining activities.

"Mining Permits" means all applicable Permits related to Mining or otherwise required by Mining Law.

"MSHA" means the United States Department of Labor, Mine Safety and Health Administration and the Legal Requirements administered thereby.

"Non-Assignable Assets" has the meaning set forth in Section 8.1(a).

"Order" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency or other Governmental Agency or by any arbitrator.

"Ordinary Course of Business" means the ordinary course of business consistent in all material respects with the Seller's past custom and practice.

"<u>Owned Real Property</u>" means all of the real property, and all right, title and interest therein, owned by Seller and used or held for use primarily in connection with the Business, including in any event the real property described on Schedule 1.1(c), together with all of seller's right, title and interest in and to the following, as it relates to the Owned Real Property: (i) all buildings, structures and improvements located on such real property owned by Seller; (ii) all improvements, fixtures, mine infrastructure, preparation plant structures and improvements, loadout structures and improvements, rail sidings, machinery, apparatus or equipment affixed to such real property owned by Seller; (ii) all rights of way, easements, if any, in or upon such real property owned by Seller and all right-of-way and other rights and appurtenances belonging or in any way pertaining to such real property interests owned by Seller (including the right, title and interest of Seller in and to any coal reserves, mineral rights (including, but not limited to, Rare Earth Minerals),underground and surface coal and mining rights, royalty rights, support rights and waivers, subsidence rights or water rights relating or appurtenant to such real property owned by Seller); (iv) all strips and gores and any land lying in the bed of any public road, highway or other access way, upon or proposed, adjoining such real property owned by Seller; and (v) any leases out to third parties affecting the real property owned by Seller; in each case of the foregoing (i)-(v), whether or not such rights or instruments creating or evidencing such rights are specifically identified on Schedule 1.1(c).

"<u>Partial Purchase Deposit</u>" has the meaning set forth in the preamble hereto.

"<u>Payables</u>" means trade liabilities and accounts payable incurred in connection with the Business. For purposes of this Agreement, a Payable is deemed "incurred" when the corresponding performance or delivery occurs, regardless of when any purchase order or commitment was entered into and regardless of when any bill is delivered and when any payment is due.

"<u>Permit</u>" means all of the permits, licenses, consents, authorizations, permit applications or other approvals, in each case, related primarily to the Real Property or Mines and/or the operation thereof.

"<u>Permit Assignment and Assumption Agreements</u>" has the meaning set forth in Section 4.3(i).

"<u>Permitted Liens</u>" means: (a) Liens for Taxes not yet due and payable and for which adequate reserves have been established in accordance with GAAP; (b) landlord's, carrier's, warehousemen's, mechanic's, materialmen's, repairer's statutory liens in each case incurred in the Ordinary Course of Business; and (c) easements, rights of way, covenants, restrictions, and other similar Liens on real property.

"<u>Person</u>" means any individual, sole proprietorship, partnership, limited partnership, corporation, limited liability company, unincorporated society, association, trust, joint venture, cooperative association, Governmental Agency or other legal entity.

"<u>Post-Closing Tax Period</u>" means any Tax period or year, or portion thereof, that begins after the Closing Date.

"<u>Pre-Closing Tax Period</u>" means any Tax period or year, or portion thereof, that ends on or before the Closing Date.

"<u>Proceeding</u>" means any claim, demand, charge, complaint, action, suit, proceeding, hearing, audit, investigation, interference, opposition, reexamination, concurrent use, cancellation or other dispute resolution or proceeding, whether judicial, administrative or arbitrative, commenced, brought, conducted or heard by or before any Governmental Agency or arbitrator.

"<u>Purchase Deposit</u>" has the meaning set forth in the preamble hereto.

"<u>Purchased Assets</u>" has the meaning set forth in Section 2.1.

"<u>Purchaser</u>" has the meaning set forth in the preamble hereto.

"<u>Purchaser Bonds</u>" has the meaning set forth in Section 8.2(e).

"<u>Purchaser Designee</u>" has the meaning set forth in Section 4.5.

"<u>Real Property</u>" means the Owned Real Property and the Leased Real Property.

"<u>Reclamation</u>" means all activities required under any Mining Law or Environmental Law, or under any Mining Permit or Environmental Permit, to prevent, mitigate or otherwise address the effects of mining activities (including the exploration, permitting, extraction, processing, storage and transportation of coal, non-coal minerals, natural gas and coalbed methane gas), including the reclamation or restoration of lands used for such activities.

"<u>Reclamation Performance Bonds</u>" means all reclamation performance bonds and collateral bonds related to the Permits, including the Reclamation Performance Bonds listed on Schedule 1.1(a).

"<u>Release</u>" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, migrating, disposing or dumping into the Environment.

"<u>Retained Assets</u>" has the meaning set forth in Section 2.2.

"<u>Retained Liabilities</u>" has the meaning set forth in Section 2.4.

"<u>Sale Motion</u>" has the meaning set forth in Section 4.1.

"<u>Sale Order</u>" means the order of the Bankruptcy Court approving the consummation of the transactions contemplated hereby outside of a Chapter 11 plan and pursuant to Sections 363 and 365 of the Bankruptcy Code.

"<u>Schedules</u>" means, collectively, the various Schedules referred to in this Agreement.

"<u>Seller</u>" has the meaning set forth in the preamble hereto.

"<u>Seller Bonds</u>" has the meaning set forth in Section 8.2(e).

"<u>Seller Permits</u>" has the meaning set forth in Section 2.1(e).

"<u>Seller's Knowledge</u>" or any other similar knowledge qualification, means the actual knowledge of Kevin Harrigan, President and Chief Executive Officer of Seller, with no inquiry, investigation, or research of any kind.

"<u>SMCRA</u>" means the Surface Mining Control and Reclamation Act of 1977, as amended.

"<u>Software</u>" means the software set forth on Schedule 1.1(d) and any other software that is used or held for use primarily in the conduct of the Business; provided that the Software will not include any Contract.

"<u>Stalking Horse Bidder</u>" shall have the meaning set forth in the Bid Procedures.

"<u>Successful Bidder</u>" shall have the meaning set forth in the Bid Procedures.

"<u>Tangible Personal Property</u>" means all tangible personal property that is (i) on Schedule 2.1(d) or (ii) used, or held for use, by the Seller primarily in the Business, including equipment, plants, materials, trucks, automobiles and other vehicles, parts, supplies, liquid fuels and chemicals.

"<u>Tax</u>" means (i) any tax, charge, levy, governmental fee or other like assessment or charge of any kind whatsoever, including income, gross receipts, ad valorem, premium, value-added, net worth, capital stock, capital gains, documentary, recapture, alternative or add-on minimum, disability, registration, recording, excise, real property, personal property, extraction, unmined mineral, sales, use, license, lease, service, service use, transfer, withholding, employment, unemployment, insurance, social security, business license, business organization, environmental, workers compensation, payroll, employer health, profits, severance, stamp, occupation, windfall profits, customs, duties, gift, estate, franchise, production, inventory, unclaimed property, escheat and other taxes of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Agency (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

"<u>Transfer Applications</u>" has the meaning set forth in Section 8.2(a).

"<u>Transfer Period</u>" has the meaning set forth in Section 8.2(a).

"<u>Transfer Taxes</u>" has the meaning set forth in Section 7.2(b).

"<u>Treatment Trusts</u>" means any trust established prior to the commencement of the Bankruptcy Cases by, between and/or among the Seller, any Additional Seller and any Governmental Agency relating to obligations and liabilities of such Seller and any Additional Seller, including, without limitation, the Global Treatment Trust Fund dated March 22, 2022, the Clear Run Trust and the Trent and Acosta 2 Treatment Trust.

"<u>WARN Act</u>" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar local, state or federal law.

## <u>ARTICLE II</u>

## PURCHASED ASSETS; ASSUMED LIABILITIES

**2.1.** __Assets to be Transferred.__ Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Seller shall unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser and/or to one or more Purchaser Designees, and Purchaser (and/or such Purchaser Designees) shall purchase, acquire and accept from Seller and/or its Additional Seller(s), free and clear of all Liens, claims and

Encumbrances, all of Seller's and its Additional Sellers' right, title and interest in, to or under all properties, rights, claims and assets, wherever situated or located, whether real, personal or mixed, whether tangible or intangible, whether identifiable or contingent, whether owned, leased, licensed, in each case primarily used or held for use, in or primarily relating to, the Business, and whether or not reflected on the books and records of Seller, as the same shall exist on the Closing Date other than the Retained Assets (collectively, the "Purchased Assets"). The Purchased Assets include the following:

(a)    the Owned Real Property;

(b)    subject to Section 2.5, the Leases that are also Assumed Agreements, and any amounts prepaid thereunder, including, without limitation, any recoupable advance minimum royalties;

(c)    subject to Section 2.5, the Contracts that are also Assumed Agreements;

(d)    the Tangible Personal Property, including the Tangible Personal Property listed on Schedule 2.1(d);

(e)    the Permits held by Seller and/or its Additional Sellers, including the Permits listed on Schedule 2.1(e), (the "Seller Permits") but excluding any Excluded Permits;

(f)    the Inventory;

(g)    the Software;

(h)    all engineering and operational data, charts, surveys, maps, plans, drawings, computer files, permit applications, books, records, data, title and other reports, tax tickets, tax appraisals, documents, papers, instruments and all other materials of all kinds to the extent related to the Real Property, Mines or the Business and, in each case, regardless of the form (e.g., paper, electronic or otherwise) in which it is maintained (collectively, the "Data"); and

(i)    all non-cash collateral and other non-cash security posted in connection with any obligation of Seller relating to the Business, including any non-cash collateral or other non-cash security posted in respect to any bond or other arrangement securing any such obligation, including non-cash collateral or other non-cash security posted in respect to the Reclamation Performance Bonds and the Lease Bonds; excluding however, cash that is part of Cash Collateral being used for purposes authorized by the Bankruptcy Code or Bankruptcy Court.

Subject to Sections 8.1(a) and 8.2, if after the Closing, it is discovered that any assets, properties or rights, including rights under Assumed Agreements and fractional real property interests, owned, leased or subleased by Seller and constituting Purchased Assets were inadvertently not transferred to Purchaser at the Closing, then Seller and its Additional Sellers shall use their commercially reasonable efforts to assign, convey, lease or sublease, as applicable, such assets, properties or rights to Purchaser, in each case upon the reasonable request of Purchaser, at no additional cost or expense to Purchaser (other than any cost or expense that Purchaser would have borne had such assets, properties or rights been transferred to Purchaser at the Closing).

