### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In Re:<br><br>**WILSON CREEK ENERGY, LLC**, *et al.*,1,<br><br>Debtors.<br>_____<br><br>**WILSON CREEK ENERGY, LLC**, *et al.*,<br><br>Movant,<br><br>v.<br><br>**LCT ENERGY, LP**,<br><br>Respondent. | **Case No. 25-70001-JAD**<br><br>**Chapter 11**<br><br><br>**Related to Document No. 293**<br><br>**Hearing Date:  March 5. 2025**<br>**Hearing Time:  9:00 a.m.**<br><br>**Response Deadline:  March 3, 2025,**<br>**at 12:00 p.m.** |

### RESPONSE OF LCT ENERGY, LP TO EMERGENCY MOTION FOR ENTRY OF AN ORDER: (I) COMPELLING COMPLIANCE WITH BIDDING PROCEDURES AND CONFIDENTALITY AGREEMENT; (II) COMPELLING DESTRUCTION OF ALL CONFIDENTIAL INFORMATION OBTAINED BY LCT ENERGY, LP, PURSUANTTO CONFIDENTIALITY AGREEMENT; AND <u>(III) GRANTING RELATED RELIEF</u>

For its response ("<u>Response</u>") to the *Emergency Motion for Entry of an Order:  (I) Compelling Compliance With Bidding Procedures and Confidentiality Agreement; (II) Compelling Destruction of All Confidential Information Obtained by LCT Energy, LP., Pursuant to Confidentiality Agreement; and (III) Granting Related Relief* [Doc. No. 293] (the "<u>Motion</u>") filed by the debtors and debtors-in-possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), LCT Energy, LP ("<u>LCT</u>"), by and through its undersigned counsel, states:

### PRELIMINARY STATEMENT

The Debtors are wrong:  LCT has not disclosed any "Confidential Information" to anyone outside of LCT and its authorized agents and representatives who have been evaluating a potential

bid for some of the Debtors' assets. LCT has not made any of the misstatements to the Debtors' unnamed "largest customers," "business partners," "trucking vendors," or "trucking companies" that the Debtors allege. All that LCT wanted to do was to bid on the Debtors' assets, which has been frustrated by the Debtors' continued harassment.  The Debtors have not even alleged any specific breach of the Confidentiality Agreement, because none occurred. Most, if not all, of the allegedly "Confidential Information" in the Debtors' virtual data room is publicly available or was already known to LCT before it was first granted access.

Neither LCT nor any of its affiliates have taken any of the actions the Debtors accuse them of taking. In response to the Debtors' February 5, 2025 letter, which falsely accused LCT, and well before the Debtors filed their inflammatory and baseless Motion, LCT's and affiliates' employees, despite having done nothing wrong, were already instructed on more than one occasion not to discuss the Debtors' bankruptcies with third parties in order to avoid the Debtors' baseless accusations.

Yet, the Debtors have used those specious allegations as a pretext to justify denying LCT access to any further information and to "disqualify" any bid that LCT might make. LCT was interested in bidding before the Debtors began lobbing untrue allegations. LCT remains interested today – despite the Debtors' highly irregular and wildly unreasonable efforts to interfere with LCT's assessment of the Debtors' assets and to freeze LCT out of the process. Frankly, the Debtors' false accusations against LCT, coupled with the Debtors' unjustified and unfair treatment of LCT, have given LCT some understandable pause. The timing of the Debtors' actions makes it reasonable to infer that they may have something to hide from LCT, the Pennsylvania Department of Environmental Protection and/or other bidders in the sale process, but whether that is so and what it may be remains to be seen.

In short, LCT has done nothing intended to harm the Debtors or their estates. Instead, it is the Debtors who are intentionally placing their own estates in jeopardy, by interfering with LCT and chilling the bidding process. However, if the Debtors, the consulting parties and this Honorable Corut do not want LCT to participate in the sale process, then LCT will comply with the terms of the Confidentiality Agreement and certify that any and all information it has received has been destroyed.

LCT employs more than 98 people at its Donegal Township Rustic Ridge mine and is part of the Robindale Energy family of companies. Robindale is a family-owned and operated business headquartered in Latrobe, Pennsylvania. Through its various affiliated entities, Robindale generates more than One Billion Dollars in revenue annually and employs more than 1,100 people, 90% of whom are based in Western Pennsylvania. The Robindale companies, including LCT, have a stellar reputation in the industry and among the various regulatory bodies that govern their operations. They do not need, nor want, any of the Debtors' alleged confidential information in order to run their business. Indeed, their participation in this sale process has been fraught with costly and unnecessary distractions.

LCT therefore submits this Response to set the record straight and to dispel any ill-conceived notion that the Debtors' accusations have even a scintilla of merit – because they don't. In support of this Response, LCT relies upon the Declarations of Judson Kroh, Michael Cocho, James Kramer, and John Ross (collectively, the "LCT Declarations").[1]

---

[1] For purposes of this Response, those Declarations are identified and cited as:

*Declaration of Judson Kroh in Support of LCT's Response to Debtors' Emergency Motion . . .,* attached to this Response as **Exhibit A** (cited below as "Kroh Dec. at ¶ ____");

*Declaration of Michael Cocho in Support of LCT's Response to Debtors' Emergency Motion . . .,* attached to this Response as **Exhibit B** (cited below as "Cocho Dec. at ¶ ____");

## BACKGROUND PERTINENT TO THIS RESPONSE

In connection with the proposed sale of substantially all of their assets, the Debtors and LCT entered into the Confidentiality Agreement. That agreement was signed and returned by LCT on January 15, 2025.