**2.2.**    **Retained Assets.** Notwithstanding anything in this Agreement to the contrary, the Seller shall retain all right, title and interest in, to and under the Retained Assets. Specifically, the Purchased Assets will not include, and the Purchaser will in no way be construed to have purchased

or acquired (or to have the right to purchase or to acquire) any interest whatsoever in any of the Retained Assets. For all purposes of and under this Agreement, the term "Retained Assets" shall consist of all assets of the Seller that are not Purchased Assets, including each of the following assets (notwithstanding that if an asset is referenced below and also in any of clauses (a) to (j) of Section 2.1, such asset will be a Retained Asset):

(a)     all cash and cash equivalents owned by Seller;

(b)     all accounts, payments or notes receivable held by Seller and/or any of its Additional Sellers as of the Closing and relating to the Business (whether or not then due, and whether billed or unbilled), and any security, claim, remedy or other right related to any of the foregoing ("Accounts Receivable") and all pre-payments in respect of the Business, whether or not the same constitutes Cash Collateral;

(c)     the rights that accrue or may accrue to Seller under this Agreement and/or the Ancillary Agreements;

(d)     all contracts and agreements other than the Assumed Agreements;

(e)     the Excluded Permits;

(f)     (i) any personnel files or records relating to the current and former employees of the Seller to the extent that the transfer of such files or records to Purchaser is prohibited by applicable law (and in such event, Purchaser and Seller will cooperate to enter into an arrangement for Purchaser or its representative to have access to such data in a manner that is compliant with applicable law) and (ii) any and all Employee Plans, and all rights in connection with, and any assets, trust agreements, insurance policies, administrative service agreements and other contracts, files and records in respect of, the Employee Plans;

(g)     any bonds of Seller or its Affiliates posted with respect to any Permits or Leases as well as any interests of Seller or its Affiliates have in Treatment Trusts or Treatment Trust funds created and/or funded in connection with any obligation of Seller or its Affiliates to a Governmental Agency;

(h)     all cash collateral posted in connection with any obligation of Seller relating to the Business, including any cash collateral posted in respect to any bond or other arrangement securing any such obligation, including the cash collateral posted in connection with the Reclamation Performance Bonds and the Lease Bonds and the Treatment Trusts (the "Cash Collateral");

(i)     the property and assets set forth on Schedule 2.2(h), including, without limitation, any and all tax refunds, attributes, or other benefits arising under the Code and/or any other applicable laws, rules, and regulations of other taxing jurisdictions arising from or relating to the Pre-Closing Tax Period;

(j)     all insurance proceeds from any insurance policy of the Seller or any applicable Additional Seller arising from or relating to any claim that predates the Closing and is a Retained Liability;

(k)     Avoidance Actions; and

(l)     Causes of Action.

**2.3.**    __Assumed Liabilities.__ On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall assume the following Liabilities of the Seller (other than any Retained Liabilities), and no other Liabilities (collectively, the "Assumed Liabilities"):

(a) all Liabilities under the Assumed Agreements other than Cure Costs;

(b) the Cure Costs for each Assumed Agreement up to the amount for such Assumed Agreement set forth in Schedule 2.3(b) (the amount of Cure Costs for any given Assumed Agreement up to the amount set forth on such Schedule, or as otherwise agreed upon by, among the Purchaser, the Seller and any applicable Additional Seller, and the counterparty to any Assumed Agreement, the "Assumed Cure Costs");

(c) all Reclamation obligations to the extent related to the Purchased Assets;

(d) all Liabilities in respect of the Seller Permits (other than the Excluded Permits) from and after Closing; and

(e) all Liabilities in respect of administrative claims designated by the Purchaser and described on Schedule 2.3(e).

Purchaser shall pay, perform and otherwise discharge in accordance with their terms and when due all of the Assumed Liabilities.

**2.4.**    __Retained Liabilities.__ Seller shall retain all Liabilities of Seller other than the Assumed Liabilities (the Liabilities so retained by the Seller and not assumed by the Purchaser are hereinafter referred to as the "Retained Liabilities"). For all purposes of and under this Agreement, the term "Retained Liabilities" shall consist of all Liabilities of the Seller that are not Assumed Liabilities, including, without limitation, each of the following Liabilities:

(a)    all Liabilities of Seller to the extent related to the Retained Assets;

(b)    any Liabilities with respect to Excluded Agreements;

(c)    any Liabilities with respect to Payables or accrued and unpaid expenses except as set forth in Section 2.3(a) or (b);

(d)    all workers' compensation claims and occupational health claims related to the Retained Assets, including and with respect to any current and former employees of the Seller;

(e)    any Liability or other obligations of the Seller or any of its or their ERISA Affiliates (or any predecessor of any of the foregoing) arising under, relating to or with respect to any Employee Plan;

(f)    all Liabilities or other obligations with respect to current or former employees of the Seller (or their representatives, dependents, spouses or beneficiaries), contractors or consultants of the Seller or any of its ERISA Affiliates, including with respect to the Coal Act;

(g)    all Liabilities arising under the WARN Act on or prior to Closing;

(h)    all Liabilities arising under the Black Lung Act related to the Retained Assets, including with respect to any current or former employee of the Seller, and further including, but not limited to, any such Liabilities arising under the Black Lung Act with respect to any of Seller's predecessors;

(i)      any Liabilities arising from or relating to any violation of applicable law, or breach of any contract or agreement (other than Assumed Cure Cost), on or prior to the Closing;

(j)      all Liabilities with respect to current or former employees (or their representatives, dependent, spouses or beneficiaries) of the Seller arising under COBRA;

(k)      all utility and other charges to the extent related to the period prior to the Closing;

(l)      all unpaid claims and obligations from severance taxes, production taxes and other similar Liabilities;

(m)      any Liabilities with respect to (i) any Taxes imposed on or with respect to the Purchased Assets that are attributable to any Pre-Closing Tax Period, (ii) any Taxes related to the Retained Assets, (iii) all Liabilities for Taxes of Seller or its stockholders or members (including any Liability of any Seller for the Taxes of any other Person under Section 1.1502-6 of the U.S. Treasury regulations (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise) or (iv) any Taxes that are not expressly assumed by Purchaser; and

(n)      except for the Assumed Liabilities, any and all Liabilities arising from or relating to the ownership or operation of the Real Property, Mines, the Business or the Purchased Assets on or before Closing.

**2.5.**   **Assignment and Assumption of Contracts.**

(a)      Schedule 2.5(a) sets forth, to the Seller's Knowledge, a list of all executory Contracts and Leases as provided by Seller (the "Available Agreements") and the related estimates of Cure Costs (which shall be used to calculate the related amounts of Assumed Cure Costs). Schedule 2.5(b) sets forth a list of all executory Contracts and Leases Purchaser seeks to have Seller "Assume" and "Assign" (the "Assumed Agreements"). Any Contracts and Leases of the Seller that are not listed on Schedule 2.5(b) and which Purchaser does not designate in writing for assumption prior to Closing shall not be considered an Assumed Agreement or Purchased Asset and shall automatically be deemed "Excluded Agreements" and, for the avoidance of doubt, Purchaser shall not be responsible for any related Cure Costs of or other Liabilities with respect to any Excluded Agreements.

(b)      Notwithstanding anything in this Agreement to the contrary, Purchaser may, from time to time in its discretion, at any time prior to Closing, amend or revise, in writing, its designations of Assumed Agreements or Excluded Agreements pursuant to Section 2.5(a), provided that any such designation be made consistent with any Bidding Procedures Order.

(c)      If an objection is timely filed by a non-Seller counterparty to an Assumed Agreement with respect to a Cure Notice for such Assumed Agreement, such objection shall be resolved by the Bankruptcy Court; provided that Purchaser with Seller may determine (prior to or after the resolution of such objection) that such Assumed Agreement should be rejected and not assigned, in which case the Assumed Agreement shall be deemed an Excluded Agreement, and Purchaser shall not be responsible for any Cure Costs or other Liabilities with respect thereto. For the avoidance of doubt, Purchaser shall not assume or otherwise have any Liability with respect to any Excluded Agreement.

(d) In addition to the payment of Assumed Cure Costs by Purchaser, Seller and Purchaser, as applicable, shall use commercially reasonable efforts to assign, or cause to be assigned, the Assumed Agreements to Purchaser, or to the applicable Purchaser Designee, including taking all actions required by the Bankruptcy Court to obtain an Order containing a finding that the proposed assumption and assignment of the Assumed Agreements to Purchaser satisfies all applicable requirements of Section 365 of the Bankruptcy Code. Purchaser shall use commercially reasonable efforts to comply with all of the requirements of Section 365 of the Bankruptcy Code necessary to permit such assumption and assignment.

(e) (i) Seller shall assign, or cause to be assigned, to Purchaser or the applicable Purchaser Designee (the consideration for which is included in the consideration set forth in Section 3.1) each of the Assumed Agreements that is capable of being assigned, as promptly as practicable after the Purchaser designates it as an Assumed Agreement pursuant to Section 2.5(a) and (ii) Purchaser shall pay promptly all Assumed Cure Costs (if any) in respect of such Assumed Agreements in connection with such assignment (as agreed to among Purchaser and the counterparties to such Assumed Agreements or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assumed Agreements, pursuant to the Sale Order and, as applicable, the Lease Assignments or Contract Assignments.

**2.6.** **Reserved**.

## ARTICLE III

### PURCHASE AND SALE

**3.1.** **Purchase and Sale of Purchased Assets.** In full consideration for the purchase of the Purchased Assets, at the Closing, the Purchaser shall (i) pay to Seller the Cash Consideration (less any applicable Purchase Deposit, which shall be applied to the Cash Consideration at Closing) by wire transfer of immediately available funds to an account or accounts designated by Seller; and (ii) assume the Assumed Liabilities.

**3.2.** **Allocation.**

(a) The Purchaser, following consultation with the Seller, shall prepare, and provide to the Seller for its review and comment, a statement allocating the amount treated for U.S. federal income tax purposes as paid for the Purchased Assets among the Purchased Assets in accordance with Section 1060 of the Code within 30 days of the Closing Date (the "Allocation Statement"). Seller shall have the right to raise reasonable objections to such Allocation Statement within 30 days of receipt of such Allocation Statement, in which event, the Purchaser and the Seller shall negotiate in good faith to resolve their differences within 20 days of the Purchaser having received the Seller's good faith objections (any Allocation Statement agreed to by the parties, an "Agreed Allocation Statement"). If Seller and Purchaser cannot mutually agree upon such allocation, Seller and Purchaser shall be free to file their own asset allocation statement.

(b) Seller and Purchaser agree to (i) be bound by an Agreed Allocation Statement and (ii) act in accordance with any such Agreed Allocation Statement in the preparation, filing and audit of any Tax return (including filing Form 8594 with its federal income Tax return for the taxable year that includes the date of the Closing).

## ARTICLE IV

## CLOSING AND DELIVERABLES

**4.1.    Bankruptcy Court Approval**. The obligation of the Seller to convey the Purchased Assets as set forth herein, and the obligation of the Purchaser to acquire the same, is contingent upon this Agreement receiving approval from the Bankruptcy Court in the Seller's Bankruptcy Case. Purchaser is aware that (a) Seller will seek approval of this Agreement by filing a motion seeking approval of such sale (the "Sale Motion"), (b) that the Sale Motion will be subject to objections and a public hearing scheduled at the convenience of the Bankruptcy Court, (c) that third parties will be permitted to bid and that this Agreement is subject to higher and/or better offers, and (d) that by entering into this Agreement, the Purchaser agrees to be a Stalking Horse Bidder, a Successful Bidder and/or a Backup Bidder as may be determined pursuant to the Bid Procedures Nothing herein shall constitute of a waiver of the Seller's duty to select the highest and/or best offer for the Seller's assets.