As defined in the Confidentiality Agreement, "Confidential Information" excludes information about the Debtors that (among other exceptions) is publicly-known, that LCT already had in its possession, or that LCT ever obtained from third party sources:

> '**Confidential Information**' means all non-public, proprietary, or confidential information of Disclosing Party . . .; *provided, however*, that Confidential Information does not include any information that: (i) is or becomes generally available to the public other than as a result of Recipient's or its Representatives' act or omission; (ii) is obtained by Recipient or its Representatives on a non-confidential basis from a third party that was not legally or contractually restricted from disclosing such information; [or] (iii) was in Recipient's or its Representatives' possession, as established by documentary evidence, before Disclosing Party's disclosure hereunder . . .

*See* Confidentiality Agreement, Motion at Ex. C thereto, p. 5 of 8 (emphasis in original).

As set forth more fully in the Declarations, most, if not all, of the allegedly "Confidential Information" was not confidential at all, because it was publicly available (including in public filings by some of the Debtors) or otherwise was already known to LCT before it signed the Confidentiality Agreement. *See, e.g.*, Kroh Dec. at ¶s 13, 19. That "publicly available" information includes trucking rates in the region, which are widely known, including to LCT. *Id*. at ¶s 20-25; Cocho Dec. at ¶s 13-21.

---

*Declaration of James Kramer in Support of LCT's Response to Debtors' Emergency Motion . . .*, attached to this Response as **Exhibit C** (cited below as "Kramer Dec. at ¶ ___"); and

*Declaration of John Ross in Support of LCT's Response to Debtors' Emergency Motion . . .*, attached to this Response as **Exhibit D** (cited below as "Ross Dec. at ¶ ___").

In their Motion, the Debtors acknowledge that, between February 5 and 8, 2025, and since February 14, 2025, LCT has been denied access to the "virtual data room" (the "VDR") the Debtors established with respect to the proposed sale of their assets. *See* Motion at ¶s 17-18, 21.

The Debtors also acknowledge that they notified LCT on February 14, 2025, that LCT has been "disqualified" and that any bid LCT submits will not be considered a "Qualified Bid" for purposes of the proposed asset sale. *Id.* at ¶ 21 and Ex. D thereto, p. 3 of 4. It appears that the Debtors sent the February 14 letter because LCT did not submit a bid for all of the Debtors' assets.

The Debtors' purported justification for denying LCT access to the VDR and for "disqualifying" any bid it might make are a series of allegations that the Debtors have lobbed at LCT since February 5, 2025.  Those allegations are specious and unfounded.

The Debtors' decision to file the Motion and to reiterate these accusations genuinely surprised LCT. In letters to the Debtors' counsel dated February 7 and 19, respectively, LCT's counsel had explained in detail why the concerns the Debtors' counsel set forth in their February 5 and 14 letters were misguided. Copies of LCT's reply letters are attached as **Exhibits E** and **F**. Along the way, LCT's and the Debtors' counsel had several conversations about the Debtors' stated concerns and LCT's responses. LCT's counsel thought those discussions were progressing and had cleared up any misunderstanding. The Debtors' Motion, however, demonstrates that the Debtors are still clinging to these unfounded accusations.

The tissue paper-thin nature of the Debtors' accusations is obvious:  They comprise just five sentences in the Debtors' 13-page Motion and 7-page supporting Declaration of Kevin Harrigan ("Harrigan Dec.").  Those sentences (collectively, the "Accusations") are:

> Shortly after the Debtors provided LCT with the Confidential Information, and to the Debtors' genuine surprise, the Debtors were informed by certain of their largest customers and significant business partners that LCT representatives were

5

conveying that the Debtors' business was spiraling, and a shutdown of their operations was imminent.

Motion at ¶15; Harrigan Dec. at ¶11 (the "First Accusation").

Equally surprising was the fact that LCT also advised certain of the Debtors' trucking vendors that, if they wanted to continue hauling coal in the area, they had to devote more resources to hauling LCT's coal.

Motion at ¶15; Harrigan Dec. at ¶11 (the "Second Accusation").

Following LCT regaining access [according to the Debtors, on February 8, 2025] to the VDR, the Debtors were advised by one of their two largest customers that LCT's derogatory comments relating to the Debtors' operations continued.

Motion at ¶20; Harrigan Dec. at ¶15 (the "Third Accusation").

Additionally, the Debtors understand that LCT raised the rates it was willing to pay to trucking companies that haul coal for the Debtors above the rates being paid by the Debtors, including trucking companies whose identities and rate structures were disclosed in response to LCT's February 10, 2025 due diligence request.

Motion at ¶20; Harrigan Dec. at ¶15 (the "Fourth Accusation").

The Debtors have learned that multiple trucking companies have diverted transportation services from the Debtors to LCT, which negatively impacts the Debtors' operations.

Motion at ¶22; Harrigan Dec. at ¶17 (the "Fifth Accusation").