**4.2.    Closing.** The consummation of the transactions contemplated by this Agreement (the "Closing") will take place remotely via the electronic exchange of documents and signatures immediately after the execution hereof, on the date of this Agreement, or on such other date or in such other manner as the parties mutually agree in writing (such date, the "Closing Date"). Title, equitable title and risk of loss with respect to the Purchased Assets (and expressly excluding any Non-Assignable Assets, but subject to Section 8.1(a)) will be deemed transferred to or vested in the Purchaser, and the transactions contemplated by this Agreement will be deemed effective for Tax, accounting and other computational purposes, and the parties will treat the Closing as if it had occurred as of 11:59 p.m. (Eastern Time) on the Closing Date.

**4.3.    Deliveries by the Seller.** At the Closing or thereafter as specified below, the Seller, at the Seller's sole cost, shall deliver or cause to be delivered to the Purchaser the following items:

(a)    one or more bills of sale as may be required to convey the Purchased Assets hereunder (each a "Bill of Sale"), in each case prepared by Purchaser and duly executed by each applicable Seller;

(b)    an Assumed Liabilities assignment and assumption agreement as may be required hereunder (the "Liabilities Assignment and Assumption Agreement"), to be prepared by Seller and duly executed by each applicable Seller;

(c)    one or more assignment and assumption of Leases with respect to the Leases that are also Assumed Agreements (the "Lease Assignments"), to be prepared by Purchaser and duly executed and notarized by each applicable Seller, in proper form for recording, and which in the case of federal and state leases (if any), shall also include certain transfer and assignment instruments to be executed by Seller and Purchaser as required under applicable Legal Requirements;

(d)    one or more assignment and assumption agreements with respect to Contracts that are also Assumed Agreements (the "Contract Assignments"), to be prepared by Purchaser and duly executed duly executed by each applicable Seller;

(e)       Deeds with respect to each parcel of Owned Real Property to be transferred hereunder, to be prepared by Purchaser and duly executed and notarized by each applicable Seller, in proper form for recording, along with any documents (including transfer tax forms) required by the applicable city, county, or state to effectuate the recording of the Deed(s);

(f)       all certificates of title necessary to transfer to the Purchaser any vehicles or other Purchased Assets the ownership of which is evidenced by a certificate of title, duly executed by each applicable Seller;

(g)       a certification, signed under penalties of perjury and dated not more than 30 days prior to the Closing Date, that satisfies the requirements of Treasury Regulation Section 1.1445-2(b)(2) and confirms that Seller is not a "foreign person" as defined in Section 1445 of the Code;

(h)       a certified copy of the Sale Order;

(i)       one or more Permit assignment and assumption agreements with respect to the Permits to be transferred hereunder (the "Permit Assignment and Assumption Agreements"), prepared by Purchaser and duly executed by each applicable Seller;

(j)       one or more powers of attorney as may be necessary to achieve the purposes of this Agreement, to be prepared by Purchaser an duly executed by Seller (the "Powers of Attorney"); and

(k)       any other documents, agreements, certifications that Purchaser in good faith deems necessary to effectuate the terms of this Agreement.

**4.4.    Deliveries by the Purchaser.** At the Closing, the Purchaser, at the Purchaser's sole cost, shall deliver or cause to be delivered to the Seller the following items:

(a)       the Cash Consideration (less any applicable Purchase Deposit, which shall be applied to the Cash Consideration at Closing) to an account or accounts designated by Seller;

(b)       the Bill(s) of Sale, prepared by Purchaser and duly executed by the Purchaser;

(c)       the Liabilities Assignment and Assumption Agreement, duly executed by the Purchaser;

(d)       the Lease Assignments, prepared by Purchaser and duly executed and notarized by the Purchaser;

(e)       the Contract Assignments, prepared by Purchaser and duly executed by the Purchaser; and

(f)       the Permit Assignment and Assumption Agreements, prepared by Purchaser and duly executed by the Purchaser.

**4.5.    Purchaser Designees.** Prior to and following the Closing Date, Purchaser shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 4.5, one or more Affiliates of Purchaser to (i) purchase specified Purchased Assets; (ii) assume specified Assumed Liabilities; and/or (iii) perform any other obligations of Purchaser under this Agreement and, as applicable, any other transaction agreement to which Purchaser is party (any Person that shall be properly designated by Purchaser in accordance with this clause, a "Purchaser

Designee"); it being understood and agreed that no such designation shall relieve Purchaser of any of its obligations hereunder and any breach hereof by a Purchaser Designee shall be deemed a breach by Purchaser. References to Purchaser hereunder shall be construed to include any such Purchaser Designee as applicable.

## ARTICLE V

### REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth on the Schedules hereto, each entity comprising Seller, jointly and severally, represents and warrants to Purchaser as follows:

**5.1.    Organization of the Seller.** To the Seller's Knowledge, each Seller is duly formed, validly existing, and in good standing under the Legal Requirements of its respective place of formation. Further, to the Seller's Knowledge, Seller is authorized, qualified or licensed to do business as a foreign corporation in each other jurisdiction where it does business or where such authorization, qualification or license is otherwise required, except where the failure to be so authorized, qualified or licensed would not be material to the Business. To Seller's Knowledge, Seller has full power and authority to (a) own, operate and lease its properties and assets as and where currently owned, operated and leased, and (b) carry on its business as currently conducted.

**5.2.    Title to Purchased Assets.** To the Seller's Knowledge, except as set forth on Schedule 5.2, Seller has good and marketable title or good and transferrable title, as applicable, to all of the Purchased Assets, subject only to Permitted Liens, and upon the consummation of the transactions contemplated hereby (including the receipt of any required consents as contemplated by Section 8.1), including the transfer of the Seller Permits, the Purchaser will have acquired good and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens. To the Seller's Knowledge, the Purchased Assets include on the Closing Date all of the tangible assets, rights and properties used, or held for use, by the Seller in the Business, other than any Retained Asset set forth on Schedule 2.2(h).

**5.3.    Litigation.** To the Seller's Knowledge, except as set forth on Schedule 5.3 and the Bankruptcy Cases (and proceedings related thereto), (a) there are no material Proceedings pending or threatened in any court or by or before any Governmental Agency by or against Seller, in each case, relating to the Business or the Purchased Assets or which would prevent the performance by Seller of this Agreement or the Ancillary Agreements or any of the transactions contemplated hereby or thereby or which declare or would be reasonably expected to declare the same unlawful or cause the rescission thereof, and (b) there are no outstanding material Orders that will affect the Business or the Purchased Assets after the date hereof.

**5.4.    Brokers.** To the Seller's Knowledge and except as set forth on Schedule 5.4 (and the fees and expenses of each Person set forth on such Schedule or otherwise retained by or on behalf of Seller shall be paid for by Seller and shall be Retained Liabilities), no Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Seller or its equity-holders in connection with the transactions contemplated hereby, and no Person has, or immediately following the consummation of the transactions contemplated hereby will have, as a result of any arrangement by Seller or its equity-holders, any right, interest or valid claim against the Purchaser for any commission, fee or other compensation as a broker, finder or financial advisor in

18

connection with the execution of this Agreement or the Ancillary Agreements or the transactions contemplated hereby or thereby.

**5.5.** **No Other Representations and Warranties**. Except for the representations and warranties contained in this Article V (including the related portions of the disclosure schedules provided by Seller), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Purchased Assets furnished or made available to Purchaser and its representatives (including any information, documents or material delivered to Purchaser, management presentations or in any other form in expectation of the transactions contemplated hereby) or as to the future revenue, profitability or success of the Business, or any representation or warranty arising from statute or otherwise in law.

## ARTICLE VI

### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

Except as set forth on the Schedules hereto, Purchaser represents and warrants to Seller as follows:

**6.1.** **Organization and Authority of Purchaser.** The Purchaser is a _____ duly formed, validly existing and in good standing under the Legal Requirements of the State of _____. Further, the Purchaser is authorized, qualified or licensed to do business as a foreign corporation in each state where such authorization, qualification or license is otherwise required, except where the failure to be so authorized, qualified or licensed would not reasonably be expected to be material to the Purchaser. The Purchaser has full power and authority to (a) own, operate and lease its properties and assets as and where currently owned, operated and leased, and (b) carry on its business as currently conducted. The execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary limited liability company or other organizational action on the part of the Purchaser, and this Agreement constitutes, and the Ancillary Agreements (to which it is a party) when executed, will constitute, the legal, valid and binding obligation of the Purchaser, enforceable in accordance with their respective terms.

**6.2.** **No Conflict or Violation.** The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements (to which it is a party), the performance of its obligations under this Agreement and the Ancillary Agreements (to which it is a party) and, after giving effect to the Sale Order and the Bidding Procedures Order, the consummation of the transactions contemplated hereby and thereby do not and shall not, in any such case, violate or conflict with, and do not and shall not result in a breach of, or require any consent under, or give rise to a right of termination, cancellation or acceleration of any obligation or loss of benefit under (a) Purchaser's organizational documents; (b) any Legal Requirement, Order or Permit applicable to Purchaser; or (c) any contract, agreement, arrangement, undertaking or license to which Purchaser is a party or by which Purchaser's assets or properties are bound, except in the case of clauses (b) and (c), as would not be material to the Purchaser.

**6.3.**  __Litigation__. There are no Proceedings pending or, to the knowledge of the Purchaser, threatened in any court or before any Governmental Agency by or against Purchaser, in each case, which would prevent the performance by Purchaser of this Agreement or the Ancillary Agreements or any of the transactions contemplated hereby or thereby or which declare or would be reasonably expected to declare the same unlawful or cause the rescission thereof.

**6.4.**  __Brokers.__ Except as set forth on Schedule 6.4 (and the fees and expenses of each Person set forth on such Schedule shall be paid for by Purchaser), no Person has acted, directly or indirectly, as a broker, finder, investment banker or financial advisor for the Purchaser or its equity-holders in connection with the transactions contemplated hereby, and no Person has, or immediately following the consummation of the transactions contemplated hereby will have, as a result of any arrangement by Purchaser or its equity-holders, any right, interest or valid claim against Seller for any brokerage commission, fee or other compensation as a broker, finder or financial advisor in connection with the execution of this Agreement or the Ancillary Agreements or the transactions contemplated hereby or thereby.

**6.5.**  __Sufficiency of Funds; Solvency.__ Purchaser has sufficient cash on hand or other sources of immediately available funds to enable it to consummate the transactions contemplated by and perform its obligations under this Agreement and the Ancillary Agreements. Immediately after giving effect to the transactions contemplated by this Agreement and the Ancillary Agreements, Purchaser shall be solvent and shall: (a) be able to pay its debts as they become due; (b) own property that has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (c) have adequate capital to carry on its business. No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated by this Agreement and the Ancillary Agreements with the intent to hinder, delay or defraud either present or future creditors of Purchaser or Seller. In connection with the transactions contemplated hereby, Purchaser has not incurred, nor plans to incur, debts beyond its ability to pay as they become absolute and matured.