Tellingly, each of these Accusations is conspicuously vague. They contain practically no details. They refer to "customers" and "business partners" and "trucking vendors" and "trucking companies" generically, with no attribution. They refer to "LCT" or its "representatives," without naming any names. They lack dates on which alleged communications or actions occurred. Those Accusations that refer to alleged communications do not identify any individual who allegedly made the statements the Debtors describe. The Accusations' opaqueness hampers LCT's ability to respond. Given that the Accusations lack any merit, it is reasonable to infer that this may be what the Debtors intend. Further, most, if not all, of the Accusations relate to normal and customary

business activities that the Debtors seek to improperly cast as violations of the Confidentiality

Agreement.

In an effort to fill-in the Accusations' many blanks, LCT also has considered the "cease and

desist" and "notice of disqualification" letters that accompany the Motion (as Exhibits C and D,

respectively).  Based on LCT's understanding of the Accusations, including what LCT has gleaned

from those two letters, LCT believes that each of the Accusations is flawed, misleading, or just

plain false.

**ARGUMENT**

**A.  THE DEBTORS' ACCUSATIONS ARE BASELESS.**

All of the Accusation are baseless.  Some are flat-out false. And most of them also are

inadmissible hearsay within hearsay. LCT addresses each of the Accusations in turn below.

**1.    The First Accusation is inadmissible hearsay and misleading, because LCT has
       not disclosed any Confidential Information to the Debtors' customers.**

For their First Accusation, the Debtors allege:

> Shortly *after* the Debtors provided LCT with the Confidential Information, and to
> the Debtors' genuine surprise, the Debtors were *informed by certain of their
> largest customers and significant business partners* that LCT representatives were
> conveying that the Debtors' business was spiraling, and a shutdown of their
> operations was imminent.

Motion at ¶15; Harrigan Dec. at ¶11 (emphasis added).

The First Accusation is classic "hearsay within hearsay" and, therefore, is not admissible.

"Hearsay" means "a statement [including an oral or written assertion] that: (1) the declarant does

not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove

the truth of the matter asserted in the statement."   Fed. R. Evid. 801(a). If a statement involves

"hearsay within hearsay," then "each part of the combined statements" must conform with an

exception to be admissible. Fed. R. Evid. 805.

Here, two statements have been combined in the First Accusation. They present two levels of hearsay: One level is LCT's alleged statement to the Debtors' "customers" and "business partners" (whoever they are). The second level is those customers' or business partners' statement(s) to the Debtors (about what LCT allegedly said or wrote to those customers or business partners). Both of these statements must satisfy exceptions to the rule against hearsay for the "combined statements" in the First Accusation to be admissible. They don't.

As to the first level of "hearsay within hearsay," the Debtors describe the declarants who told them what LCT allegedly said or wrote as "certain of [the Debtors'] largest customers and significant business partners." Those declarants made their statement(s) to the Debtors out-of-court. And the Debtors offer the alleged statement(s) of those declarants, via Mr. Harrigan's Declaration, to try and prove that LCT in fact made its statement to the declarants. But the Debtors have not shown that the applicable "customers" or "business partners" are unavailable to testify, as Federal Rule of Evidence 804 requires for any of its exceptions to apply, and the Debtors have not identified any other applicable exception. If the declarants (who presumably work for these "customers" or "business partners") do not testify, LCT will not be able to test their veracity, perceptions, or recollections via cross-examination. Therefore, the statement those "customers" or "business partners" made to the Debtors about LCT is not admissible. *See* Fed. R. Evid. 802 ("Hearsay is not admissible . . .").

Nor have the Debtors satisfied the second level of "hearsay within hearsay" for the alleged "combined statement" by "LCT representatives" to be admissible. That second level is the Debtors' description of what LCT supposedly told "certain of" the Debtors' "customers" or "business partners." This statement also does not pass muster under Rule 801. For example, it is not a statement of an opposing party under Rule 801(d)(2), given that the Debtors have not even

8

identified who at LCT allegedly made the statement in the first place. *See, e.g., Davis v. Salvation Army*, 2024 U.S. App. LEXIS 9780 at *2 n.2 (3d Cir. Apr. 23, 2024) (". . . the statement could not be admitted as a party-opponent's statement because there was insufficient evidence identifying the declarant."). The Debtors likewise have not shown that this statement satisfies any other exception to the rule against hearsay.

Fundamentally, the Motion and Mr. Harrigan's Declaration lack sufficient detail for anyone else to understand who any of the declarants were. Which of the Debtors' "largest customers" and "significant business partners" supposedly heard or read the alleged statement of LCT? Which individuals employed by those entities do the Debtors mean? Which "LCT representative" are the Debtors accusing? LCT and the Court are left to guess the answers to these and other questions. That seems to be the point – *i.e.*, throw enough mud against the wall so that LCT has a difficult time defending itself.

Although the Motion and Mr. Harrigan's Declaration are exceedingly vague, the Debtors attached a February 5, 2025 "cease and desist" letter as "Exhibit C" that may shed some light on the First Accusation. In that letter, the Debtors allege that:

> It has come to the Debtors' attention that LCT . . . has used information acquired pursuant to the Confidentiality Agreement, and in direct violation thereof, to engage in efforts to interfere with the Debtors' contractual relations with certain of its business partners. More specifically, the Debtors have been advised that: . . . Jim Cramer [sic] has improperly and incorrectly mischaracterized the condition of the Debtors in an effort to interfere in their contractual relationship with U.S. Steel for the benefit of LCT.