**6.6.**  __Permitting__. Neither Purchaser nor any Person that, together with any Affiliates of Purchaser, owns ten percent (10%) or more of the equity interests of Purchaser has been subject to any bond forfeiture, permit suspension or revocation or similar effort or any Proceeding instituted by any Governmental Agency that would prohibit or materially adversely affect the transfer of the Seller Permits to Purchaser. Neither Purchaser nor any Persons "owned or controlled" by Purchaser or any of their respective Affiliates is currently (a) ineligible to receive additional surface mining permits or (b) under investigation to determine whether its eligibility to receive additional surface mining permits should be revoked, i.e., "permit blocked." As used in this Section 6.6, "owned or controlled" shall be defined as set forth in 30 C.F.R. Section 773.5 (1991); and "Proceeding" shall mean any action, suit, proceeding, arbitration, investigation or audit, whether or not by any Governmental Agency.

**6.7.**  __"AS IS" Transaction.__ Purchaser hereby acknowledges and agrees that, except only as provided in Section 5 above, Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including, without limitation, income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any tangible Purchased Assets, the environmental condition or other matter relating to the physical condition of any real property or improvements which are the subject of any lease, the zoning of any real property or improvements which are the subject of any lease, the

value of the Purchased Assets (or any portion thereof), the transferability of the Purchased Assets or any portion thereof, the terms, amount, validity, collectability or enforceability of any Assumed Liabilities or Seller's Contract, the merchantability or fitness of the machinery and equipment, the inventory or any other portion of the Purchased Assets for any particular purpose, or any other matter or thing relating to the Purchased Assets or any portion thereof). Without in any way limiting the foregoing, Seller hereby disclaims any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets. Purchaser further acknowledges that Purchaser has conducted an independent inspection and investigation, review and analysis of the physical condition of all portions of the Purchased Assets and all such other matters relating to or affecting or comprising the Purchased Assets and/or the Assumed Liabilities as Purchaser deemed necessary or appropriate and that in proceeding with the contemplated transactions, Purchaser is doing so based solely upon such independent inspections and investigations. Accordingly, Purchaser will accept the Purchased Assets at the Closing **"AS IS," "WHERE IS," and "WITH ALL FAULTS."**

## ARTICLE VII

### TAX MATTERS

**7.1.    Withholding.** Purchaser shall be entitled to deduct and withhold from the Cash Consideration otherwise payable pursuant to this Agreement to the Seller such amounts as Purchaser is required to deduct and withhold under applicable Legal Requirements. To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Seller.

**7.2.    Tax Cooperation; Allocation of Taxes.**

(a)    Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Purchaser and Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six years following the Closing Date. Seller and Purchaser shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(b)    For purposes of determining Assumed Liabilities and Retained Liabilities under Section 2.3 and Section 2.4, (i) in the case of any ad valorem Taxes (including, for the avoidance of doubt, real or personal property Taxes) for a taxable period that begins on or before and ends after the Closing Date (a "Straddle Period"), (A) the portion of such ad valorem Taxes allocable to the Post-Closing Tax Period shall be the product of (x) the amount of such Taxes for the entirety of such Straddle Period, multiplied by (y) a fraction, the numerator of which is the number of days for such Straddle Period included in the Post-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period and (B) the balance of such ad valorem Taxes shall be allocable to the Pre-Closing Tax Period, and (ii) any other Taxes imposed with respect to a Straddle Period will be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period using the interim closing of the books method.

(c)     All transfer, excise, franchise, property, documentary, sales, use, stamp, registration, recording, value added and other such Taxes and fees (including any penalties and interest) imposed on Purchaser or Seller in connection with this Agreement and the Ancillary Agreements ("Transfer Taxes") shall be paid by the Purchaser. Purchaser and the Seller will cooperate to timely make all Tax returns, reports, forms and other filings as may be required to comply with the Legal Requirements relating to such Transfer Taxes and the Seller will cooperate with Purchaser in making such filings.

(d)     Seller shall cause all Taxes imposed on or with respect to the Purchased Assets for a Pre-Closing Tax Period to be timely paid, and all applicable filings, reports and returns relating to such Taxes to be filed, as provided by Applicable Law.

## ARTICLE VIII

## CERTAIN COVENANTS AND AGREEMENTS

**8.1.    Certain Provisions Relating to Consents.**

(a)     Nothing in this Agreement nor the Ancillary Agreements shall be construed as an attempt or agreement to assign any Purchased Asset, including any Assumed Agreement or other right, which, after giving effect to the provisions of Sections 363 and 365 of the Bankruptcy Code, is not assignable without the Consent of a third party or absent Consent would in any way materially (in relation to such Contract) adversely affect any rights of Purchaser with respect to such Contract, as the assignee or transferee, or constitute a violation of a Legal Requirement or a breach of such Contract (as the case may be) in the event of an assignment ("Non-Assignable Assets"), unless and until such Consent shall have been obtained and upon such Consent being obtained the relevant Purchased Asset will automatically be transferred and assigned pursuant to the Ancillary Agreement that would have effected such transfer and assignment at Closing had such Consent not been required. Each party shall, and shall cause its Affiliates to, use commercially reasonable efforts in endeavoring to obtain such Consents for such Non-Assignable Assets as promptly as practicable after Closing, including the negotiation and execution of any transfer or consent documentation required by the counterparty so long as such documentation does not create any material obligations of any party not otherwise set forth herein for a period of six months following the Closing. Following the Closing, to the extent permitted by applicable Legal Requirements and any applicable Contract, prior to the obtainment of such Consents or, in the event Consents to the assignment thereof cannot be obtained, Seller and Purchaser will cooperate in a mutually agreeable arrangement under which the Purchaser would obtain, to the extent possible, the benefits and assume the obligations thereunder in accordance with this Agreement, including sub-contracting, sub-licensing, sub-leasing or contract mining, provided that Seller and Purchaser will continue to use commercially reasonable efforts in endeavoring to obtain such Consents for a period of six months following the Closing. Nothing in this Agreement shall obligate or require either party or its respective Affiliates to pay any consent or approval fee or other compensation to secure any such approval or consent.

(b)     This Section 8.1 shall not apply to the Permits, which are governed by Section 8.2.

**8.2.    Permitting.**

(a)     Documents; Filings. After the Closing, Purchaser (with Seller's full cooperation) shall use commercially reasonable efforts to prepare and deliver all applications (the "Transfer

Applications") necessary to transfer the Seller Permits, other than the Excluded Permits to Purchaser or any Purchaser Designees. Purchaser (with Seller's full cooperation) shall prepare said Transfer Applications and submit the same to the respective Governmental Agencies' offices as soon as reasonably practicable following Closing. Seller and Purchaser shall diligently pursue obtaining the approval from all Governmental Agencies of the full transfer the Seller Permits (other than the Excluded Permits) to Purchaser or Purchaser Designee (such period following Closing through the full transfer of the Seller Permits (other than the Excluded Permits) to Purchaser or Purchaser Designee shall herein be referred to as the "Transfer Period"), provided that in no event shall Purchaser or any Purchaser Designee be obligated to accept any material amendment to the terms of any Seller Permits or any additional conditions with respect to any Seller Permits. At Closing, Seller and Purchaser shall execute one or more Permit Assignment and Assumption Agreements in order to transfer the Seller Permits (other than Excluded Permits). Notwithstanding anything stated herein to the contrary, to the extent that transfers of certain Seller Permits to Purchaser or a Purchaser Designee are required to be approved by the applicable Governmental Agencies under the applicable Legal Requirements, then (i) at the Closing, Purchaser will obtain the benefits and assume the obligations under such Seller Permits and (ii) in accordance with the forgoing, the transfers shall, to the fullest extent permitted by law, for all purposes be effective as of the Closing Date (and to the extent any such transfer is not fully effective as of the Closing Date as a result of any limitation under applicable law, such transfer will automatically be completed upon the elimination of such limitation). At Closing, each holder of a Seller Permit will grant to Purchaser a limited Power of Attorney granting Purchaser authority to execute documents in connection with the transfer of the Seller Permits. With respect to any Seller Permit that is expired, Seller will, at the request of Purchaser, use its best efforts to have any such Seller Permit reissued as promptly as possible and will permit Purchaser to coordinate the reissuance process if Purchaser so requests, in which case Seller will fully cooperate with Purchaser, including by providing access to such Seller Permit on any related e-permitting platforms.

(b)      Operations on Permits During the Transfer Period. During the Transfer Period with respect to any Seller Permit, Seller shall grant Purchaser or Purchaser Designee the right to enter upon the property covered by such Seller Permit and immediately commence and continue mining and reclamation operations, under the terms and conditions of such Seller Permits and subject to all Legal Requirements, and Purchaser will obtain the benefits and assume the obligations under such Seller Permits, including, with respect to the transfer of the Mining Permits relating to the Mines. The foregoing right of entry includes the right of entry on, over and across the property covered by such Seller Permit, together with the right of ingress and egress to and from such property, as necessary to maintain and comply with the terms of the Seller Permits and to perform reclamation obligations related thereto or to achieve compliance with any applicable law or regulation. Purchaser shall indemnify Seller for any action taken by it during the Transfer Period under this section.

(c)      Applicant Violator System. During the Transfer Period with respect to any Seller Permit, the Seller shall ensure that neither Seller will have been denied, or be made subject to denial of, any application for any mining license, permit or other governmental authorization by any Governmental Agency (or renewal or amendment thereof) due to application of the Applicant Violator System established pursuant to the SMCRA (or any applicable equivalent state system) (the "Applicant Violator System").

(d)    <u>Notices of Violation</u>. In the event that either Purchaser or Seller receives a notice of any non-compliance with respect to any Seller Permit arising from events occurring during the Transfer Period, then it shall immediately give written notice of the noncompliance to other party and in any event within two (2) Business Days of receipt of such notice.

(e)    <u>Reclamation Performance Bonds and Lease Bonds</u>. Schedule 1.1(a) sets forth a list of certain Reclamation Performance Bonds and Lease Bonds of Seller (the "<u>Seller Bonds</u>") and the amount of such Seller Bonds (the "<u>Bond Amount</u>"). As promptly as practicable after the date hereof, Purchaser shall use commercially reasonable efforts to cause substitute reclamation performance bonds and collateral bonds relating to the Seller Permits (other than Excluded Permits) and bonds relating to the Leases that are Assumed Agreements, each in the applicable Bond Amount, to be issued with Purchaser or Purchaser Designee as the principal (the "<u>Purchaser Bonds</u>") to replace in their entirety all Seller Bonds.