*See* Motion, Ex. C thereto, p. 3 of 8. In other words, the Debtors assert that Mr. Kramer used "Confidential Information" in violation of the Confidentiality Agreement and "mischaracterized" the Debtor' "condition" to U.S. Steel. But if this is the basis for the First Accusation, then the Debtors are wrong on the facts.

First, in their letter the Debtors have not identified a single shred of "Confidential Information" that Mr. Kramer divulged to U.S. Steel or anyone else. That's because he didn't. He is not a member of the "deal team" working on a potential bid for some of the Debtors' assets. *See* Kramer Dec. at ¶ 8. He has never had access to the VDR. *Id*. at ¶ 9. And, with the exception of receiving basic information regarding the evaluation of a bid on or about January 25, 2025, Mr. Kramer has not been provided with any information that he understood to come from the VDR. *See, e.g., id*. at ¶s 10-11. Notably, Mr. Kramer's communication to U.S. Steel came well *before* anyone at LCT had access to the VDR or executed the Confidentiality Agreement.

Second, Mr. Kramer did not "mischaracterize" the Debtors' condition to U.S. Steel. Mr. Kramer's responsibilities as Business Development Manager for Robindale Energy Services, Inc. ("Robindale") include overseeing the domestic sale of coal by Robindale and its affiliates, such as LCT. *See id*. at ¶ 3. U.S. Steel is one of his major accounts. Consequently, Mr. Kramer regularly communicates with U.S. Steel. That's part of his job. *Id*. at ¶s 12-13. Shortly after learning of the Debtors' bankruptcies, on January 8, 2025, Mr. Kramer contacted U.S. Steel to notify them of the Debtors' bankruptcy filing and that Robindale was in a position to rapidly help U.S. Steel with its low-volatile coal requirements, if needed.    *Id*. at ¶ 22. As noted above, at the time of that communication, LCT had not yet executed the Confidentiality Agreement and did not have access to the VDR. *Id*. at ¶ 24. Obviously, therefore, Mr. Kramer could not have had any Confidential Information when that communication occurred. Accordingly, nothing in his January 8 communication with U.S. Steel disclosed any confidential information about the Debtors. *Id*. at ¶ 23. And, to the best of Mr. Kramer's knowledge, U.S. Steel did not make any changes to its orders or business with the Debtors based on his communication. *Id*. at ¶ 25.

<u>Third</u>, the Debtors' First Accusation about LCT's communication with one of its major customers ignores basic commercial realities. Neither the filing of the Debtors' bankruptcy cases nor anything in the Confidentiality Agreement prohibits LCT from conducting its daily business, such as interacting with its own customers about their coal needs. And neither the Debtors' bankruptcies nor the Confidentiality Agreement prevent LCT from competing for possible future business with other companies, including the Debtors. To the extent the Debtors' First Accusation suggests otherwise, it is wrong.

### 2. The Second Accusation is just plain false and is inadmissible hearsay.

For their Second Accusation, the Debtors allege:

> Equally surprising was the fact that LCT also advised certain of the Debtors' trucking vendors that, if they wanted to continue hauling coal in the area, they had to devote more resources to hauling LCT's coal.

Motion at ¶ 15; Harrigan Dec. at ¶ 11. As with the First Accusation, this is hearsay within hearsay. It also is just plain false. LCT did not say that.

In the Second Accusation, the Debtors necessarily are repeating what certain unidentified "trucking vendors" told them – namely, what LCT allegedly said to those "trucking vendors." As with the First Accusation, the Debtors offer the trucking vendors' out-of-court statement to the Debtors about what LCT allegedly said to those vendors, in an effort to "prove" that LCT actually said it. It's quintessential "hearsay within hearsay" and, for the same reasons the First Accusation fell short, the Second Accusation is inadmissible too. Fed. R. Evid. 801(a); 802.

Even if the Second Accusation were not inadmissible hearsay, the Court should not consider it for a separate reason – namely, because it is false. Just like the First Accusation, the Second Accusation is conspicuously vague. By referring to unnamed "trucking vendors" and to "LCT," without naming any names, the Debtors require the Court and LCT to speculate regarding which

"trucking vendors" the Debtors mean, who at LCT allegedly made the statement, and who at these

"trucking vendors" allegedly heard or read it.

Once again, though, in their February 5, 2025 "cease and desist" letter, the Debtors evidently

purport to explain the alleged basis for their accusation.  They assert that:

> It has come to the Debtors' attention that LCT . . . has used information acquired
> pursuant to the Confidentiality Agreement, and in direct violation thereof, to engage
> in efforts to interfere with the Debtors' contractual relations with certain of its
> business partners. More specifically, the Debtors have been advised that:  (i) Mike
> Cocho of LCT has contacted the Debtors' trucking companies (including Melissa
> Trucking in Maryland) and intentionally misrepresented to said companies the
> status of the Debtors' operations and encouraged action that would otherwise
> disrupt operations of the Debtors and, by extension, the success of their Chapter 11
> Cases[.]