## 8.3.    <u>Further Assurances</u>.

(a)    As of or following the Closing Date, upon the terms and subject to the conditions set forth in this Agreement, the Bankruptcy Code and any orders of the Bankruptcy Court, each of Seller and Purchaser agrees to use their commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other party in doing, in the most expeditious manner practicable, all things necessary, proper or advisable to confirm and assure the rights and obligations provided for in this Agreement and the Ancillary Agreements and render effective the consummation of the transactions contemplated hereby and thereby, or otherwise to carry out the intent and purposes of this Agreement, including (i) the making of all necessary registrations and filings as promptly as practicable and the taking of all steps as may be necessary to obtain a Consent from a counterparty to a Contract, (ii) the obtaining of all permits, licenses, consents, authorizations, permit applications or other approvals necessary for Purchaser to take possession of the Purchased Assets and operate the Business; provided, nothing in this Agreement shall obligate or require either Seller or Purchaser to pay any consent or approval fee or other compensation to secure any such permits, licenses, consents, authorizations, permit applications or other approvals (other than customary filing and similar fees related to the transfer of the Seller Permits and the Leases with the U.S. federal government, the Commonwealth of Pennsylvania, and the State of Maryland, which, if paid by Seller, shall be promptly reimbursed by Purchaser), (iii) the defending of any Proceedings challenging this Agreement or the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby, and (iv) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement and the Ancillary Agreements, in each case, after giving effect to the Sale Order.

(b)    The Seller and the Purchaser shall use their commercially reasonable efforts to furnish to each other all information required for any application or other filing to be made pursuant to any Legal Requirement in connection with the transactions contemplated by this Agreement, after giving effect to the Sale Order.

## 8.4.    <u>Correspondence</u>. Until the 12-month anniversary of the Closing Date or, with respect to electronic communications, until 30 days after the Closing Date, Seller shall use its commercially reasonable efforts to promptly forward to Purchaser any mail (including electronic mail) that the Seller receives after the Closing Date to the extent relating to the applicable Purchased Assets or the Business. During such periods, Purchaser likewise shall use its commercially reasonable efforts

to promptly forward to Seller any mail (including electronic mail for such 30 days) that the Purchaser receives after the Closing Date to the extent relating to the Retained Assets, the Retained Liabilities or the employment of Employees during the period prior to the Closing Date.

**8.5.   Employees.**

(a)   At or following the Closing, the Purchaser may make offers of employment to those Employees as the Purchaser may determine in its sole discretion. Any such offers of employment shall be on such terms and conditions as the Purchaser may determine in its sole discretion. No provision in this Section 8.5, whether express or implied, shall (i) create any third-party beneficiary or other rights in any Employee or any other current or former employee of the Seller (including any beneficiary or dependent thereof), any other participant in any Employee Plan or any other Person; (ii) create any rights to continued employment with the Seller, the Purchaser or any of their Affiliates; or (iii) constitute or be deemed to constitute an amendment to any Employee Plan or any other plan, program, policy, agreement or arrangement providing for compensation or benefits sponsored or maintained by the Seller, the Purchaser or any of their respective Affiliates.

(b)   Seller understands and agrees that it is Seller's sole responsibility to terminate the employment of any of Seller's employees that Seller does not wish to retain as its employee as of the Closing. Seller acknowledges that it is within Purchaser's sole discretion to offer employment or not offer employment to any of the Employees.

(c)   Purchaser shall be solely responsible for, and agrees to hold harmless Seller from and against, any liability arising under the WARN Act with respect to any Employee who becomes an employee of Purchaser after the Closing Date and who is found to have suffered an "employment loss" under the WARN Act as a result of being terminated by Purchaser on or after the Closing Date.

(d)   Seller shall be solely responsible for, and agrees to hold harmless the Purchaser from and against, any liability arising under the WARN Act with respect to any current or former employee, whether or not such employee becomes an employee of Purchaser, who is found to have suffered an "employment loss" under the WARN Act as a result of being terminated by Seller on or before the Closing Date.

**8.6.   Bulk-Sales Laws.** The Purchaser hereby waives compliance by the Seller with the requirements and provisions of any "bulk-transfer" Legal Requirements of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to the Purchaser, to the extent applicable.

**8.7.   Post-Closing Books and Records.** From and after the Closing Date for a period of one (1) year, each party shall provide the other parties (and their respective agents and representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, to the assets, books, records, systems and other property and any employees of the other parties so as to enable Purchaser and Seller to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, to prosecute and defend legal Proceedings or for other like purposes, to enable Seller to wind down Retained Assets and Retained Liabilities and to enable the Purchaser to conduct and operate the Business. During such one (1) year period, each party (and their respective agents and representatives) shall be permitted to make copies of any books

and records described in this Section 8.7, subject to Section 10.2. If any party desires to dispose of any such books and records, such party shall, thirty (30) days prior to such disposal, provide the other party with a reasonable opportunity to remove or copy such records to be disposed of at the removing party's expense. Purchaser and Seller shall retain such books and records for a period of six (6) years following the Closing.

**8.8.    No Successor Liability.** Pursuant to the Sale Order and in accordance with Section 363(f) of the Bankruptcy Code, upon the Closing, Purchaser shall not be deemed to: (a) be the successor of or successor employer (as described under any applicable Legal Requirement) to the Seller, including, with respect to any Employee Plans, or under the Coal Act, and any common law successor liability (b) have, de facto, or otherwise, merged with or into the Seller, (c) be a mere continuation or substantial continuation of Seller or the enterprise(s) of the Seller, or (d) other than as expressly set forth in this Agreement, be liable for any acts or omissions of Seller in the current or former conduct of the Business or arising under or related to the Purchased Assets or any other assets. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Agreement, Purchaser shall not be liable for any Liens, Encumbrances or Liabilities (other than Assumed Liabilities) against or of Seller or any of its predecessors or Affiliates or any of its or their assets (including any of the Purchased Assets), and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, or whether fixed or contingent, whether now existing or hereafter arising, with respect to the Business, the Purchased Assets or any Liabilities of Seller arising prior to or after the Closing Date.

# ARTICLE IX
## TERMINATION AND EFFECT

**9.1    Termination.** This Agreement may be terminated at any time before the Closing as follows:

(a)    By Seller, by written notice to Purchaser if the Closing has not occurred by the date as required by Sale Order confirming and approving the transactions contemplated hereby.

(b)    By mutual written consent of Seller and Purchaser.

(c)    Automatically, upon the occurrence of the consummation of any transaction (regardless of the form thereof) involving a sale of all or any substantial portion of the Purchased Assets by Seller to a purchaser or purchasers other than Purchaser via an Alternative Transaction.

**9.2    Effect of Termination; Liquidated Damages.**

(a)    If this Agreement is terminated by Seller pursuant to Section 9.1(a), then notwithstanding anything to the contrary in this Agreement, Purchaser shall forfeit the Purchase Deposit as liquidated damages which, the parties agree, shall be Seller's sole and exclusive (legal or equitable) remedy against Purchaser.

(b)    If this Agreement is terminated pursuant to Section 9.1(b), or terminated automatically pursuant to Section 9.1(c), then Seller will promptly return the Purchase Deposit to Purchaser.

## ARTICLE X

### MISCELLANEOUS PROVISIONS

**10.1    Survival.** None of the representations or warranties contained in this Agreement or in any instrument delivered pursuant to this Agreement, including any rights arising out of any breach of such representations or warranties shall survive the Closing.

**10.2    Confidentiality.** Following the Closing, Seller agrees not to, and to cause its agents and representatives not to, use or disclose any confidential or non-public information concerning the Purchased Assets or the Business, or the business affairs of Purchaser and its Affiliates or the Assumed Liabilities ("Confidential Information") except disclosure of Confidential Information that (a) is lawfully obtained after Closing from a source that, to the knowledge of Seller, was not under an obligation of confidentiality to Purchaser with respect to such information, (b) is independently developed by Seller without violating any of its obligations under this Agreement, (c) is or becomes available to the public without any breach by Seller of the terms of this Agreement, (d) is or may be necessary to wind down any of Seller's estates, or in connection with the enforcement of the rights of, or the defense of any Proceeding against or involving, Seller provided that, in each case, the Confidential Information is afforded confidential treatment, (e) to the extent it relates to any Retained Assets and/or Retained Liabilities, or (f) is or may be necessary in connection with the Bankruptcy Cases provided that the Confidential Information is afforded confidential treatment. Notwithstanding the foregoing, Seller may disclose Confidential Information if Seller believes (after consultation with counsel) it is legally required to make such disclosure in order to comply with Legal Requirements, regulation, rule or legal, judicial or administrative process (including any rule, regulation or policy statement of (i) any self-regulatory organization of which a party is a member) or (ii) in connection with the Bankruptcy Cases. If Seller or any of its agents or representatives becomes required (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) or it becomes necessary in connection with the Bankruptcy Cases to disclose any of the Confidential Information, Seller or such agents or representatives shall use reasonable efforts to provide Purchaser with prompt notice, to the extent allowed by law, rule and regulation, of such requirement, and, to the extent reasonably practicable, cooperate with Purchaser, at the Purchaser's expense, to obtain a protective order or similar remedy to cause such information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege; provided, that, in the event that such protective order or other similar remedy is not obtained, Seller shall, or shall cause such agents or representatives to, furnish only that portion of such information that has been legally compelled, and shall, or shall cause its agents or representatives (as applicable) to, exercise its commercially reasonable efforts, at the Purchaser's expense, to obtain assurance that confidential treatment will be accorded such disclosed information.

**10.3    Notices.** All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given: (a) when delivered personally to the recipient; (b) three (3) Business Days after being sent by certified United States Mail, postage prepaid, return receipt requested; or (c) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications shall be sent to the Seller and to the Purchaser at the addresses indicated below:

**If to Seller:**

      Corsa Coal Corp./Wilson Creek Energy, LLC
      Attn: Kevin Harrigan, Chief Executive Officer
      Email: kharrigan@corsacoal.com

with a copy (which shall not constitute notice) to:

      **Raines Feldman Littrell LLP**
      11 Stanwix Street, Suite 1100
      Pittsburgh, PA 15222
      Attn:  Michael J. Roeschenthaler and
             Mark A. Lindsay
      Email: mroeschenthaler@raineslaw.com
              mlindsay@raineslaw.com

**If to Purchaser:**

      [●]

with a copy (which shall not constitute notice) to:

      [●]

or to such other address as any party hereto may, from time to time, designate in writing delivered pursuant to the terms of this Section 10.3.

**10.4**    **Waivers and Amendments.** No amendment, modification or discharge of this Agreement (including any Schedule or Exhibit), and no waiver hereunder, shall be valid or binding unless set forth in writing and duly executed by the party against whom enforcement of the amendment, modification, discharge or waiver is sought. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the party granting such waiver in any other respect or at any other time. Neither the waiver by any party hereto of a breach or of a default under any provisions of this Agreement, nor the failure by any party on one or more occasions to enforce any of the provisions of this Agreement or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

**10.5**    **Fees and Expenses.** Except to the extent expressly provided otherwise in this Agreement, each party will bear its own costs, fees and expenses (including attorneys', consultants', and advisors' fees and expenses) incurred in connection with this Agreement, the Ancillary Agreements and the transactions contemplated hereby and thereby.