Motion at Ex. C thereto, p. 3 of 8. Thus, the Debtors evidently contend that Mr. Cocho used

"Confidential Information" when contacting trucking companies and that he "misrepresented" the

"status of the Debtors' operations" and "encouraged" some unexplained "action."

If this is the substance of the Second Accusation, then the Court should discount it entirely

– because it never happened. First, the Debtors allege that Confidential Information was "used"

for alleged communications with the Debtors' "trucking companies."  Once again, the Debtors

have not identified what "Confidential Information" they mean – because none actually was "used"

or disclosed.

Second, contrary to paragraph 15 of the Debtors' Motion, Mr. Cocho states that "neither I,

nor Robindale's dispatcher for the relevant counties, has ever 'advised' any trucking vendor that

'if they [want] to continue hauling coal in the area, they [must] devote more resources to hauling

LCT's coal, or anything similar." *See* Cocho Dec. at ¶ 31 (quoting Motion at ¶ 15).[2]  Furthermore,

---

[2] Even if they had said anything like that to any trucking vendor, it would not violate the
Confidentiality Agreement.

Mr. Cocho is not a member of the team evaluating a potential bid for any of the Debtors' assets, he has never had access to the VDR, and thus he was not then aware of any Confidential Information. *See, e.g., id*. at ¶s 8-9.

Third, aside from disposing of paragraph 15 in the Motion, Mr. Cocho repudiates the Debtors' allegations in the February 5 letter quoted above. As Mr. Cocho explains in his Declaration, the last time he had any communication with Melissa Trucking was one text and one e-mail, both on February 24, *2023*, in which the owner advised Mr. Cocho that she was selling her trucks and provided a list of those trucks. The last time Melissa Trucking hauled any material for any Robindale-affiliated entity was November 7, 2024 – i.e., some two months before the Debtors' chapter 11 cases began. Furthermore, Melissa Trucking is a small player in the market, given that, as far as Mr. Chocho is aware, it currently has only three trucks in service. Although Mr. Cocho does not know which other (unidentified) "trucking companies" the Debtors accuse him of having contacted, he states that he has "never contacted any of the Debtors' trucking companies, including Melissa Trucking, and made any representations regarding the 'state of the Debtors' operations' or 'encouraged' any 'action' of them whatsoever." *Id*. at ¶s 32-37.

This is simply further evidence that the Debtors' Second Accusation is groundless, because the "communications" about which the Debtors complain did not occur.

**3. The Third Accusation is incorrect and is inadmissible hearsay.**

The Debtors' Third Accusation also is textbook "hearsay within hearsay" and, because the Debtors have not proved that each level of hearsay conforms with an exception to the rule, the "combined statement" in the Third Accusation is not admissible either. Aside from being inadmissible, the Third Accusation also is untrue. The Debtors allege:

> Following LCT regaining access [on February 9, 2025] to the VDR, the Debtors *were advised by one of their two largest customers* that LCT's derogatory comments relating to the Debtors' operations continued.

Motion at ¶20; Harrigan Dec. at ¶15 (emphasis added).

As with the First and Second Accusations, the Debtors report what they heard or read ("were advised") by "one of their two largest customers" (the declarant) regarding what that unnamed declarant allegedly heard or read from "LCT." For the reasons stated above regarding the first two Accusations, this is more "hearsay within hearsay." No exception having been shown for both levels of hearsay, the Third Accusation also is inadmissible. Fed. R. Evid. 801(a); 802.

Even if the Third Accusation were not hearsay, it is not entitled to any credence. As with the first two Accusations, the Debtors have not named which of their "customers" heard the alleged comments, what person with LCT allegedly made the comments the Debtors describe generically or, for that matter, what the substance of the allegedly "disparaging" comments was. Because the Third Accusation lacks any modicum of meaningful factual content, it carries no weight.

Furthermore, once again the Debtors have not articulated what "Confidential Information" allegedly was misused or what breach of the Confidentiality Agreement occurred.

Finally, the Third Accusation, as LCT understands it, is blatantly and demonstrably false. This time, the Debtors evidently alluded to the content of the Third Allegation in their February 14, 2025 "Notice of Disqualification . . ." letter. There, they allege that:

> It has recently come to the Debtors' attention that . . . LCT, through its representatives, has continued to disparage the Debtors to its [sic] customers. More specifically, on or about February 12, 2025, the Debtors received information from U.S. Steel, one of its largest customers, that *LCT has suggested to U.S. Steel that* the Debtors were going to be unable to sell coal to U.S. Steel, and that U.S. Steel should buy its coal from LCT. These allegations are materially false, as the Debtors has operated, and continue to operate, their businesses within the confines of Chapter 11 Cases.

Motion, Ex. D, p. 3 of 4 (emphasis added).

14

If this is the basis of the Third Accusation, then the Debtors have it backwards. LCT did not "suggest" to U.S. Steel that the Debtors would be unable to sell coal to U.S. Steel. LCT also did not "suggest" to U.S. Steel that it should buy coal from LCT.