**10.6**    **Successors and Assigns.** This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of its rights, interests or obligations may be assigned by any party hereto, including by operation of law, without the prior written consent of the other party; provided that Purchaser or any Purchaser Designee may assign this Agreement and/or any Ancillary Agreement without such approval to an assignee that agrees to be bound by the terms and conditions of the applicable

agreement and assume all obligations of the assigning party hereunder or thereunder, as applicable and provided that no such assignment will relieve the assigning party of any of its duties under the relevant agreement.

**10.7**   **Consent to Jurisdiction.** Without limitation of any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Cases have been closed pursuant to Section 350(a) of the Bankruptcy Code, each party irrevocably submits to the jurisdiction of the U.S. District Court for the Western District of Pennsylvania and the Court of Common Pleas of Allegheny County, for the purposes of any Proceeding arising out of this Agreement or any transaction contemplated hereby. Each party agrees to commence any such Proceeding either in the U.S. District Court for the Western District of Pennsylvania, or if such Proceeding may not be brought in such court for jurisdictional reasons, in the Court of Common Pleas of Allegheny County, Pennsylvania. Each party further agrees that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth above shall be effective service of process for any Proceeding in the said courts with respect to any matters to which it has submitted to jurisdiction in this Section 10.7. Each party irrevocably and unconditionally waives any objection to the laying of venue of any Proceeding arising out of this Agreement or the transactions contemplated hereby in said courts, and hereby and thereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Proceeding brought in any such court has been brought in an inconvenient forum.

**10.8**   **Governing Law.** Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by and construed and interpreted in accordance with the laws of the Commonwealth of Pennsylvania, without regard to its principles of conflicts of laws.

**10.9**   **Specific Performance.** Each party's obligation under this Agreement is unique. If any party should breach its covenants under this Agreement, the parties each acknowledge that it would be extremely impracticable to measure the resulting losses; accordingly, the non-breaching party or parties, in addition to any other available rights or remedies they may have under the terms of this Agreement, shall be entitled to specific performance and/or to obtain an injunction or injunctions to prevent breaches of this Agreement, and each party expressly waives the defense that a remedy in damages will be adequate and waives any obligation that that a bond be posted.

**10.10**   **Waiver of Jury Trial.** EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (i) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, and (ii) IT MAKES SUCH WAIVER VOLUNTARILY.

**10.11** **Severability.** Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability (a) of the offending term or provision in any other situation or in any other jurisdiction or (b) of any other term or provision of this Agreement.

**10.12** **Entire Agreement.** This Agreement (including the Schedules and Exhibits hereto), the Sale Order and the Ancillary Agreements constitute the entire agreement among the parties hereto with respect to the subject matter hereof, and supersede all prior and contemporaneous understandings, agreements, statements, representations, documents, instruments, communications and correspondence, whether written or oral, express or implied, by or among the parties hereto and their respective Affiliates, representatives and agents with respect to the subject matter hereof and thereof. Upon Closing, the rights and obligations under the Confidentiality Agreement will terminate.

**10.13** **Construction.** The parties and their respective counsel have participated jointly in the negotiation and drafting of this Agreement and the Ancillary Agreements. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement or the Ancillary Agreements. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting party has no application and is expressly waived. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it. The word "or" is used in the inclusive sense of "and/or."

**10.14** **Incorporation of Exhibits and Schedules.** The Exhibits and Schedules identified in this Agreement are incorporated herein by reference and made a part hereof. There may be included in the Schedules and elsewhere in this Agreement items and information that are not "material," and such inclusion shall not be deemed to be an acknowledgment or agreement that any such item or information (or any nondisclosed item or information of comparable or greater significance) is "material," or to affect the interpretation of such term for purposes of this Agreement. Matters reflected in the Schedules are not necessarily limited to matters required by this Agreement to be disclosed in the Schedules. The representations and warranties of Seller set forth in Article V are hereby excepted to the extent disclosed in the disclosure schedules provided by Seller. Such disclosure schedules shall be arranged in sections corresponding to the numbered and lettered paragraphs contained in this Agreement. Any information disclosed on one schedule hereunder shall also be considered to be disclosed on any other schedule hereunder corresponding to a representation or warranty to the extent applicability of such information is reasonably apparent. No disclosure in the Schedules relating to a possible breach or violation of any Contract, Legal Requirement or Order shall be construed as an admission or indication that such breach or violation exists or has occurred. Any capitalized term used in the Schedules and not otherwise defined therein shall have the meaning given to such term in this Agreement. Any headings set forth in the Schedules are for convenience of reference only and shall not affect the meaning or interpretation of any of the disclosures set forth in the Schedules.

**10.15** **Headings.** The headings contained in this Agreement are included for convenience only, and will not affect in any way the meaning or interpretation of this Agreement.

**10.16    Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. The electronic transmission of any signed original counterpart of this Agreement shall be deemed to be the delivery of an original counterpart of this Agreement. The executed Agreement together with any attachments hereto may be photocopied and stored on computer tapes, disks and similar electronic storage media ("Imaged Document"). If an Imaged Document is introduced as evidence in any judicial, arbitration, mediation or administrative proceeding, it shall be considered as admissible evidence, provided that such Imaged Document bears the signatures of the parties and further provided that there is no evidence that such Imaged Document has been manipulated or otherwise altered in any way. Neither party shall object to the admissibility of the Imaged Document on the basis that such was not originated or maintained in documentary form under either the hearsay rule, the best evidence rule, or other rule of evidence.

**10.17    Announcements**. Except as required in the Bankruptcy Cases or as otherwise required by applicable Legal Requirement, Purchaser shall consult with Seller before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby and shall not issue any such release or make any such statement prior to such consultation.

**10.18    Third Parties.** Except as otherwise expressly provided for in this Agreement, nothing in this Agreement, whether expressed or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any Persons other than the parties to this Agreement and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first set forth above.

[Seller's Signature Blocks]

[Purchaser's Signature Blocks]

**Schedule 1.1(a)**

**<u>Lease Bonds and Reclamation Performance Bonds</u>**

[To Be Filed]

**Schedule 1.1(b)**

**<u>Leased Real Property</u>**

[To Be Filed]

**Schedule 1.1(c)**

**<u>Owned Real Property</u>**

[To Be Filed]

**Schedule 1.1(d)**

**<u>Software</u>**

[To Be Filed]

**Schedule 2.1(d)**

**<u>Tangible Personal Property</u>**

[To Be Filed]

**Schedule 2.1(e)**

**<u>Seller Permits</u>**

[To Be Filed]

**Schedule 2.2(h)**

**<u>Retained Assets</u>**

[To Be Filed]

**Schedule 2.3(b)**

## Assumed Cure Costs

[To Be Filed]

**Schedule 2.3(e)**

**<u>Assumed Liabilities (Administrative Costs)</u>**

[To Be Filed]

**Schedule 2.5(a)**

**<u>Available Agreements</u>**

[To Be Filed]

**Schedule 2.5(b)**

**Assumed Agreements**

[To Be Filed]

**Schedule 5.2**

**Title to Purchased Assets**

[To Be Filed]

**Schedule 5.3**

**<u>Litigation Actions</u>**

[To Be Filed]

**Schedule 5.4**

**<u>Seller's Brokers</u>**

[To Be Filed]

**Schedule 6.4**

**<u>Purchaser's Brokers</u>**

[To Be Filed]

## **EXHIBIT 3**

Auction and Sale Order Hearing Notice

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | **Case No.: 25-70001-JAD** |
| **WILSON CREEK ENERGY, LLC, *et al.*,[1]** | **Chapter 11** |
| Debtors. | *Jointly Administered* |
| **WILSON CREEK ENERGY, LLC, *et al.*,** | **Doc. No.:** |
| Movant, | **Related to Document No. 116** |
| v. | **Hearing Date: March 12, 2025** |
| **KIA II, LLC; KEYBANK NATIONAL ASSOCIATION; LSQ FUNDING GROUP, L.C.; R&D SVONAVEC VENTURES, LLC; BILL MILLER EQUIPMENT SALES; CLEVELANDBROTHERS EQUIPMENT; AND PRIME ALLIANCE BANK, INC., as Assignee of WINGSPIRE EQUIPMENT FINANCE,** | **Hearing Time: 9:00 AM (EST)** |
| | **Response Deadlines:** |
| | **General Sale Objections: 4:00 PM (EST) on February 24, 2025** |
| Respondents. | **Supplemental Objections:  4:00 PM (EST) on March 11, 2025** |

### NOTICE OF PROPOSED SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS, BIDDING PROCEDURES, AUCTION, AND SALE ORDER HEARING

**PLEASE TAKE NOTICE** that the Debtors, by and through their proposed undersigned counsel, sought approval from the United States Bankruptcy Court for the Western District of Pennsylvania (the "Court") to effectuate the sale of all or substantially all of the Debtors' assets in the *Debtors' Motion for Entry of Orders (A) Approving Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (C) Authorizing the Debtors to Designate Stalking Horse Bidder and Approving Proposed Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and Assignment of*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Wilson Creek Energy, LLC (6202); Wilson Creek Holding, Inc. (7733); Maryland Energy Resource, LLC (5299); Mincorp Acquisition Corp. (4858); Mincorp Inc. (5688); PBS Coals, Inc. (2413); Roxcoal, Inc. (3768); Quecreek Mining, Inc. (1745), Croner, Inc. (0529); Elk Lick Energy, Inc. (8551); and Corsa Coal Corp. (0027). The Debtors' address is 1576 Stoystown Road, Friedens, Pennsylvania 15541.

*Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [Doc. No. 116] (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that on [●], the Court entered the *Order (A) Approving Bidding Procedures for Sale of All or Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate Stalking Horse Bidder and Approving Proposed Stalking Horse Bid Protections, (C) Scheduling Auction for and Hearing to Approve the Sale of the Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (E) Approving Assumption and Assignment Procedures, (F) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (G) Granting Related Relief* (the "Bidding Procedures Order").[2] The Bidding Procedures Order approved the bidding procedures (the "Bidding Procedures") attached as **Exhibit 1** to the Bidding Procedures Order. The Bidding Procedures set the key dates and times related to the sale of the Sale Assets and assumption and assignment of the Executory Contracts and unexpired leases.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Order, all related exhibits, including the Bidding Procedures, and any other filings related to the foregoing are available for free on the website of Debtors' notice agent, Omni Agent Solutions ("Omni"): at https://cases.omniagentsolutions.com/wilsoncreek (the "Case Website").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Motion, the Debtors seek to sell all or substantially all of their assets (the "Sale Assets") to the any Successful Bidder (which the Debtors may designate as one or more Stalking Horse Bidders in accordance with the Bidding Procedures Order) free and clear of all liens, claims, encumbrances, and other interests to the fullest extent permitted under 11 U.S.C. § 363(f) and other applicable law.