**In fact, <u>the Debtors</u> said those things to U.S. Steel!**

LCT knows this because Corsa Coal Corporation's ("<u>Corsa</u>") Vice President of Sales, Michael Reiter, said so to John Ross. Mr. Ross is the Senior Operations Manager of the Donora River Terminal ("<u>DRT</u>") for Robindale, an affiliate of LCT. DRT is the facility to which the Debtors deliver their low-volatile coal for U.S. Steel. Ross Dec. at ¶ 12. DRT is the facility at which the Debtors store coal for ultimate purchase by U.S. Steel for use in its Clairton Works facility. *Id*. at ¶ 13. DRT's daily reporting system tracks coal inventories on site, including the Debtors' coal inventories. *See id.* at ¶ 26. Furthermore, based on his 47 years of experience in the coal industry, Mr. Ross is able to estimate coal inventories by visually inspecting suppliers' coal piles at DRT. *Id.* at ¶ 27. He can easily identify the Debtors' coal because the Debtors have two segregated coal stockpiles at DRT. *Id.* at ¶ 28.

As part of his responsibilities, it is Mr. Ross's usual and customary practice to report coal inventories at DRT to suppliers and customers, including the Debtors and U.S. Steel, and he has been reporting coal inventories at DRT to customers, including U.S. Steel, for over 11 years. *Id*. at ¶s 17-18.

One week before February 12, 2025, Mr. Ross reported to Mr. Reiter that the Debtors' coal inventories at DRT were extremely low. *Id*. at ¶ 33. During that conversation, Mr. Reiter told Mr. Ross that *Mr. Reiter had already advised U.S. Steel* that the Debtors' coal inventory was low and that *Mr. Reiter had advised U.S. Steel* to "buy coal from its neighbors." *Id*. at ¶ 34. Based on the fact that Corsa's and LCT's prep plants are across the road from one another, Mr. Ross interpreted

Mr. Reiter's comment about "neighbors" to mean that Mr. Reither had advised U.S. Steel that it should begin buying coal from LCT. *Id*. at ¶ 35.

On February 12, 2025, Mr. Ross advised U.S. Steel that, based on the information set forth in DRT's daily reports, the Debtors were "negative by 600 tons" at DRT. *Id*. at ¶ 36. The next day, during another conversation about the Debtors' low coal volumes at DRT, Mr. Reiter told Mr. Ross that *Mr. Reiter had advised U.S. Steel* that shipments would be low that week. *Id*. at ¶s 38-39.

All of the information Mr. Ross communicated to U.S. Steel about the Debtors' coal inventory at DRT is the same information to which he has had access and had been reporting to U.S. Steel for the past 15 years. He has never communicated any "Confidential Information" to U.S. Steel or any other person or entity. *Id*. at ¶s 43-44.

In short, contrary to the Debtors' Third Accusation, to the extent anyone "suggested" to U.S. Steel that the Debtors "were going to be unable to sell coal to U.S. Steel" or that U.S. Steel "should buy its coal from LCT," those "suggestions" came from the Debtors, not from LCT or its affiliates.[3]

### 4. The Fourth Accusation is misleading, because LCT adjusted its truck hauling rates in response to market factors -- not based upon any allegedly "Confidential Information" of the Debtors.

The Fourth Accusation is meritless. LCT's affiliated trucking companies adjust their truck hauling rates in response to market factors. They did not do so because of any "Confidential Information" about which truck hauling companies the Debtors use and how much the Debtors

---

[3] Mr. Reiter made these statements directly to Mr. Ross (not to some third party who later relayed them to LCT) and Mr. Reiter made these statements unquestionably within the scope of his then-existing agency or employment relationship with the Debtors. As such, they are admissible against the Debtors as opposing-party statements that are not hearsay. *See, e.g.,* Fed. R. Evid. 801(d)(2)(A); 801(d)(2)(D).

pay them. And LCT increased its rates on only one trucking route out of nearly 200 routes that

Robindale manages – and that route is not one of the routes for which LCT asked the Debtors on

February 10, 2025, to place information into the VDR. The February 10, 2025 request was a

continuation of several information requests LCT had made previously.  Trucking information was

an immaterial aspect of that request. Nonetheless, the Debtors allege that:

> Additionally, the Debtors understand that LCT raised the rates it was willing to pay
> to trucking companies that haul coal for the Debtors above the rates being paid by
> the Debtors, including trucking companies whose identities and rate structures were
> disclosed in response to LCT's February 10, 2025 due diligence request.

Motion at ¶20; Harrigan Dec. at ¶15. To the extent the Debtors imply that LCT increased the rates

it pays for trucking companies to haul its coal in an effort to hinder the Debtors' business or as a

result of allegedly "confidential" information LCT reviewed in the VDR, the Debtors are way off-

base.  LCT's adjusted its hauling rates due to market forces having nothing to do with the Debtors.

First, the Debtors' implication that LCT raised its trucking rates in response to information

about the Debtors' trucking rates in the VDR is unfounded. Information about trucking rates is

widely known. LCT simply did not need any "Confidential Information" from the VDR about that.

In his Declaration, Mr. Cocho explains this.

Mr. Cocho, who is Robindale's Transportation Manager and has held positions in its

transportation department for more than 27 years, oversees the transportation of coal for Robindale

and its affiliates, including LCT. Cocho Dec. at ¶s 1, 3.  He reports that trucking rates are widely

and publicly known or available.  Id. at ¶ 13. In fact, truck dispatchers contact trucking companies

on a regular basis, often multiple times per week, to inquire into and advise as to current rates. Id.

at ¶ 14. Robindale has first-hand knowledge of prevailing trucking rates, given that it has two

affiliate trucking companies which transport more material on a volume basis than any other

trucking company in Western Pennsylvania. See id. at ¶ 15. In 2024, Robindale's affiliated

17

trucking companies moved over ten million tons of bulk material. *Id*. at ¶ 17. Robindale's affiliated

trucking companies have 195 trucks with full-time drivers working 60-plus hours per week, five

to six days per week, depending upon demand. *Id*. at ¶ 18.