**PLEASE TAKE FURTHER NOTICE** that the deadline by which all Bids for the Sale Assets must be actually received by the parties specified in the Bidding Procedures is **March 7, 2025, at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures Order, if one or more Qualified Bids are received by the Bid Deadline, an auction (the "Auction") to sell the Sale Assets will take place at 10:00 a.m. (prevailing Eastern Time) on March 10, 2025 at the offices of: (a) Raines Feldman Littrell LLP, 11 Stanwix St., Suite 1100, Pittsburgh, Pennsylvania 15222, (b) via in person or a virtual platform, such as Zoom or GoToMeeting, or (c) such other location, in each case as the Debtors designate and shall be timely communicated to all persons entitled to attend the Auction. The Debtors may cancel the Auction pursuant to the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors do not timely receive more than one Qualified Bid, subject to the other provisions of these Bidding Procedures, the Debtors, in consultation with the Consultation Parties, shall exercise their sound business judgment in furtherance of their fiduciary duties owed to their estates and creditors thereof, to determine what

---

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or Bidding Procedures Order, as applicable.

action(s) the Debtors should take to preserve and maximize the value of their estates, including whether to (i) extend the Bid Deadline; (ii) confer and attempt to confirm any non-Qualified Bids received as of the Bid Deadline; or (iii) withdraw this Motion.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of the Sale Assets to the Successful Bidder (the "Sale Order Hearing") before the United States Bankruptcy Court for the Western District of Pennsylvania, Courtroom D, 54th Floor U.S. Steel Tower, 600 Grant Street, Pittsburgh, PA 15219 on February 26. 2025, at 10:00 a.m. (prevailing Eastern Time), or at such time thereafter as counsel may be heard or at such other time as the Court may determine. The Sale Order Hearing may be adjourned from time to time without further notice to creditors or parties in interest by filing a notice on the Court's docket for these Chapter 11 Cases or the making of an announcement at the Sale Order Hearing.

**PLEASE TAKE FURTHER NOTICE** that objections to the Sale, if any, (i) must be in writing, (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the Case Management Order (iii) state with particularity the legal and factual basis for the objection, and (iv) be filed with the Court no later than **February 24, 2025, at 4:00 p.m. (prevailing Eastern Time)**.

**FAILURE TO ABIDE BY THE BIDDING PROCEDURES, THE BIDDING PROCEDURES ORDER, OR ANY OTHER ORDER OF THE COURT IN THESE CHAPTER 11 CASES MAY RESULT IN THE REJECTION OF YOUR BID FOR THE SALE ASSETS.**

**PLEASE TAKE FURTHER NOTICE THAT ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED TO THE SALE(S) AND FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE(S), INCLUDING WITH RESPECT TO THE TRANSFER OF THE SALE ASSETS TO THE SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS THAT SUCH PARTY OR ENTITY MAY HAVE AGAINST THE CARE PAVILION DEBTORS OR THE SALE ASSETS.**

*[The remainder of this page is left intentionally blank.]*

Respectfully submitted,

Dated: [●], 2025

**RAINES FELDMAN LITTRELL, LLP**
By: */s/ Michael J. Roeschenthaler*
Michael J. Roeschenthaler (PA ID No. 87647)
Kenneth J. Lund (PA ID No. 63468)
Mark A. Lindsay (PA ID No. 89487)
Daniel R. Schimizzi (PA ID No. 311869)
11 Stanwix Street, Suite 1100
Pittsburgh, PA 15222
Telephone: 412-899-6462
Email: mroeschenthaler@raineslaw.com
klund@raineslaw.com
mlindsay@raineslaw.com
dschimizzi@raineslaw.com

*Counsel to the Debtors and*
*Debtors in Possession*

## **EXHIBIT 4**

Contract Assumption and Assignment Notice

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In Re: | **Case No.: 25-70001-JAD** |
| **WILSON CREEK ENERGY, LLC, *et al.*,[1]** | **Chapter 11** |
| Debtors. | *Jointly Administered* |
| **WILSON CREEK ENERGY, LLC, *et al.*,** | **Doc. No.:** |
| Movant, | **Related to Document No. 116** |
| v. | **Hearing Date: March 12, 2025** |
| **KIA II, LLC; KEYBANK NATIONAL ASSOCIATION; LSQ FUNDING GROUP, L.C.; R&D SVONAVEC VENTURES, LLC; BILL MILLER EQUIPMENT SALES; CLEVELANDBROTHERS EQUIPMENT; AND PRIME ALLIANCE BANK, INC., as Assignee of WINGSPIRE EQUIPMENT FINANCE,** | **Hearing Time: 9:00 AM (EST)** |
| | **Response Deadlines:** |
| | **General Sale Objections: 4:00 PM (EST) on February 24, 2025** |
| Respondents. | **Supplemental Objections: 4:00 PM (EST) on March 11, 2025** |

**NOTICE OF EXECUTORY CONTRACTS THAT MAY BE ASSUMED
AND ASSIGNED IN CONNECTION WITH THE SALE TRANSACTIONS**

 **PLEASE TAKE NOTICE** that on January 15, 2025, the Debtors, by and through their undersigned counsel, filed the *Debtors' Motion for Entry of Orders (A) Approving Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Approving Bidding Procedures for the Sale of All or Substantially All of the Debtors' Assets, (C) Authorizing the Debtors to Designate Stalking Horse Bidder and Approving Proposed Stalking Horse Bid Protections, (D) Scheduling Auction for and Hearing to Approve Sale of the Debtors' Assets, (E) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (F) Approving Assumption and Assignment Procedures, (G) Authorizing Assumption and*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Wilson Creek Energy, LLC (6202); Wilson Creek Holding, Inc. (7733); Maryland Energy Resource, LLC (5299); Mincorp Acquisition Corp. (4858); Mincorp Inc. (5688); PBS Coals, Inc. (2413); Roxcoal, Inc. (3768); Quecreek Mining, Inc. (1745), Croner, Inc. (0529); Elk Lick Energy, Inc. (8551); and Corsa Coal Corp. (0027). The Debtors' address is 1576 Stoystown Road, Friedens, Pennsylvania 15541.

*Assignment of Executory Contracts and Unexpired Leases, and (H) Granting Related Relief* [Doc. No. 116] (the "Motion").[2]

**PLEASE TAKE FURTHER NOTICE** that under the Motion, the Debtors seek authority to, among other things, assume and assign certain executory contracts and unexpired leases under section 365 of the Bankruptcy Code. If you are a counterparty to any contract or lease with the Debtors, you should check **Schedule 1** to determine: (i) if your contract or lease is listed; and (ii) if your contract or lease is listed, if you dispute the Debtors' calculation of the amount necessary to cure any monetary defaults under your contract or lease (each, a "Cure Amount").

**PLEASE TAKE FURTHER NOTICE** that on [●], 2024, the United States Bankruptcy Court for the Western District of Pennsylvania (the "Court") entered its *Order (A) Approving Bidding Procedures for Sale of All or Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate Stalking Horse Bidder and Approving Proposed Stalking Horse Bid Protections, (C) Scheduling Auction for and Hearing to Approve the Sale of the Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (E) Approving Assumption and Assignment Procedures, (F) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (G) Granting Related Relief* (the "Bidding Procedures Order"). The Bidding Procedures Order approved the bidding procedures (the "Bidding Procedures") attached as Exhibit 1 to the Bidding Procedures Order. The Bidding Procedures set the key dates and times related to the sale of the Sale Assets and assumption and assignment of the executory contracts and unexpired leases.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Order, all related exhibits, including the Bidding Procedures, and any other filings related to the foregoing are available for free on the website of Debtors' notice agent, Omni Agent Solutions ("Omni"): at https://cases.omniagentsolutions.com/wilsoncreek (the "Case Website").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Motion, the Debtors seek to sell all or substantially all of their assets (the "Sale Assets") to the any Successful Bidder (which the Debtors may designate as one or more Stalking Horse Bidders in accordance with the Bidding Procedures Order) free and clear of all liens, claims, encumbrances, and other interests to the fullest extent permitted under 11 U.S.C. § 363(f) and other applicable law.

**PLEASE TAKE FURTHER NOTICE** that the deadline by which all Bids for the Sale Assets must be actually received by the parties specified in the Bidding Procedures is **March 7, 2025, at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the terms of the Bidding Procedures Order, if one or more Qualified Bids are received by the Bid Deadline, an auction (the "Auction") to sell the Sale Assets will take place at 10:00 a.m. (prevailing Eastern Time) on March 10, 2025 at the offices of: (a) Raines Feldman Littrell LLP, 11 Stanwix St., Suite 1100, Pittsburgh, Pennsylvania 15222, (b) via in person or a virtual platform, such as Zoom or GoToMeeting, or (c)

---

[2] Capitalized terms used but not otherwise defined herein shall the meanings ascribed to such terms as set forth in the Motion.

such other location, in each case as the Debtors designate and shall be timely communicated to all persons entitled to attend the Auction. The Debtors may cancel the Auction pursuant to the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors do not timely receive more than one Qualified Bid, subject to the other provisions of these Bidding Procedures, the Debtors, in consultation with the Consultation Parties, shall exercise their sound business judgment in furtherance of their fiduciary duties owed to their estates and creditors thereof, to determine what action(s) the Debtors should take to preserve and maximize the value of their estates, including whether to (i) extend the Bid Deadline; (ii) confer and attempt to confirm any non-Qualified Bids received as of the Bid Deadline; or (iii) withdraw this Motion.

**PLEASE TAKE FURTHER NOTICE** that a hearing will be held to approve the sale of the Sale Assets to the Successful Bidder (the "Sale Order Hearing") before the United States Bankruptcy Court for the Western District of Pennsylvania, Courtroom D, 54th Floor U.S. Steel Tower, 600 Grant Street, Pittsburgh, PA 15219 on February 26. 2025, at 10:00 a.m. (prevailing Eastern Time), or at such time thereafter as counsel may be heard or at such other time as the Court may determine. The Sale Order Hearing may be adjourned from time to time without further notice to creditors or parties in interest by filing a notice on the Court's docket for these Chapter 11 Cases or the making of an announcement at the Sale Order Hearing.

**PLEASE TAKE FURTHER NOTICE** that any objections to the inclusion of your contract or lease on Schedule 1, or the Debtors' calculation of the Cure Amount with respect to your contract or lease (each, a Cure Objection"), (i) must be in writing, (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the Case Management Order, (iii) state with particularity the legal and factual basis for the objection, and (iv) be filed with the Court and served in accordance with the Case Management Order no later than **February 24, 2025, at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that any objections solely relating to adequate assurance of future performance of the Successful Bidder (each, an Adequate Assurance Objection): (i) must be in writing, (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the Case Management Order, (iii) state with particularity the legal and factual basis for the objection, and (iv) be filed with the Court and served in accordance with the Case Management Order no later than **March 11, at 4:00 p.m. (prevailing Eastern Time)**.