Again, notably, one of Robindale's affiliated trucking companies hauls coal for the Debtors.

*Id*. at ¶ 16. Robindale knows exactly what the Debtors are paying Robindale's affiliate.

Consequently, Robindale, its affiliated trucking companies, and Mr. Cocho personally have a deep

understanding of the trucking marketplace in Western Pennsylvania and the cost structure involved

in operating trucking companies. *Id*. at ¶ 19. He personally is, and always has been, acutely aware

of prevailing trucking rates in Western Pennsylvania as a function of his job duties at Robindale.

*Id*. at ¶ 20. And Mr. Cocho therefore did not have, nor did he need, access to the Debtors' trucking

rates in order to understand prevailing trucking rates in Western Pennsylvania.  *Id*. at ¶ 21. If Mr.

Cocho, or anyone else for that matter, wants to know what trucking rates are in the region, all they

have to do is ask any trucking company.  None of this information is secretive.

Second, Robindale and its affiliates, including LCT, adjust trucking rates in the normal

course of their business to react to changing market conditions. Cocho Dec. at ¶ 25; Kroh Dec. at

¶ 29. For example, the trucking rate for LCT's Rustic Ridge facility has been changed numerous

times in the past two years. Cocho Dec. at ¶ 26; Kroh Dec. at ¶ 30. Robindale and its affiliates

have 200 trucking routes.  Kroh Dec. at ¶ 27. January 2025 was a cold and snowy month that

backed up trucking services in Western Pennsylvania. *See id.* at ¶ 26. LCT reacted to the market

by increasing its rate on one route (Rustic Ridge) in February 2025 because it needed more trucks.

*Id.* at ¶ 28.

Third, the Rustic Ridge trucking route – the only route for which LCT raised the rates it

pays to haul coal during February 2025 – is not one of the two trucking routes for which LCT

18

made a "due diligence" request. Attached as **Exhibit G** is a copy of the email that LCT sent on

February 10, 2025, asking the Debtors to add certain information in the VDR. *See* Motion at ¶ 19;

Harrigan Dec. at ¶ 14 (describing LTC's "due diligence" request). All but two of the items

requested are unrelated to trucking routes or rates. The only two routes and rates LCT asked the

Debtors to add in the VDR were for "Casselman to Shade" and "Acosta to Shade" – *not* for the

Rustic Ridge route on which LTC raised its rates.

Market forces, not some nefarious effort to harm the Debtors, drove LCT's decision to raise

the rate it pays for the Rustic Ridge trucking route. And the Debtors have not established (nor can

they) that this rate adjustment arose from a breach of the Confidentiality Agreement – a breach

they have not specifically identified in any respect.

   5.  **The Fifth Accusation assumes a breach of the Confidentiality Agreement
        that did not occur and, therefore, is idle speculation.**

Finally, as with the other Accusations, the Debtors' Fifth Accusation does not specifically

identify any breach of the Confidentiality Agreement or misuse of Confidential Information.

Instead, it assumes that a breach or misuse occurred, and that some illusory "causal connection"

exists between LCT's "access" to Confidential Information and the behavior of other trucking

companies. In fact, no breach, misuse, or "causal connection" has been proved:

> The Debtors have learned that multiple trucking companies have diverted
> transportation services from the Debtors to LCT, which negatively impacts the
> Debtors' operations.

Motion at ¶22; Harrigan Dec. at ¶17. Again, the Debtors have not identified any "Confidential

Information" that was "misused."   They have not pointed to any breach of the Confidentiality

Agreement, because none occurred. As explained above regarding the Fourth Accusation, trucking

rates are common knowledge in the marketplace. And, as explained in the Declarations (see

above), LCT adjusts its truck hauling rates from time-to-time to address market conditions.  In

other words, the Debtors have not shown that any breach of the Confidentiality Agreement occurred, or that LCT misused Confidential Information in any fashion. To the extent their Fifth Accusation implies any breach or misuse by LCT, the Debtors are mistaken. The Fifth Accusation is just idle speculation.

## B. THE MOTION IS PROCEDURALLY DEFECTIVE BECAUSE THE RELIEF THE DEBTORS SEEK REQUIRES AN ADVERSARY PROCEEDING, NOT A MOTION.

The Debtors' Motion is improper procedurally and should be denied for that reason also. In the Motion, the Debtors seek two forms of relief:

-   "compelling LCT to comply with the Bidding Procedures and Confidentiality Agreement, and to discontinue any use or disclosure of Confidential Information for any reason whatsoever . . ."; and

-   "compelling LCT to destroy Confidential Information and . . . provide a written verification of the same to the Debtors . . .."