**IF AN EXECUTORY CONTRACT COUNTERPARTY FAILS TO FILE WITH THE BANKRUPTCY A TIMELY CURE OBJECTION TO THE INCLUSION OF A CONTRACT OR LEASE ON SCHEDULE 1 OR THE PROPOSED CURE AMOUNT WITH RESPECT TO SUCH CONTRACT OR LEASE, THE EXECUTORY CONTRACT COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO THE AMOUNT TO CURE ANY DEFAULT UNDER THE APPLICABLE EXECUTORY CONTRACT. THE CURE AMOUNTS SET FORTH ON SCHEDULE 1 HERETO SHALL BE CONTROLLING AND WILL BE THE ONLY AMOUNT NECESSARY TO CURE OUTSTANDING DEFAULTS UNDER THE**

**APPLICABLE EXECUTORY CONTRACT UNDER BANKRUPTCY CODE SECTION 365(B), NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE EXECUTORY CONTRACT, OR ANY OTHER DOCUMENT, AND THE APPLICABLE EXECUTORY CONTRACT COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH EXECUTORY CONTRACT AGAINST THE DEBTORS, ANY SUCCESSFUL BIDDER, OR THE PROPERTY OF ANY OF THEM.**

**IF NO ADEQUATE ASSURANCE OBJECTION IS TIMELY RECEIVED WITH RESPECT TO ASSUMPTION AND ASSIGNMENT OF AN ASSUMED AGREEMENT: (I) THE COUNTERPARTY TO SUCH ASSUMED AGREEMENT SHALL BE DEEMED TO HAVE CONSENTED TO THE ASSUMPTION BY THE DEBTORS AND ASSIGNMENT TO THE SUCCESSFUL BIDDER OF THE ASSUMED AGREEMENT, AND BE FOREVER BARRED FROM ASSERTING ANY OBJECTION WITH REGARD TO SUCH ASSUMPTION AND ASSIGNMENT (INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO THE CURE AMOUNT AND ADEQUATE ASSURANCE OF FUTURE PERFORMANCE BY THE SUCCESSFUL BIDDER); (II) ANY AND ALL DEFAULTS UNDER THE ASSUMED AGREEMENT AND ANY AND ALL PECUNIARY LOSSES RELATED THERETO SHALL BE DEEMED CURED AND COMPENSATED PURSUANT TO BANKRUPTCY CODE SECTION 365(B)(1)(A) AND (B) UPON PAYMENT OF THE CURE AMOUNT SET FORTH IN THE NOTICE OF ASSUMED AGREEMENTS FOR SUCH ASSUMED AGREEMENT; AND (III) THE CURE AMOUNT SET FORTH IN THE NOTICE OF ASSUMED AGREEMENTS FOR SUCH ASSUMED AGREEMENT SHALL BE CONTROLLING, NOTWITHSTANDING ANYTHING TO THE CONTRARY IN SUCH ASSUMED AGREEMENT, OR ANY OTHER RELATED DOCUMENT, AND THE COUNTERPARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OTHER CLAIMS RELATED TO SUCH ASSUMED AGREEMENT AGAINST THE DEBTORS AND THEIR ESTATES OR THE SUCCESSFUL BIDDER, OR THE PROPERTY OF ANY OF THEM, FOR ANY BREACHES, CLAIMS, OR OTHER LIABILITIES OR OBLIGATIONS THAT EXISTED PRIOR TO THE CLOSING OF THE SALE TRANSACTION WITH THE SUCCESSFUL BIDDER.**

*[The remainder of this page is left intentionally blank]*

Respectfully submitted,

Dated: [●], 2025   **RAINES FELDMAN LITTRELL, LLP**

   By:*/s/ Michael J. Roeschenthaler*
   Michael J. Roeschenthaler (PA ID No. 87647)
   Kenneth J. Lund (PA ID No. 63468)
   Mark A. Lindsay (PA ID No. 89487)
   Daniel R. Schimizzi (PA ID No. 311869)
   11 Stanwix Street, Suite 1100
   Pittsburgh, PA 15222
   Telephone: 412-899-6462
   Email: mroeschenthaler@raineslaw.com
   klund@raineslaw.com
   mlindsay@raineslaw.com
   dschimizzi@raineslaw.com

   *Counsel to the Debtors and*
   *Debtors in Possession*

## **SCHEDULE 1**

Potential Assumed Agreements

[TO BE FILED]

## **EXHIBIT 5**

Post-Auction Notice

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re: | **Case No.: 25-70001-JAD** |
| **WILSON CREEK ENERGY, LLC, *et al.*,**[1] | **Chapter 11** |
| Debtors. | *Jointly Administered* |
| **WILSON CREEK ENERGY, LLC, *et al.*,** | **Doc. No.:** |
| Movant, | **Related to Document No. 116** |
| v. | **Hearing Date: March 12, 2025** |
| **KIA II, LLC; KEYBANK NATIONAL ASSOCIATION; LSQ FUNDING GROUP, L.C.; R&D SVONAVEC VENTURES, LLC; BILL MILLER EQUIPMENT SALES; CLEVELANDBROTHERS EQUIPMENT; AND PRIME ALLIANCE BANK, INC., as Assignee of WINGSPIRE EQUIPMENT FINANCE,** | **Hearing Time: 9:00 AM (EST)** |
| | **Response Deadlines:** |
| | **General Sale Objections: 4:00 PM (EST) on February 24, 2025** |
| Respondents. | **Supplemental Objections:  4:00 PM (EST) on March 11, 2025** |

## NOTICE OF SUCCESSFUL BID AND BACKUP BID

**PLEASE TAKE NOTICE** that, pursuant to the *Order (A) Approving Bidding Procedures for Sale of All or Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Designate Stalking Horse Bidder and Approving Proposed Stalking Horse Bid Protections, (C) Scheduling Auction for and Hearing to Approve the Sale of the Debtors' Assets, (D) Approving Form and Manner of Notice of Sale, Auction, and Sale Order Hearing, (E) Approving Assumption and Assignment Procedures, (F) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases, and (G) Granting Related Relief* (the "Bidding Procedures Order"), the United States Bankruptcy Court for the Western District of Pennsylvania approved, among other things,

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Wilson Creek Energy, LLC (6202); Wilson Creek Holding, Inc. (7733); Maryland Energy Resource, LLC (5299); Mincorp Acquisition Corp. (4858); Mincorp Inc. (5688); PBS Coals, Inc. (2413); Roxcoal, Inc. (3768); Quecreek Mining, Inc. (1745), Croner, Inc. (0529); Elk Lick Energy, Inc. (8551); and Corsa Coal Corp. (0027). The Debtors' address is 1576 Stoystown Road, Friedens, Pennsylvania 15541.

the implementation of the Bidding Procedures attached to the Bidding Procedures Order as **Exhibit 1** in connection with the disposition of the Sale Assets.[2]

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures Order, the deadline for submitting a Qualified Bid for the Sale Assets was March 7, 2025, at 4:00 p.m. (prevailing Eastern time) (the "Bid Deadline") and in the event that the Debtors timely received one or more Qualified Bids, the Debtors would conduct the Auction on March 10, 2025, at 10:00 a.m. (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE** that on March 10, 2025, the Debtors conducted the Auction in accordance with the Bidding Procedures and certain rules distributed to Auction attendees prior to and at the Auction. At the Auction, the Debtors determined that the highest and/or best offer was submitted by [●] (the "Successful Bidder" and the Successful Bidder's winning bid, the "Successful Bid") and the second highest and/or best offer was submitted by [●] (the "Backup Bidder," and the Backup Bidder's bid, the "Backup Bid"). Attached hereto as **Exhibit A** is a copy of the final, fully-executed asset purchase agreement (collectively, the "APA", and the transaction contemplated thereby the "Sale Transaction") between the Debtors and the Successful Bidder, containing the terms of the Successful Bid.

**PLEASE TAKE FURTHER NOTICE** that, as contemplated by the Bidding Procedures Order, the Debtors will seek final approval of the Sale Transaction to the Successful Bidder pursuant to the Transaction Documents, during the **Sale Order Hearing on March 12, 2025, at 9:00 a.m. (prevailing Eastern Time)** before the United States Bankruptcy Court for the Western District of Pennsylvania, 5414 U.S. Steel Tower, 600 Grant Street, Pittsburgh, PA 15219. The Successful Bidder(s) shall appear at the Sale Order Hearing and be prepared to testify in support of the Successful Bid(s) and the Successful Bidder(s)' ability to close in a timely manner, including with respect to demonstrating adequate assurance of future performance that may be required in connection with the assumption and assignment of any Assumed Agreements. The Sale Order Hearing may be adjourned or rescheduled as ordered by the Bankruptcy Court, or by the Debtors in consultation with the Successful Bidder and the Consultation Parties, but without further notice to creditors and parties in interest other than by announcement by Debtors of the adjourned date at the Sale Order Hearing. The Debtors' presentation to the Bankruptcy Court for approval of a Successful Bid does not constitute the Debtors' acceptance of the Successful Bid. The Debtors shall be deemed to have accepted a Successful Bid only when the Successful Bid has been approved by order of the Court in a form acceptable to the Debtors and Successful Bidders.

**PLEASE TAKE FURTHER NOTICE** that if the Sale Transaction is not consummated with the Successful Bidder pursuant to the Successful Bid, the Debtors may designate the Backup Bidder as the new Successful Bidder and such Backup Bidder's Backup Bid as the new Successful Bid, and the Debtors will be authorized to consummate the Sale Transaction with the Backup Bidder without further order of the Court.

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms as set forth in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that any objection relating to adequate assurance of future performance by a Successful Bidder, the conduct of the Auction, and the form of Proposed Sale Order, (i) must be in writing, (ii) conform to the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the Case Management Order, (iii) state with particularity the legal and factual basis for the objection, and (iv) be filed with the Court and served in accordance with the Case Management Order no later than **March 11, 2025, at 4:00 p.m. (prevailing Eastern Time)**.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Order, all related exhibits, including the Bidding Procedures, and any other filings related to the foregoing are available for free on the website of Debtors' notice agent, Omni Agent Solutions ("Omni"): at https://cases.omniagentsolutions.com/wilsoncreek (the "Case Website").

**PLEASE TAKE FURTHER NOTICE THAT ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE DEEMED TO HAVE CONSENTED TO THE SALE(S) AND FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE(S), INCLUDING WITH RESPECT TO: (I) THE TRANSFER OF THE SALE ASSETS TO THE SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS THAT SUCH PARTY OR ENTITY MAY HAVE AGAINST THE DEBTORS OR THE SALE ASSETS; (II) ADEQUATE ASSURANCE OF FUTURE PERFORMANCE OF THE SUCCESSFUL BIDDER; AND (III) THE CONDUCT OF THE AUCTION.**

Respectfully submitted,

Dated: [●], 2025

**RAINES FELDMAN LITTRELL, LLP**

By:*/s/ Michael J. Roeschenthaler*
Michael J. Roeschenthaler (PA ID No. 87647)
Kenneth J. Lund (PA ID No. 63468)
Mark A. Lindsay (PA ID No. 89487)
Daniel R. Schimizzi (PA ID No. 311869)
11 Stanwix Street, Suite 1100
Pittsburgh, PA 15222
Telephone: 412-899-6462
Email: mroeschenthaler@raineslaw.com
klund@raineslaw.com
mlindsay@raineslaw.com
dschimizzi@raineslaw.com

*Counsel to the Debtors and
Debtors in Possession*