Motion at ¶s 31; 35. The Debtors attempt to "shoe-horn" such relief into a "contested matter" under Bankruptcy Rule 9014. But, as the foundation for the relief they seek, the Debtors point out that "the bankruptcy court is, after all, a court of equity." *Id.* at ¶ 25 (citation omitted). And what the Debtors seek, fundamentally, is equitable relief. They desire essentially (i) a mandatory injunction to prevent LCT from using any Confidential Information and (ii) an order requiring LCT to "specifically perform" in accordance with the Confidentiality Agreement's provision regarding destruction of any such information.

This type of equitable relief must be sought in an adversary proceeding, not by motion. *See* Fed. R. Bankr. P. 7001 (7) ("The following are adversary proceedings: . . . (7) a proceeding to obtain an injunction of other equitable relief . . ."). Rule 7001 expressly covers mandatory and other forms of injunctive relief. It also covers requests for specific performance. As explained in the Collier treatise:

> 'Other equitable relief' as used in Rule 7001(g) should include relief other than injunctions traditionally granted only by courts of equity. Accountings and specific performance immediately come to mind . . .

10 Collier on Bankruptcy ¶ 7001.08 (L. King 16th Ed. 2024). Accordingly, the Motion should be denied, subject to refiling as an adversary proceeding under Bankruptcy Rule 7001, et seq. Nonetheless, LCT has no desire to keep any information it received if the Debtors, the consulting parties, and/or this Honorable Court do not want LCT to participate in the sale process. LCT is more than willing to comply with the terms of the Confidentiality Agreement and certify the destruction of any material it received from the VDR if LCT is not permitted to bid.

## C. THE DEBTORS' SPURIOUS ACCUSATIONS AGAINST (AND PRETEXTUAL "DISQUALIFICATION" OF) LCT ARE CHILLING THE BIDDING PROCESS AND THEREBY HARMING THE ESTATES.

LCT has been interested, and remains interested, in bidding for some of the Debtors' assets. By making spurious and potentially defamatory allegations against LCT – and then using those allegations as a pretext to "disqualify" LCT as a potential bidder – the Debtors are harming their own estates and exposing the estates to potential adverse claims. These actions and allegations have also caused harm to LCT and other related Robindale entities. Although it is true that LCT and the Debtors are competitors, in many instances competitors can be among the most obvious and among the most interested potential bidders. Their presence and involvement can result in more robust sale processes and, ultimately, higher selling prices that benefit the estates and creditors as a whole.  Where feasible, debtors-in-possession and trustees therefore should encourage, rather than discourage, competitors' participation in the sale process. Competitors' involvement as motivated, aggressive bidders may help to maximize the value realized for an estate's assets.

Here, though, the Debtors seem intent on blaming LCT for perceived wrongs that lack any credible basis and/or blaming LCT for what might be a broken sale process. The Debtors have used their false accusations as a pretext to block LCT from participating in the sale process and are depriving it of the information necessary to formulate a suitable bid. Stunningly, in their Motion the Debtors complain that LCT had not yet submitted a bid or indication of interest as of February 14, 2025 – when the Debtors notified LCT that it was "disqualified" from ever being a "Qualified Bidder." *See* Motion at ¶ 21. Yet, on February 14 the deadline for submitting bids was still a full three weeks away! The bidding deadline will not arrive *until March 7, 2025.*

By falsely accusing LCT of wrongdoing and then barring LCT from further access to information in the VDR, the Debtors have decreased the likelihood that LCT will be a bidder and/or the amount of assets on which LCT would bid if permitted to do so. *See* Kroh Dec. at ¶ 31. The Debtors' continued allegations have had, and will continue to have, a bid-chilling effect on the bankruptcy sale process. *Id*. at ¶ 32. And if LCT (or any other Robindale affiliate) is not permitted to simultaneously operate its business while evaluating a prospective bid, then LCT will not be able to participate in the process as a prospective bidder. *Id*. at ¶ 33.

The Debtors' paranoid behavior toward LCT is undeserved and baseless. It's bad for these cases. And it's bad for the bankruptcy system generally. If debtors who are striving to sell their assets accuse their competitors (or other potential bidders) of misbehavior without any legitimate basis, as the Debtors have done here repeatedly, they will chill bidding and produce less robust sales. That, in turn, will result in smaller purchase prices and in smaller recoveries for creditors and equity holders.

## CONCLUSION

The Debtors' Accusations are meritless. LCT did not breach the Confidentiality Agreement or misuse Confidential Information. The Debtors have not cited a single specific breach or established any actual misuse, because none exists. The Debtors' pretextual decision to "disqualify" any bid that LCT might make is unjustified and counterproductive to the estates' best interests. The Debtors' threats and accusations are having a bid-chilling effect that may harm their own estates. And their behavior in these cases raises troubling implications about what effects such misguided behavior could have for asset sales in future bankruptcy cases.

Their Motion should be denied, LCT's access to the VDR should be restored, and the Court should grant to LCT such other relief as is just and proper, including the right to participate in the sale process and submit a bid.

Dated: March 3, 2025                                       Respectfully submitted,

                                                           BERNSTEIN-BURKLEY, P.C.

                                                           By: /s/ *Kirk B. Burkley*
                                                           Kirk B. Burkley, Esq. (PA 89511)
                                                           601 Grant Street, 9th Floor
                                                           Pittsburgh, PA 15219
                                                           Telephone: (412) 456-8108
                                                           Facsimile: (412) 456-8135
                                                           kburkley@bernsteinlaw.com